**2023-1719 and 2023-1721**

# United States Court of Appeals for the Federal Circuit

STRATOSAUDIO, INC.,

*Appellant,*

– v. –

HYUNDAI MOTOR AMERICA,

*Appellee.*

STRATOSAUDIO, INC.,

*Appellant,*

– v. –

VOLKSWAGEN GROUP OF AMERICA, INC.,

*Appellee.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2021-00721 and IPR2021-01267*

## BRIEF FOR APPELLANT

ROBERT GREENSPOON
WILLIAM W. FLACHSBART
DUNLAP BENNETT & LUDWIG PLLC
333 North Michigan Avenue,
Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com

*Counsel for Appellant*

AUGUST 1, 2023

COUNSEL PRESS, LLC (888) 277-3259

## CLAIMS AT ISSUE

U.S. Patent No. 8,166,081, Selected Claims

9. A system for combining multiple media comprising:

> [a] a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium;
>
> [b] a second receiver module configured to receive at least a second media signal content and uniquely identifying data specific to at least the second media content, the second media content received discretely from the first media content;
>
> [c] an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module;
>
> an input module configured to receive at least a response input responsive to the second media content; and
>
> [d] a transmitting module configured to transmit a response message having at least the uniquely identifying data specific to the second media content to a computer server.

15. The system of claim 9, wherein, in response to receiving the response message, the computer server is configured to correlate the response message to the second media content with the specific instance of the first media content.

Case: 23-1719 Document: 3 Page: 1 Filed: 04/20/2023

**FORM 9. Certificate of Interest** **Form 9 (p. 1)**
**March 2023**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1719

**Short Case Caption** StratosAudio, Inc. v. Hyundai Motor America

**Filing Party/Entity** StratosAudio, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 4/20/23 Signature: /s/Robert Greenspoon

Name: Robert Greenspoon

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| StratosAudio, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| White & Case LLP | John Scheibeler | Jonathan Lamberson |
| Ashley T. Brzezinski | Hallie Kiernan | David M. Tennan |
| Victoria A. Moffa | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 1

RULE 28(j) DUPLICATIVE CONTENT STATEMENT ........ 1

INTRODUCTORY STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

- A. About StratosAudio ........ 5
- B. IPR Petitions Against the ’081 Patent, and Scope of the Present Issues ........ 6
- C. Description of the ’081 Patent ........ 7
- D. Prior Art Used in the Only Two Successfully-Asserted Grounds ........ 14
  - 1. DeWeese ........ 14
  - 2. Ellis-2005 ........ 18
  - 3. Crosby ........ 20
- E. The Board’s Decisions ........ 21

SUMMARY OF THE ARGUMENT ........ 24

ARGUMENT ........ 25

- A. Standard of Review ........ 27
- B. The Board Erred to Hold that DeWeese Anticipates ........ 30
  - 1. Output System ........ 30
  - 2. Specific Instance ........ 32
  - 3. Two Modules and Discrete Receipt ........ 34
- C. The Board Erred to Hold that Ellis-2005 in view of Crosby Rendered Challenged Claims Obvious ........ 37

CONCLUSION ........ 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......... 29

*Apple Inc. v. MPH Techs. Oy*,
2022 U.S. App. LEXIS 6044 (Fed. Cir. 2022) .......... 28

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) .......... 27

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010) .......... 35, 36

*Cisco Sys., Inc. v. Egenera, Inc.*,
IPR2017-01341, Paper 10 (PTAB Nov. 13, 2017) .......... 36

*Comcast Cable Comm'ns., LLC v. Promptu Sys. Corp.*,
838 F. App'x 551 (Fed. Cir. 2021) .......... 35

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 28

*Engel Indus., Inc. v. Lockformer Co.*,
96 F.3d 1398 (Fed. Cir. 1996) .......... 35

*Gaus v. Conair Corp.*,
363 F.3d 1284 (Fed. Cir. 2004) .......... 35

*Hopkins Mfg. Corp. v. Cequent Performance Prods., Inc.*,
IPR2015-00613, Paper 9 (PTAB Aug. 7, 2015) .......... 36

*HTC Corp. v. Cellular Comm'cns. Equip., LLC*,
701 F. App'x 978 (Fed. Cir. 2017) .......... 35

*In re Am. Acad. of Sci. Tech Ctr.*,
367 F.3d 1359 (Fed. Cir. 2004) .......... 29

*In re Arkley*,
455 F.2d 586 (CCPA 1972) .......... 27

*In re Fritch*,
972 F.2d 1260 (Fed. Cir. 1992) .......... 29

*In re Gartside*,
204 F.3d 1305 (Fed. Cir. 2000) ........................................................................28

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ........................................................................27

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) .................................................................. 25, 27

*Institut Pasteur v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ........................................................................28

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) ...........................................................................33

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ........................................................................28

*InTouch Techs., Inc. v. VGo Communs., Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ........................................................................29

*Kloster Spreedsteel AB v. Crucible, Inc.*,
793 F.2d 1565 (Fed. Cir. 1986) ........................................................................27

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .........................................................................................29

*Lego Sys., Inc. v. MQ Gaming LLC*,
IPR2020-01446, Paper 14 (PTAB Feb. 16, 2021) ..............................................36

*LG Elects., Inc. and Hisense Co., Ltd. v. Polaris Powerled Techs., LLC*,
IPR2020-01337, Paper 11 (PTAB Mar. 9, 2021) ................................................36

*Merck & Cie v. Gnosis S.P.A.*,
808 F.3d 829 (Fed. Cir. 2015) ..........................................................................28

*Net MoneyIn v. Verisign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ........................................................................27

*Par Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ........................................................................27

*PersonalWeb Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ..........................................................................28

*Rembrandt Data Techs. LP v. AOL, LLC*,
641 F.3d 1331 (Fed. Cir. 2011) ........................................................................30

*TQ Delta, LLC v. Cisco Sys.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................29

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(4)(A) ....................1

35 U.S.C. § 319 ....................1

37 C.F.R. § 42.65(a) ....................29

Fed. Cir. R. 47.5 ....................1

**Other Publications:**

The American Heritage Dictionary of the English Language,
https://www.ahdictionary.com/word/search.html?q=instance
(last viewed July 9, 2023) ....................32

Dictionary.com, https://www.dictionary.com/browse/instance
(last viewed July 9, 2023) ....................32

The Oxford Learner's Dictionary,
https://www.oxfordlearnersdictionaries.com/us/definition/english/instance_1
(last viewed July 9, 2023) ....................32

The Oxford Pocket Dictionary of Current English,
https://www.encyclopedia.com/science-and-technology/computers-and-electrical-engineering/computers-and-computing/instance
(last viewed July 23, 2023) ....................32

## STATEMENT OF RELATED CASES

The following companion appeal might directly affect or be directly affected by this Court's decision in the instant case under Fed. Cir. R. 47.5: *StratosAudio, Inc. v. Volkswagen Group of America, Inc. and Hyundai Motor America*, 2023-1720.

## JURISDICTIONAL STATEMENT

This is a consolidated appeal of two final written decisions of the Patent Trial and Appeal Board (the "Board") entered respectively on January 23 and 24, 2023. (Appx0001-0052, Appx0053-0134). Appellant StratosAudio, Inc., timely filed its appeals on March 24, 2023. (Appx0712-0718, Appx2973-2978). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 319.

## RULE 28(j) DUPLICATIVE CONTENT STATEMENT

This appeal is companion to StratosAudio's appeal of another final written decision on a related patent: Appeal No. 2023-1720. The following sections of the two principal briefs filed today are substantially duplicative:

- Statement of the Case: About StratosAudio
- Argument: Standard of Review

## INTRODUCTORY STATEMENT

StratosAudio did not invent concurrent display of a main media type (*e.g.*, a song) alongside related media (*e.g.*, the song's title, or a targeted advertisement). Stated so broadly, such systems were old by the time of StratosAudio's entry into the field. It was commonplace for screens to show song data during playback.

Instead, the inventions of StratosAudio's challenged U.S. Patent No. 8,166,081 are improvements on such earlier systems. StratosAudio devised intricate and highly useful improvement-features that are far more specific and important. Such improvements (unlike the prior art) require receipt of data enabling identification of a specific instance of the media content received from a broadcast medium (*e.g.*, data identifying that particular song-transmission occurrence). In this way, the receiving device holds "data enabling the identification of a specific instance," which is a database-linked unique identifier, something akin to a unique serial number, for that instance of transmission. The invention's novel approach adds value to database operations that analyze (as one example) how well targeted ads perform, correlated with the database-linked unique identifier against any number of characteristics of that instance of transmission (song content, moment sent, geography of receipt, demographics of user, number of times media content presentation occurred, *etc*.). This novel approach even allows distinguishing repeated broadcasts of the same media content from the same source. StratosAudio's

added technological features thus laid the groundwork for enhanced business reporting.

Nonetheless, Appellees (Volkswagen Group of America and Hyundai Motor America) convinced the Board to shoehorn two rudimentary prior art concurrent-display systems into the scope of the challenged claims, leading to the Board's unpatentability decisions. Volkswagen's effort almost failed. It drew a rare dissent from one of the patent judges.[1]

Those primitive concurrent-display systems (prior art known as "DeWeese" and "Ellis-2005/Crosby") did not include data enabling the identification of a specific instance of the media content. The Board incorrectly identified "program guide data" (DeWeese) or "Packet IDs" that delineate digitally tunable channels (or "tracks") of a stream (Ellis-2005/Crosby), to read on the vastly different claimed concept of a "specific instance," *i.e.*, data identifying an occurrence. As shown

[1] The Government Accountability Office has raised concern that Board judges experience "pressure not to file a dissent or concurrence." PATENT TRIAL AND APPEAL BOARD: Increased Transparency Needed in Oversight of Judicial Decision-Making, Report to Subcommittee on Courts, Intellectual property, and the Internet, Committee on the Judiciary, House of Representatives (December 2022) (GAO-23-105336), 26; *see also id.* at 9 n.25 (noting judges not "awarded work credit for authoring dissents"), 69 (judge noting "my dissent would have reflected poorly on the Director, so the case was re-paneled . . . ."). This pressure (including Board financial incentives not to dissent because they do not get paid for such work) has led to due process challenges against AIA trials. *See* Brief of New Vision Gaming & Development, Inc. (ECF#34) in App. No. 2020-1400 (Fed. Cir.), at 22, 47-48. This background underscores how weak Volkswagen's case was, to lead one judge to dissent despite strong institutional barriers against doing so.

below, the Board's claim construction rendered important claim limitations superfluous—an anomalous result that is not correct.

Because of these and other Board errors, StratosAudio now appeals.

## STATEMENT OF THE ISSUES

1. Whether the Board erred to hold that DeWeese anticipated, despite established differences from the challenged claims, including: (1) (as the dissenting judge noted) absence of an output system configured to present concurrently first and second media content on an output of either a first "or" second receiver module; (2) absence of data enabling identification of a specific instance of first media; and/or (3) DeWeese's disclosure of a single DOCSIS modem, mapped improperly by the Board onto two separately-claimed receiver modules.
2. Whether the Board erred to hold that Ellis-2005 in view of Crosby rendered claims obvious, despite (1) proof that the "PIDs" of Ellis-2005 were digital channel identifiers, not data enabling identification of a specific instance of first media; and (2) no Board finding that any disclosure of Crosby filled this gap.
3. Whether the Board erred to hold that the prior art disclosed certain dependent claim limitations.

## STATEMENT OF THE CASE

### A. About StratosAudio

StratosAudio is a start-up company founded in 1999 by lead inventor of the ’081 Patent, Kelly Christensen. Beginning in the early 2000s, StratosAudio created a better media-infotainment experience through its innovative technology in real time interactive data services. StratosAudio’s technology allows a user to easily obtain and engage with additional information associated with media content of various broadcast streams. Early efforts included the creation of the StratosAudio Interactive Symphony Digital IF Radio working prototype, which was the 2004 Consumer Electronics Show (CES) in Las Vegas, Best of Innovations Awards Honoree with partners-in-build, Hyundai Autonet and Motorola. With this success at CES and the interest of major automotive and electronics companies like Hyundai Autonet and Motorola, StratosAudio continued innovating and refining its technology over the past twenty years.

StratosAudio has protected its innovative and novel technology through a set of patents, including the ’081 Patent. Over the years, several major car manufacturers have incorporated StratosAudio’s technology into their respective vehicle media console systems. StratosAudio filed suit in December 2020 against five of these auto-manufacturers, including Volkswagen, Volvo, Subaru, Mazda, and Hyundai, for infringement of seven patents, including the ’081 Patent.

### B. IPR Petitions Against the ’081 Patent, and Scope of the Present Issues

On April 16, 2021, Volkswagen Group of America filed the petition for what became IPR2021-00721. (Appx2261-2349). The Board issued its Final Written Decision on January 24, 2023. (Appx0053-0134). Though Volkswagen raised four IPR grounds, the Board denied three grounds and granted the petition on only one of them, in a divided 2-1 decision: finding claims 9-11 and 23 unpatentable based on anticipation by DeWeese, U.S. Published App. No. 2005/0262542 (Appx3795-3843). (Appx0125). Administrative Patent Judge Arbes filed a dissenting opinion, concluding that Volkswagen had not proved that DeWeese anticipated any claim, since it did not disclose the “output system” limitation. (Appx0126-0134). Since Volkswagen brought no cross-appeal of the Board’s affirmative rejection of the other three grounds, this appeal from the -00721 proceeding concerns solely the question of whether DeWeese anticipates the challenged claims.

On July 16, 2021, Hyundai Motor America filed the petition for what became IPR2021-01267. (Appx0175-0249). The Board issued its Final Written Decision on January 23, 2023. (Appx0001-0052). Hyundai (like Volkswagen) raised four grounds, and in this case, the Board only decided one of them—agreeing with Hyundai’s obviousness assertions against claims 9-11, 15 and 23 based on a combination of Ellis-2005, U.S. Published App. No. 2005/0227611 (Appx1304-1333), and Crosby, U.S. Patent No. 6,628,928 (Appx1177-1197). (Appx0051). With

only one ground decided at the Board, this appeal from the -01267 proceeding concerns solely the question of whether Ellis-2005 in view of Crosby renders the challenged claims obvious.

**C. Description of the ’081 Patent**

The ’081 Patent (Appx0140-0174) relates to media advertising and associating an advertising media signal with another media signal. Specifically, the ’081 Patent describes a novel system for combining multiple media content after discretely identifying each instance of the first media content (*e.g.*, content such as a radio program) and the second media content (*e.g.*, targeted advertisements). (Appx0156, 1:18-20; Appx4861-4862, ¶ 27). In advertising, it is desirable to associate products with specific characteristics and such associations may increase the chance that a potential customer will decide to purchase a product when the product is associated with a favorable characteristic. (Appx0156, 1:22-30). In view of this, the ’081 Patent states that an advertisement may be more effective if it is associated with an image of a celebrity or another media element that exhibits favorable characteristics. (Appx0156, 1:30-34; Appx4861-4863, ¶¶ 27-29). As depicted in Figure 1 (reproduced below), the multimedia system of the ’081 Patent can comprise a first transmitter 3, primary device 4, ancillary device(s) 5, media association system 2, advertisement entity 6, and control management system 100. (Appx0142, Fig. 1; Appx4863-4864, ¶¶ 31-32).




The first transmitter 3 (*e.g.*, a radio broadcaster) may transmit the first media content to the primary device, or any other devices, systems, or entities in the multimedia system, including the ancillary device. (Appx0160, 10:56-58 ("the first transmitter 3 can send a first media signal 111 to the primary device 4 and/or ancillary device 5"), Appx0161, 12:30-35 ("it is clear that the first media signal 111 could further be transmitted to any number of devices or entities, as well as the ancillary devices 5"); Appx4864-4865, ¶ 33). The media association system can provide a related media signal 114 to the primary and/or ancillary devices. (Appx0160, 9:43-48). Similarly, "the media association system 2 and the advertisement entity 6 can provide an advertisement media signal 113 to the primary and/or ancillary devices 4, 5." (Appx0161, 12:37-40; *see also* Appx0166, 21:49-51 ("The ancillary device 5 can receive the first media signal 111 and the advertisement

signal 113 directly from the first transmitter 3 and/or the media association system 2."); Appx4864-4865, ¶ 33).

The '081 Patent describes three ways of transmitting the first media signal and the second media signal to the devices: (1) the second media signal is integrated with the first media signal; (2) "the first media signal and the second media signal are ***separate and discrete***;" and (3) the first media signal is intercepted during transmission and the second media signal is added to the transmission. (Appx0157-0158, 4:64-5:3 (emphasis added), Appx0160-0161, 10:63-11:1, Appx0161, 11:14-20). The challenged claims, namely independent claim 9 and dependent claims 10, 11, 15 and 23, are directed to those embodiments where the first media content is transmitted separately and discretely from the second media content. (Appx0173, cl. 9, 35:30-31; Appx4865, ¶ 34).

The '081 Patent explains that when the first and second media signals are sent separately, a "unique identifier 115" can be assigned to "each media content segment conveyed via the [first or associated] media signal." (Appx0161, 11:32-37, Appx0145, Fig. 1D). A unique identifier may be used to identify and distinguish each instance of a broadcast of media content from every other instance of a broadcast of media content, since "the unique identifier 115 is tied to the specific instance of each media content segment conveyed via the first media signal 111." (Appx0161, 11:32-37). The '081 Patent further exemplifies the relationship between

the "unique identifier" and identification of the "specific instance of each media content segment" within disclosure of the discrete storage of each identifier in database 1111:

> The unique event identifier and/or identifiers are preferably implemented as a part of a database that allows for the storage and/or retrieval of the identifier and/or data associated with the identifier. By means of the unique event identifier and/or identifiers, ***reports can be generated*** on the performance of various aspects of the system such as who, what, when, where, why, which, and/or how an event within the system occurred, including the number of times an event within the system occurred; locations for events; what prompted an event; devices, signals and/or users associated with events and/or means associated with the events.

(Appx0159, 7:65-8:9, emphasis added).

This database capability brings benefits.

> As illustrated in FIG. 1D, the unique identifier 115 is database-linked thereby allowing a user (for example, a user of the control management system 100, media association system 2 and/or advertisement entity 6) to conduct a search or lookup of the information identified by the unique identifier 115 to determine the location, the user device, the time of transmittal, the program and/or media content in the first media signal, the available options for response to the user of the device, and/or other identifying characteristic information.

(Appx0161, 11:38-46; Appx4865-4866, ¶ 35).

The ’081 Patent shows that data enabling the identification of a "specific instance" of each media content segment (in other words, an occurrence) is determined at each and every broadcast. (Appx4866-4867, ¶ 36). In particular, the ’081 Patent states, "the broadcast scanning system 160 is configured to: analyze the

broadcast streams received by a plurality of broadcast sources 120 to obtain or identify the media content transmitted in the broadcast streams" and "assign a unique event identifier 115 specific to the broadcast of each specific broadcast stream." (Appx0171, 32:5-11).

The '081 Patent incorporates by reference a co-pending application (which issued as U.S. Patent No. 8,875,188 (Appx5134-5164) for its disclosure regarding how the broadcast scanning system 160 determines the unique event identifier. (Appx0171, 32:14-20). The incorporated-by-reference application confirms that the broadcast scanning system analyzes the broadcast stream and determines the unique event identifier enabling identification of the specific instance of the media content at the moment the broadcast occurs. *See, e.g.,* (Appx5152, 10:4-42, Appx5153, 12:32-38, Appx5154, 14:31-34; Appx4866-4867, ¶ 36). This unique event identifier travels with the first (or other) media content to the intended receiver.

The '081 Patent states that the unique event identifier data is "preferably implemented as a part of a database that allows for the storage and/or retrieval of the identifier and/or data associated with the identifier." (Appx0159, 7:65-8:1). As noted already, the '081 Patent states, "[b]y means of the unique event identifier and/or identifiers, reports can be generated on the performance of various aspects of the system such as who, what, when, where, why, which, and/or how an event within the system occurred, including the number of times an event within the system

occurred; locations for events; what prompted an event; devices, signals and/or users associated with events and/or means associated with the events." (Appx0159, 8:1-9; Appx4867, ¶ 37). The '081 Patent specification discusses "time of day" in a context distinct from discussion of the unique event identifier—a "conditional filter" used during control of a management server—but never treats "time of day" as a possible unique identifier embodiment or example. (*See* Appx0161-0162, 11:63-12:10).

Once the system receives the first media content, the second media content, and their respective identifying data, either the primary device 4 and/or the ancillary device 5 presents concurrently both media content. (Appx0162, 14:5-13 ("then have either the primary device 4 and/or ancillary device 5 to present the advertisement signal 113 at the same time or substantially the same time as the first media signal 111 is presented to the user of either the primary device 4 and/or ancillary device 5"), Appx0162, 14:27-31 ("Next, the primary device 4 and/or ancillary device 5 present the advertisement signal media signal 113 at the same time or nearly the same time as the first media signal 111 is presented to the user of primary device 4 and/or ancillary device 5."); Appx4867-4868, ¶ 38). When discussing presentation of the first and second media content on an output, the use of "and/or" in the specification versus "or" in claim element 9[d] of the challenged claims has meaning. (Appx4867-4868, ¶ 38). While the specification contemplates that the *first* and *second media content* may be presented separately or together on the primary

device ***and/or*** the ancillary device, claim element 9[d] requires concurrently presenting the *first media content* and *second media content* together on *an output of the first receiver module* **or** *the second receive module*. (Appx4867-4868, ¶ 38).

The ’081 Patent explains that “[t]he ancillary device 5 can comprise superior bandwidth, storage capacity, and/or processing power relative to the primary device 4, allowing the ancillary device 5 to transmit more complex data to the media association system 2.” (Appx0163, 15:43-47; Appx4868-4869, ¶ 39). “For example, if a media signal 114 and/or an advertisement media signal 113 cannot be viewed on the primary device 4, then a user can view the media signal 114 and/or the advertisement media signal 113 on an ancillary device 5.” (Appx0166, 21:32-36; *see also* Appx0168, 25:26-29 (“Such steps can reduce bandwidth requirements, restrict access to the related media signal 114, and allow it to be viewed on the primary and/or an ancillary devices 4, 5 capable of viewing media in a certain set of formats.”); Appx4868-4869, ¶ 39).

The ’081 Patent further explains the system includes a means of allowing a user to input or respond to the media content being presented. (Appx0163, 15:9-14). The user responses can include responses to interactive media content, such as polls, voting, or games. (Appx0161, 12:54-57, Appx0163, 15:12-14; Appx4869, ¶ 40).

### D. Prior Art Used in the Only Two Successfully-Asserted Grounds

Prior art applied at the Board included only rudimentary concurrent-display technologies. Each lacks any facility or capability for post-display analysis of user interaction with a second media (*e.g.*, responses to a targeted ad) cross-correlated with the first media instance (*e.g.*, song or ad occurrence) that accompanied such interaction. The ’081 Patent’s claim 15 (challenged only in the -01267 proceeding) in particular calls out a specific mechanism for this: “The system of claim 9, wherein, in response to receiving the response message, the computer server is configured to correlate the response message to the second media content with the specific instance of the first media content.” (Appx0173).

#### 1. DeWeese

DeWeese (asserted only in the -00721 proceeding by Volkswagen) discloses television viewing concurrent with user “chatting” with friends, each on the same screen. It describes an interactive television program, which permits “users who are watching a television program or channel to engage in real-time chat communications with each other.” (Appx3828, ¶ 11); Appx4880, ¶ 61). In an exemplary embodiment, DeWeese teaches a television chat system 10. (Appx3796, Fig. 1A (reproduced below), Appx3830, ¶ 51).




*FIG. 1A*

DeWeese's television chat system 10 contains a main facility 12 with a program guide database 14, television distribution facility 16 for distributing television programming and other information, and user television equipment 20. (Appx3830, ¶¶ 51-52; Appx4881, ¶ 62).

DeWeese explains that television distribution facility 16 distributes program guide data and other information to the user television equipment 20. (Appx3830, ¶ 55; Appx4881, ¶ 63). In addition to the program guide data, "[c]ommunication paths 24 [] allow television distribution facility 16 to distribute scheduled television programming, pay programming, real-time communications, chat requests and other

video and audio information to user television equipment 20." (Appx3830, ¶ 55; Appx4881, ¶ 63). Each television distribution facility may also distribute real-time communications and chat requests between the user television devices associated with the distribution facility. (Appx3830, ¶ 57; Appx4881, ¶ 63). The user television equipment 20 has a receiver, set-top box 26, that receives the television programming and other information. (Appx3831, ¶ 59; Appx4881, ¶ 63). The program guide data may be distributed to set-top box 26 continuously, periodically, or a combination of the two, whereas chats are distributed in real-time. (Appx3831, ¶ 60; Appx4881, ¶ 63).

DeWeese discloses a single device "user television equipment 20," that receives both the television programming and chats. (Appx3830, ¶ 55 ("Communication paths 24 preferably have sufficient bandwidth to allow television distribution facility 16 to distribute scheduled television programming, pay programming, real-time communications, chat requests and other video and audio information to user television equipment 20 in addition to non-video program guide information and communications."); Appx4881-4882, ¶ 64). The television equipment 20 then presents both the first media content and second media content via the display screen 200. (Appx3808, Fig. 9, Appx3835, ¶ 97 ("The divided nature of screen 200 allows users to simultaneously watch a television program and send

real-time communications to other users who are viewing the same program at the same time."); Appx4882-4883, ¶ 65).

DeWeese's Figure 9 (reproduced below) depicts the display screen of DeWeese's system.




FIG. 9

(Appx3808, Fig. 9; *see also* Appx4882-4883, ¶ 65).

DeWeese explains that the display screen can contain video for television program 202 in one region 203 and chat messages in the chat room region 206. (Appx3829, ¶ 31, Appx3835 ¶ 93; Appx4883, ¶ 66). In addition, advertisement 201 may be displayed in region 205 of display screen 200. (Appx3835 ¶ 93; Appx4882-4883, ¶ 65).

In exactly one (and only one) sentence, DeWeese discloses that its set top box includes a DOCSIS modem. (Appx3831, ¶ 59). The DOCSIS modem is never mentioned again, and its sole mention does not expressly describe what role it plays in the system. However, Volkswagen's expert opined (and the Board accepted) that this DOCSIS modem was the exact structure a person of skill in the art would understand to serve as the module that receives *both* television signals *and* two-way chat communication data. (Appx0109).

**2. Ellis-2005**

Ellis-2005 (asserted only in the -01267 proceeding by Hyundai) discloses music listening and facilities to purchase merchandise, both controlled on the same screen. It discloses a single piece of "user music equipment 22," that receives both the first and second media content. (Appx1325-1326, ¶¶ 42-43). The user music equipment 22 receives signals related to channels through input 26 to set-top box 28. (Appx1325-1326, ¶ 42). Within set-top box 28 are two tuners, tuner 50 and tuner 51. (Appx1310, FIG. 3, Appx1325-1326, ¶¶ 42-43). A user may tune to a channel on tuner 50 and the signal is provided to video output 30 of the user music equipment 22. (Appx1310, FIG. 3, Appx1325-1326, ¶ 42). A user may use a different tuner, tuner 51, to tune to a second signal and obtain in-band digital data for that signal. (Appx1326, ¶ 43). Audio and video content received from tuner 50 may be displayed for the user by user music equipment 22 through the television 36. (Appx1326, ¶

46). Similarly, audio content may be played either via television 36 or on audio system 37. (Appx1326, ¶ 46). The user music equipment may tune to the first music channel on tuner 50 and present this content audibly while tuning tuner 51 to a second music channel and displaying the in-band music information for the second channel. (Appx1331, ¶¶ 93-94, Appx1320, FIG. 10; *see also* Appx1980-1981, ¶ 51). Such second channel, in turn, uses its single analog carrier frequency to carry data corresponding to multiple digital, logical channels. (Appx1325, ¶ 41).

Ellis-2005 describes the use of packet identifiers ("PID") and PID maps to locate the media content on the digital channels. A "suitable" approach to distributing digital music programming is to provide multiple digital channels on a single analog "channel." (Appx1325, ¶ 41). The digital channel may also include a number of "tracks," for example, "video tracks, audio tracks, and data or other suitable tracks." (Appx1325, ¶ 41). Packets on a single carrier frequency are multiplexed, and the PID within each packet establishes on a packet-basis which logical "track" on that carrier frequency the packet belongs to. (Appx1325, ¶ 41). The PID identifies which track the content is on and the PID map is essentially a catalog of which PIDs are associated with each channel. (Appx1325, ¶ 41; *see also* Appx1981, ¶ 52).

Finally, Ellis-2005 describes a way to use the display of music information to purchase merchandise. (Appx1330, ¶ 87). No discussion of merchant-server

processes exists in Ellis-2005. For example, there is no disclosure of whether or to what extent PIDs would be used during or after a purchase transaction at a merchant server.

**3. Crosby**

Crosby is yet another rudimentary concurrent-display system involving music and music information. Only two aspects of Crosby are possibly germane to the issues on appeal—each aspect resulting only in "program segment" identification, not instance-information. First, a mobile unit can transmit signals identifying a broadcast (*e.g.*, carrier frequency of the broadcast, date and time the broadcast was received, geographical location of the mobile unit at the date and time the broadcast was received, subscriber ID, or mobile unit ID) to the operations center 110. (Appx1179, FIG. 1, Appx1191, 7:30-36). In response, the network operations center determines the identity of the broadcaster and the specific program segment selected by the subscriber. (Appx1191, 7:36-41). The network operations center then downloads information pertinent to the program segment and provides that information to the subscriber via a website and allow the subscriber to download the information from the website if they decide to do so. (Appx1191, 7:41-50; *see also* Appx1978-1979, ¶ 49). Note the contrast with the '081 Patent's claim 9, in which a "receiving module" takes in identifying data: in this Crosby embodiment, the

broadcast signal received at the device does *not* include identifying data. (Appx1191, 8:48-53).

Second, in Crosby's alternative embodiment, "program segment identification information" and information "identifying the broadcaster" is encoded in the broadcast signal. (Appx1191, 8:53-56, Appx1193, 11:44-58). Crosby describes various program segment information such as song title, CD title, performer name, record label, etc. (Appx1191, 7:62-66, Appx1192, 10:7-15). This program segment information (again, content-identifiers, not database-linked unique instance-identifiers) may be displayed to the user using a graphic display. (Appx1193, 11:55-58). In this embodiment, the system need not determine the program segment or date and time of broadcast, because it functions without program segment or date and time of broadcast. (Appx1189, 4:51-58).

Thus, Crosby does not teach or suggest including date and time of broadcast in the encoded broadcast signal, nor any other mechanism to create anything akin to a piece of transmission-instance identification data. (Appx1193, 11:37-63; Appx2013, ¶ 115).

## E. The Board's Decisions

In the -00721 proceeding, with Judge Arbes dissenting, the Board majority (2-1) agreed with Volkswagen that DeWeese anticipated claims 9-11 and 23. (Appx0125). The majority brushed aside the fact that there is no second display

output of any kind in DeWeese (over the viewpoints of Judge Arbes and StratosAudio), based on its manner of parsing the grammar of the "output system" limitation. Whereas the claim language states: "an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module" (Appx0173, 35:32-35), the majority differently, and expressly, construed the limitation as:

> 1) the output system must be able to present, at the same time, both the first and second media content on an output of the first receiver module; or 2) the output system must be able to present, at the same time, the first and the second media content on an output of the second receiver module.

(Appx0073-0074). Judge Arbes disagreed, in dissent noting that "the plain language of claim 9 supports Patent Owner's interpretation." (Appx0127). Judge Arbes concluded: "Thus, the [claimed] system has (at least) two receiver modules and each has its own output." (Appx0127). The differences in claim construction were stark (Judge Arbes: a single system "configured to present" on structure 1 "or" structure 2; the majority: a system "able to present" on structure 1 or a system (not necessarily the same one) "able to present" on structure 2). Under plain meaning, Judge Arbes would have denied Volkswagen's petition in its entirety.

All panel members joined in the conclusion that DeWeese disclosed the "specific instance" limitation, based solely on "program guide" information being received (such as TV listings, program times, channels and titles generated

beforehand at the main facility). (Appx0112-0113). The Board declined to infer that data meeting this claim limitation had to be "dynamically determined," despite StratosAudio's plain meaning explanation that an instance is an "occurrence." (Appx0112-0113; Appx02591, Appx2616-2618).

And all panel members also joined in rejecting StratosAudio's showing that Volkswagen relied on the same structure (a DOCSIS modem) as corresponding to both the first receiver module and the second receiver module, despite claim language that requires respective claimed "receiving modules" to be different, and requiring that the second media content must be received "discretely from" the first media content. (Appx0108-0111). The Board accepted Volkswagen's expert's explanation that separately-named "first" and "second" claimed "modules" can be subparts of one another, that a DOCSIS modem will have respective media-type packets, that such packets would be "interleaved" with "header" information allowing a "first" type to be distinguished from a "second" type, and thereby media types traveling over the exact same physical structure in the exact same media stream destined for the exact same display screen, travel over respective "first" and "second" modules and are somehow "discretely separated" from one another. (Appx0110-0111).

In the -01267 proceeding, the Board held that the Ellis-2005 PIDs (packet identifiers) satisfied the limitation of "data enabling the identification of a specific

instance of the first media content." (Appx0021-0027). The Board did not reach Hyundai's alternative argument that Crosby independently discloses this limitation. (Appx0022-0024).[2] The Board likewise accepted Hyundai's expert's non-textual inferences that the limitations of dependent claim 15 (regarding a server configured to correlate a response message to second media content with the specific instance of the first media content) would be found in the Ellis-2005/Crosby combination. (Appx0040-0046).

## SUMMARY OF THE ARGUMENT

Rudimentary, primitive, combined-display technologies of the prior art did not render any challenged claim unpatentable.

Since any of at least three limitations of claim 9 are absent from DeWeese, the Board erred to hold that DeWeese anticipated. These are: (1) absence of an output system configured to present concurrently first and second media content on an output of either a first "or" second receiver module (as Judge Arbes agreed in dissent); (2) absence of data enabling identification of a specific instance of the first

[2] The Board expressed its holding based on the combination ground (Ellis-2005 with Crosby), even though a separate Hyundai ground (not addressed at the Board) asserted that Ellis-2005 alone established single-reference obviousness. This Board approach potentially mooted StratosAudio's explanations why there was no reason to combine. Should those explanations become relevant again in view of any Hyundai response argument, StratosAudio would, in reply, explain the Board's error in rejecting them.

media content; and/or (3) DeWeese's disclosure of a single DOCSIS modem, mapped improperly by the Board onto two separately-claimed receiver modules.

Since Ellis-2005 discloses only PIDs which identify logical tracks, but does not disclose data enabling identification of a specific instance of the first media content, the Board erred in its obviousness conclusions that relied on a combination of Ellis-2005 and Crosby. The Board did not reach or decide the use of any disclosure from Crosby for this limitation, making Crosby essentially irrelevant to this appeal.

## ARGUMENT

In determining patentability in an IPR, the Board must (1) make necessary factual findings supported by substantial evidence and (2) articulate logical and rational reasons for its decision based on that substantial evidence. *See In re NuVasive, Inc.*, 842 F.3d 1376, 1381-82 (Fed. Cir. 2016) (cleaned up). The Board failed to fulfill either of these obligations, and in doing so, committed independent and overlapping reversible errors. In short, the Board strained to find similarities between the claimed invention and two to three rudimentary and primitive concurrent-display technologies of the prior art, but erred to do so.

First, Judge Arbes in dissent was correct that DeWeese does not anticipate, based on the claimed "output system" absence. The Board cast aside plain meaning,

and mistakenly rewrote unambiguous claim language to match the prior art's single output display. Second, the Board misconstrued "specific instance" as a matter of law, by not applying its plain meaning of an "occurrence," and incorrectly finding that DeWeese's program guide information (mere identification of content organized prior to broadcast in one-hour time blocks) qualifies somehow for the claim (requiring data identifying a ***specific instance*** of the first media content). Third, the Board illogically held that one DOCSIS modem can read on two separately-claimed modules, and illogically held that interleaved packets with expert-inferred headers—features divined not from words in the reference but from an expert's declaration—qualified as respective types of data "received discretely" from one another.

Concerning the Ellis-2005/Crosby combination, the Board carried forward its misconstruction of "specific instance," deepening its errors, irrationally applying that language to PIDs—mere digital channel-track indicators within packets traveling on one carrier frequency. The Board found that PIDs are "data enabling the identification of a specific instance of the first media"—an impossibility since a track in this context, under one PID datum, can carry many instances, occurrences, and items of content, including recurrences of the same media content. The Board likewise irrationally found in the Ellis-2005/Crosby combination disclosure of the specific claimed features of claim 15 (an intricate correlation configuration at a

particular server), in the absence of any textual basis permitting such conclusions, relying instead on pure *ipse dixit* say-so by Hyundai's expert.

**A. Standard of Review**

In determining patentability in an IPR, the Board must (1) make necessary factual findings supported by substantial evidence and (2) articulate logical and rational reasons for its decision based on that substantial evidence. *See NuVasive v.* 842 F.3d at 1381-82 (cleaned up).

An anticipation conclusion requires proof that "the claimed subject matter is identically disclosed or described in 'the prior art.'" *Net MoneyIn v. Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) (quoting *In re Arkley*, 455 F.2d 586, 587 (CCPA 1972)). Similarly, a party asserting that a patent claim would have been obvious carries the burden of proving that a proposed combination will achieve the claimed invention. *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1193 (Fed. Cir. 2014); *In re Magnum Oil Tools Int'l, Ltd*. 829 F.3d 1364, 1381 (Fed. Cir. 2016). The absence from the prior art of a single claim element usually will foreclose both anticipation and obviousness. *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1362-63 (Fed. Cir. 2016); *Kloster Spreedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1571 (Fed. Cir. 1986).

This Court reviews final written decisions of the Board to "ensure that they are not arbitrary, capricious, an abuse of discretion, otherwise not in accordance with

law or unsupported by substantial evidence." *PersonalWeb Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992 (Fed. Cir. 2017) (cleaned up); *see also Apple Inc. v. MPH Techs. Oy*, 2022 U.S. App. LEXIS 6044, *6 (Fed. Cir. 2022) ("What a piece of prior art teaches presents a question of fact.") (internal citation omitted). This Court reviews the Board's legal conclusions (such as claim construction) *de novo* and underlying factual findings for substantial evidence. *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 833 (Fed. Cir. 2015). Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion…. Mere uncorroborated hearsay or rumor does not constitute substantial evidence." *In re Gartside*, 204 F.3d 1305, 1312 (Fed. Cir. 2000) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)).

To evaluate factual findings, this Court must determine "whether a reasonable fact finder could have arrived at the agency's decision" based on the "record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016) (quoting *Gartside*, 203 F.3d at 1312). The Court reverses when a Board factual finding is not based on substantial evidence. *See Institut Pasteur v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013) (reversing inter partes reexamination rejection upheld by the Board because the Board lacked substantial evidence to conclude that the prior art disclosed a particular claim limitation).

Conclusory expert opinions are not substantial evidence. *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1358-59 (Fed. Cir. 2019). "Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight." 37 C.F.R. § 42.65(a); *see also In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1368 (Fed. Cir. 2004). *Ipse dixit* expert declarations "fail to provide any meaningful explanation for why one of ordinary skill in the art would be motivated to combine [cited] references *at the time of [the] invention*," and further "fail to explain why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*." *TQ Delta*, 942 F.3d at 1362 (citing *InTouch Techs., Inc. v. VGo Communs., Inc.*, 751 F.3d 1327, 1353-54 (Fed. Cir. 2014) and *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012)) (emphasis in original). Moreover, "one cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention." *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007) ("claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

## B. The Board Erred to Hold that DeWeese Anticipates

In view of the foregoing legal standards, DeWeese does not anticipate claims 9-11 or 23, and the Board erred to conclude that it does.

### 1. Output System

First, Judge Arbes explained the error in the majority's "output system" analysis, based on of its easily-observed misconstruction of the "output system" language of claim 9. Judge Arbes was correct, and this Court should adopt his reasoning. As he explained, this language is clear and unambiguous, and requires the capacity to present at two outputs at two modules (the "first receiver module" and "second receiver module"). (Appx0127-0128). The word "or" at the end of the "output system" limitation is meaningful—it signifies the presence in the "configured" "output system" of two outputs. Indeed, the Board's parsing of this limitation lends it a scope identical to this underline/strikethrough rewrite of the actual claim language:

> an output system configured to present concurrently the first media content and the second media content on an output of ~~the first~~ a receiver module ~~or the second receiver module~~.

This was error, because the task of claim construction is not to rewrite claims, especially when claim language is clear and unambiguous. *Rembrandt Data Techs. LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011).

Consequently, the claimed "output system" (under its actual plain meaning) must have a configuration / capability to present concurrently the first and second media contents on either of two extant outputs. For example, a song may be played (the "first" media content) concurrently with display of an ad for a particular truck (the "second" media content) on one device. But when that occurs, that must happen as an alternative to such events happening on an already-configured, alternative, extant device that also stands ready in the overall system. In the '081 Patent, the preferred embodiment shows the two distinct outputs in the form of a mobile phone device, and a car radio. "The primary device 4 illustrated in FIG. 1 may be a portable device, such as a … cellular phone" and "[t]he ancillary device can be portable, mobile such as a radio in a car or fixed in place." (Appx0159, 8:44-47, 8:58-60). These are both extant at the same time in the overall system and capable of concurrent display, even if only one device performs that role at a time.

When properly construed as just described (and as Judge Arbes explained), there is no dispute that DeWeese does not disclose the "output system" of claim 9. The only DeWeese output that Volkswagen attempted to read on the claim with its petition was the single television screen output. (Appx0130-0131). It did not identify any alternative output device that stood ready and already-configured at the same time alternatively to perform that role. Thus, this Court should reverse for this reason alone, in accord with Judge Arbes's rare and meaningful dissent.

**2. Specific Instance**

The Board separately erred to hold that DeWeese disclosed "data enabling the identification of a specific instance of the first media." The plain meaning of "instance" in this context is an "occurrence." The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=instance (last viewed July 9, 2023) ("A case or occurrence"); Dictionary.com, https://www.dictionary.com/browse/instance (last viewed July 9, 2023) ("1. a case or occurrence of anything"); The Oxford Pocket Dictionary of Current English, https://www.encyclopedia.com/science-and-technology/computers-and-electrical-engineering/computers-and-computing/instance (last viewed July 23, 2023) ("1. an example or single occurrence of something"); *see also* The Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/instance_1 (last viewed July 9, 2023) ("a particular example or case of something"). The word "specific" in the claim, if anything, doubles down on this denotation. The intrinsic record is consistent. The incorporated-by-reference patent document discusses that the specific-instance data of the preferred embodiment is constructed at the moment of transmission. *See* Statement of the Case, Section C, *supra*.

The Board's cavalier reading of this limitation on DeWeese shows that the Board simply read the term out of the claim, which is improper. Observe how the

following strikethrough rewriting of the claim equally reads on the DeWeese program guide information as the Board's existing analysis does:

> a first receiver module configured to receive at least a first media content and data enabling the identification ~~of a specific instance~~ of the first media content from a first broadcast medium.

The identified DeWeese data was simply "data enabling the identification of the first media content." Put another way, the Board rendered the "specific instance" language superfluous in its interpretation and application.

That was legal error. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021). DeWeese's program guide information certainly enables "identification of the first media content." But it does not enable "identification of ***a specific instance*** of the first media content" because it generically refers to the content. This Court may rely on its own experience with television program guides. If programming gets interrupted (*e.g.* there is an earthquake in San Francisco during a sports game and breaking news takes over), the program guide does not change, even as distinct instances of unscheduled "media content" override the scheduled programming. The present invention would recognize (and uniquely identify) the breaking news segments, plus the programming segments and ads within the one hour block, overcoming such weaknesses in programming guides (like DeWeese's).

Since the Board not only ignored plain meaning of "specific instance," but also rendered the entire term superfluous, and since respecting the proper meaning

of the term forecloses DeWeese from anticipating, this Court should independently reverse for this reason (should it need to reach it).

**3. Two Modules and Discrete Receipt**

Finally, if the Court even needs to reach it (it should not in view of the two foregoing independent errors discussed above), a third independent error, when corrected, should lead this Court to reverse the DeWeese anticipation holdings. The claim language denotes that, on the second receiver module, the "second media content" (*e.g.*, music information to be displayed, or a targeted ad) must be "received discretely from the first media content." (Appx0173, 35:27-31). Volkswagen's theory (propounded through its expert) reads each of claim 9's first two claim limitations on the same DOCSIS modem of DeWeese, during its receipt of a single packet stream. (Appx0102-0111). In other words, the same DOCSIS modem in DeWeese, in a single moment in time, according to Volkswagen's expert analysis adopted by the Board, was both the "first receiver module" to carry the "first media content" (DeWeese's music content), and the "second receiver module" to carry the "second media content received discretely from the first media content." (Appx0102-0111).

The Board's endorsement of Volkswagen's and its expert's conflation was irrational and contrary to law. The law is clear: "Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are

'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)); *see also Comcast Cable Comm'ns., LLC v. Promptu Sys. Corp.*, 838 F. App'x 551, 553-554 (Fed. Cir. 2021) (affirming Board's determination that a petitioner failed to demonstrate unpatentability when it mapped two distinct limitations to the same element in the prior art); *HTC Corp. v. Cellular Comm'cns. Equip., LLC*, 701 F. App'x 978, 982 (Fed. Cir. 2017) (unpublished) ("The separate naming of two structures in the claim strongly implies that the named entities are not one and the same structure."); *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1405 (Fed. Cir. 1996) (concluding that where a claim provides for two separate elements, a "second portion" and a "return portion," these two elements "logically cannot be one and the same").

Despite this clear law, the Board improperly mapped, and allowed Volkswagen and its expert to map, the same element in the prior art (the DOCSIS modem, within DeWeese's set top box) to multiple distinct components of the claims, and did not rebut the clear implication that the claimed components are distinct. *See Becton, Dickinson & Co.*, 616 F.3d at 1254. Specifically, Volkswagen's position maintained that the self-same DOCSIS modem in DeWeese served to receive ***both*** television data ***and*** chat data—***both*** of the data types Volkswagen

respectively read on "first media content" and "second media content." (Appx0107-0111).

The Board's error was particularly odd, since the Board often recognizes when a ground maps the same element or teaching in a reference to multiple claim elements, and commonly denies IPR institution in such cases. *See, e.g., Lego Sys., Inc. v. MQ Gaming LLC*, IPR2020-01446, Paper 14 at 12-14 (PTAB Feb. 16, 2021); *LG Elects., Inc. and Hisense Co., Ltd. v. Polaris Powerled Techs., LLC*, IPR2020-01337, Paper 11 at 18 (PTAB Mar. 9, 2021); *Cisco Sys., Inc. v. Egenera, Inc.*, IPR2017-01341, Paper 10 at 14-15 (PTAB Nov. 13, 2017); *Hopkins Mfg. Corp. v. Cequent Performance Prods., Inc.*, IPR2015-00613, Paper 9 at 12 (PTAB Aug. 7, 2015) (all denying institution when the petition mapped a single element in the prior art to at least two separately recited elements in the claim). Because "first receiver module" in 9[a] is separately recited from the "second receiver module" in 9[b], the clear implication of the claim language is that those elements are distinct components. *See Becton, Dickinson & Co.*, 616 F.3d at 1254. In failing to recognize this principle, the Board profoundly erred.

To be sure, the Board noted that the term "module" as such received a broad construction within the intrinsic record. (Appx0109-0110). Within the patent specification, it is true that, generically, "modules" in a general sense can be deemed part of one another, one module can be a subset of another module, and modules

may be logical rather than physical. (Appx0109-0110). Yet none of this definitional broadening language for the plain word "module" nullifies the clear command of claim language later in the patent document. Such claim language (which controls) denotes that two separate modules must exist, and they must do separate, different and distinct things. In other words, the claim (not the specification) controls. The claim *first* requires that receiver modules are separate (there is a "first" one and a "second" one, and the second one has its "media content received discretely"). Once this is understood, only *then* does specification lend breadth to the construction of any one individual module that happens to meet the claimed criteria, without negating the already-claimed and reinforced separateness.

* * *

As shown, this Court should reverse the anticipation holding over DeWeese, for any one or more of three overlapping reasons.

### C. The Board Erred to Hold that Ellis-2005 in view of Crosby Rendered Challenged Claims Obvious

Separately, in the -01267 proceeding, the Board erred to hold claims 9-11, 15 and 23 unpatentable as obvious over Ellis-2005 in view of Crosby. The Board's conclusion that Ellis-2005 discloses the "specific instance" limitation is particularly

confused and irrational.[3] The Board concluded: "We have not been directed to anything in the record that would require restricting the claim term 'identification' to distinguishing between two or more instances of the same media content, as Patent Owner argues, as opposed to identifying a specific instance of media content by either where the data for that media content is within the stream or by distinguishing between different music 'tracks' in the stream." (Appx0024).

Under scrutiny, this statement reveals utter confusion on the part of the Board. The claim language requires "data enabling the identification of a specific instance of the first media content." If data identifies an occurrence (*e.g.*, by reflecting something akin to a unique serial number for a particular transmission to a particular user on a particular stream for that particular content), it will necessarily "distinguish[] between two or more instances of the same media content." Conversely, it is preposterous to say that data can identify a "specific instance" when all it does is identify where data for media content is within a stream. Likewise, the Board's usage of the terminology "music 'tracks' in the stream" in its phrasing quoted above openly exposes its misunderstanding of how the term "track" is used

[3] As mentioned, the Board did not reach to Crosby for disclosure of the "specific instance" data of claim 9. Since this is an APA appeal, it would be beyond the power of this Court to consider adoption of factual findings not made by the Board. Even so, if Hyundai were to make procedurally improper contentions about Crosby in these proceedings, it does not disclose the "specific instance" data for the same reason that DeWeese does not.

in Ellis-2005—only in the sense of a delivery channel, not in the sense of a piece of music. The Board simply lost the thread of logic and reason when assessing Hyundai's Ellis-2005/Crosby contentions.

No proper analysis could have supported Hyundai's petition in this regard. Claim element 9[a] recites "a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium." (Appx0173, 35:23-26). Ellis-2005 does not teach "data enabling the identification of a specific instance of the first media content" required by element 9[a]. (Appx2006, ¶ 102). Hyundai referred to Ellis-2005's disclosure of "packet identifiers ('PIDs')" and "PID maps" as satisfying this limitation. (Appx0222). Hyundai stated, "the tuner receives packet identifiers ('PIDs') with each track, which enable the system to distinguish between different tracks," and that PID maps are also transmitted in-band to enable the identification of a specific instance of the media content. (Appx0222; Appx2006-2007, ¶ 103).

However, the way in which Ellis-2005 describes PIDs belies this contention, and reveals error in the Board's adoption of it. (Appx2006-2007, ¶ 103). Ellis-2005 uses the PIDs corresponding to the given signal streams to identify the locations in a channel (the so-called "tracks") where data for each signal stream is located. (Appx2007-2008, ¶ 104). According to Ellis-2005, a "suitable" approach to

distributing digital music programming is to provide multiple digital channels in on single analog "channel." (Appx1325, ¶ 41). The digital channel may also include a number of "tracks," for example "video tracks, audio tracks, and data or other suitable tracks." (Appx1325, ¶ 41). These are not tracks as in a song track from an album. (Appx2007-2008, ¶ 104). The tracks Ellis-2005 is referring to are essentially lanes on the digital channel's highway. The PID identifies which lane media is located within. (Appx1325, ¶ 41). The PID map is essentially a catalog of which PIDs are associated with each channel. (Appx1325, ¶ 41). Thus, PIDs and PID maps serve only to identify the track of the channel and the digital channel the media arrives over. (Appx2007-2008, ¶ 104). Element 9[a], however, requires "data enabling identification of a specific instance of the first media content." PIDs and PID maps do not identify an instance or occurrence of the media content, only the relative positional track organization of the content where the media content is transmitted in Ellis-2005's system. (Appx2007-2008, ¶ 104). Any conclusion to the contrary by the Board is either legally erroneous, unsupported by substantial evidence, the product of arbitrary and capricious reasoning, or all of the above.

In Ellis-2005, the multiple digital channels may be thought of as highways with each track a lane on the given highway. (Appx2008, ¶ 105). The PIDs identify the lane and the PID maps identify the highway that media content is traveling on. (Appx2008, ¶ 105). The identification described in the '081 Patent, by contrast, is

more akin to identifying a specific car on the highway—akin to a unique serial number for that car's passage. Knowing which lane a car is in does not uniquely identify the car. For example, in Ellis-2005 knowing PID information does not allow for distinguishing between two or more instances of the same media content, particularly when, for example, the same song may travel on the same audio track over various broadcasts during the day, each time the song is played. (Appx2008, ¶ 105). The PIDs and PID maps as used in Ellis-2005 are not able to distinguish between these repeat occurrences of the same song on the same track on the same channel. (Appx2008, ¶ 105).

Accordingly, Ellis-2005 lacks disclosure of "data enabling identification of a specific instance of the first media content." Consequently, the Board erred both legally and factually to conclude otherwise. No obviousness conclusion over Ellis-2005 can withstand scrutiny. This Court should reverse.

* * *

StratosAudio separately appeals the obviousness conclusion rendering claim 15 unpatentable, though this Court need not reach this question if it agrees with the claim 9 arguments above. Claim 15, in a sense, expresses deeper detail over how the data structuring, use and manipulation within claim 9 delivers value. Under claim 15, the final limitation of claim 9 becomes the focus of attention. That final limitation in claim 9 describes a response message that keys to the second media content. So

for example, a user might click on a targeted ad. The response message travels with the data identifying that ad ("second media content").

Claim 15 is a dependent claim that adds further detail and further utility. In claim 15, the server that receives such response message performs important tasks. It is configured to correlate the response message with the "specific instance of the first media content." (Appx0173, 36:24-27). This sets the stage for what the '081 Patent specification describes as valuable reporting functionality on a database backend. (Appx0159, 7:65-8:9).

Out of the gate, Hyundai's claim 15 assertions were inconsistent with its claim 9 assertions—and the Board's adoption thereof consequently rife with error. As the Board described: "Petitioner argues, a person of ordinary skill in the art 'would have understood the response message for the second media content (i.e., merchandise request relating to the viewed music information) to be correlated with the ***specific instance*** of the first media content (i.e., ***the music program*** that the user is listening to).'" (Appx0040, emphasis added). In this passage, the "specific instance" is no longer the PID (so vehemently urged just pages earlier), but is instead the "music program" in some vague manner. The Board's inconsistency in how it handled the same term in its claim 9 application, versus its claim 15 application, is itself error that cries out for reversal by this Court.

Overlooking the absence of any disclosure of server capabilities or server processes in Ellis-2005/Crosby, the Board ultimately adopted Hyundai's contentions by stating: "this feature [*i.e.*, merchandise purchasing capacity] allows the user to purchase merchandise that is related to the music program that the user is listening to at the time the purchase is made (i.e., correlated with the specific instance of the first media content)." (Appx0046). Yet merchandise-purchasing can and does occur ***without*** the detail of claim 15 within the Ellis-2005/Crosby system. Respectfully, it is the Board who has ***mentally*** "correlated" a merchandise purchase as disclosed in Ellis-2005/Crosby with a specific instance of a first media content. Hyundai's proofs fell short of any showing that a ***server*** was in any respect disclosed as configured to correlate anything of that nature. Merchandise purchasing as disclosed in the prior art combination was simply garden-variety e-commerce. It did not need, and certainly did not disclose, claim 15's precise server configuration limitations. No record evidence rationally supported any conclusion of a server configuration as required by claim 15.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Board in both the -00721 and -01267 proceedings, and find that neither Volkswagen nor Hyundai proved any claim of the '081 Patent unpatentable by a preponderance of the evidence.

Respectfully submitted,

/s/ ROBERT GREENSPOON
ROBERT GREENSPOON
WILLIAM W. FLACHSBART
DUNLAP BENNETT & LUDWIG PLLC
333 North Michigan Avenue,
Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com
*Counsel for Appellant*

AUGUST 1, 2023

# Addendum

# TABLE OF CONTENTS
# ADDENDUM


| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 39 | Final Written Decision (IPR2021-01267) | 01/23/2023 | Appx1 |
| 63 | Final Written Division (IPR2021-00721) | 01/24/2023 | Appx53 |
| | U.S. Patent No. 8,166,081 | | Appx140 |

Trials@uspto.gov
571-272-7822

Paper 39
Date: January 23, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

HYUNDAI MOTOR AMERICA,
Petitioner,

v.

STRATOSAUDIO, INC.,
Patent Owner.

---

IPR2021-01267
Patent 8,166,081 B2

---

Before JUSTIN T. ARBES, HYUN J. JUNG, and KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed herein, we determine that Petitioner, Hyundai Motor America, has shown by a preponderance of the evidence that claims 9–11, 15, and 23 (the "challenged claims") of U.S. Patent No. 8,166,081 B2 (Ex. 1001, "the '081 Patent") are unpatentable. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

### *A. Procedural History*

The Petition (Paper 2, "Pet.") requested *inter partes* review of the challenged claims of the '081 Patent. Patent Owner, StratosAudio, Inc., filed a Preliminary Response. Paper 8. Based upon the record at that time, we instituted *inter partes* review on all challenged claims on the grounds presented in the Petition. Paper 9 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 17, "PO Resp."), Petitioner filed a Reply (Paper 20, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 25, "PO Sur-reply").

With our authorization, Patent Owner filed a Supplemental Brief (Paper 31, "PO Supp. Br.") and Petitioner filed a Responsive Supplemental Brief (Paper 33, "Pet. Supp. Br.") to address certain claim interpretation issues.

On October 24, 2022, an oral hearing was held. A transcript of the hearing is made part of the record. *See* Paper 38.

### *B. Related Matters*

The parties identify the following as related matters: *StratosAudio Inc. v. Hyundai Motor America*, No. 6:20-cv-01125-ADA (W.D. Tex.); *StratosAudio, Inc. v. Volkswagen Group of America, Inc.*, No. 6:20-cv-1131

(W.D. Tex.); *StratosAudio, Inc. v. Mazda Motor of America, Inc.*, No. 6:20-cv-01126 (W.D. Tex.); *StratosAudio, Inc. v. Subaru of America, Inc.*, No. 6:20-cv-01128 (W.D. Tex.); and *StratosAudio, Inc. v. Volvo Cars of North America, LLC*, No. 6:20-cv-01129 (W.D. Tex.). Pet. 2–3; Paper 5, 1.

The parties also indicate that the ’081 Patent is the subject of an *inter partes* proceeding, *Volkswagen Group of America, Inc. v. StratosAudio, Inc.*, IPR2021-00721 (PTAB Apr. 16, 2021) (“the ’721 IPR”). Pet. 3; Paper 5, 1.

*C. The ’081 Patent*

The ’081 Patent relates to media advertising and associating an advertising media signal with another media signal. Ex. 1001, 1:18–20. The ’081 Patent explains that it is generally desirable to associate products with specific characteristics, and such associations may increase the chance that a potential customer will decide to purchase a product when the product is associated with a favorable characteristic. *Id.* at 1:22–30. In view of this, the ’081 Patent states that an advertisement may be more effective if it is associated with an image of a celebrity or another media element that exhibits favorable characteristics. *Id.* at 1:30–34.

The ’081 Patent describes a media enhancement system that is configured to associate a secondary media signal (e.g., an advertisement) to a primary media signal (e.g., a radio broadcast). *Id.* at 3:8–12. The ’081 Patent explains that the secondary media signal may be based on the content of the primary media, user characteristics (e.g., demographic and/or geographic information), and/or third party preferences (e.g., the goals of advertisers). *Id.* at 3:17–21.

The ’081 Patent discloses one example in which a radio station transmits a song in a first media signal that is received by a user enabled-device (e.g., a cellular phone with a radio). *Id.* at 3:27–30. A media

association system analyzes the song to determine what media elements can be associated with the song, and the media association system provides a second media signal (e.g., an advertisement) to the user enabled-device. *Id.* at 3:30–36. While the user enabled-device is playing the song, the user enabled-device displays the media content in the second media signal (e.g., a still or moving picture of the advertised product). *Id.* at 3:37–40. The '081 Patent discloses another embodiment in which a user enabled-device is playing a song from a first media signal, media content from a second media signal (e.g., a still or moving picture with selectable audio of an advertised product) is displayed by the user enabled-device, and the audio track for the first media signal is paused upon selection of the second media signal audio. *Id.* at 3:41–47.

Figure 1A of the '081 Patent is reproduced below.

FIG. 1A




Figure 1A, above, is a block diagram that depicts signals and identifiers correlated and transmitted between elements of a media

enhancement system. *Id.* at 2:41–43. The system can include first transmitter 3, control management system 100, media association system 2, primary device 4, and advertisement entity 6. *Id.* at 8:11–16. First transmitter 3 can be broadcast content from a radio station, from over the internet, through a cable line, or satellite, and/or through other communication methods. *Id.* at 8:17–24. For instance, first transmitter 3 can send first media signal 111 that is received by primary device 4. *Id.* at 8:41–43.

Figure 1B of the ’081 Patent is reproduced below.

FIG. 1B




According to the ’081 Patent, Figure 1B, above, is a block diagram illustrating that media association system 2 can send or transmit secondary or related media signal 114, using information regarding the media content

of first media signal 111, to primary device 4 and/or ancillary device 5 through an Internet connection. *Id.* at 9:34–37, 9:39–48. Advertisement entity 6 can send advertisement signal 113 to media association system 2 so advertisement signal 113 is provided to primary device 4 upon the latter receiving a specific song from first transmitter 3 via first media signal 111. *Id.* at 10:24–29.

The '081 Patent explains that unique identifier 115 can be provided for each media signal (i.e., first media signal 111 and advertisement media signal 113) to facilitate the assignment and/or sending of advertisement media signal 113 with first media signal 111. *Id.* at 12:66–13:3. According to the '081 Patent, unique identifier 115 can be stored in a database and/or other location, such as control management system 100, along with other relevant information. *Id.* at 13:13–15. The '081 Patent discloses that unique identifier 115 can be used by media association system 2, advertisement entity 6, first transmitter 3, and/or primary device 4 and/or control management system 100 to track and/or record the results of any signal and to determine whether the signal should be provided to primary device 4 and/or the user. *Id.* at 13:16–22.

Figure 3 of the '081 Patent is reproduced below.

FIG. 3




Figure 3, shown above, is an illustration that depicts primary device 4, such as a radio-enabled cellular phone, with display panel 450 that is connected to media association system 2. *Id.* at 2:50–51, 18:55–57, 19:11–13, 19:17. Primary device 4 receives first media signal 111 (not shown in Fig. 3) via receiver 455 and/or wire data connection 470. *Id.* at 18:57–59. First media signal 111 includes, for example, a radio program that primary device 4 can play to a user via speaker 453. *Id.* at 18:61–63. Display panel 450 can show information relating to the radio program being played. *Id.* at 19:13–15. For instance, upper portion 451 of the display panel can include textual information corresponding to the radio's music. *Id.* at 19:17–22. The information about the radio's music may be obtained from a Radio Broadcast Data System (RBDS) and/or Radio Data System (RDS) signal

accompanying first media signal 111 when the latter is in the form of a radio signal. *Id.* at 24:63–65. Lower panel 452 displays advertisement media signal 113 (not shown in Fig. 3), which may comprise any form of media content. *Id.* at 12:40–42, 19:45–46.

Primary device 4 can also send signals to transmitter 3, media association system 2, control management system 100, and/or advertisement entity 6. *Id.* at 15:9–12. For example, the signals from primary device 4 can be responses to interactive media signals. *Id.* at 15:12–14. Primary device 4 can transmit user behavior, can report location, direction of motion, and/or speed, and can detect other information about a user and/or the user's location and/or environment. *Id.* at 15:17–27. The '081 Patent explains that this information can be used by media association system 2 to determine what media and/or advertisements to send to primary device 4 to obtain a user's reaction and/or what media and/or advertisements are likely to elicit a positive reaction at a given time and/or when the user is in a given state or environment. *Id.* at 15:27–34.

*D. Challenged Claims*

Petitioner challenges claims 9–11, 15, and 23. Claim 9 is the only independent claim challenged, and is set out below:

> 9[pre] A system for combining multiple media comprising:
>
> 9[a] a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium;
>
> 9[b] a second receiver module configured to receive at least a second media ~~signal~~ content and uniquely identifying data specific to at least the second media

content, the second media content received discretely from the first media content;

9[c] an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module;

9[d] an input module configured to receive at least a response input responsive to the second media content; and

9[e] a transmitting module configured to transmit a response message having at least the uniquely identifying data specific to the second media content to a computer server.

Ex. 1001, 35:22–41 (bracketed labelling designated by Petitioner; *see* Pet. 23–30) (claim corrected as indicated in the Certificate of Correction; *see* Ex. 1001, p. 35).

### *E. Evidence*

Petitioner relies upon the following evidence:

(1) U.S. Patent No. 5,303,393, issued April 12, 1994 ("Noreen") (Ex. 1005);

(2) U.S. Patent No. 6,628,928 B1, issued September 30, 2003 ("Crosby") (Ex. 1006);

(3) World Intellectual Property Organization Publication No. WO 02/067447 A2, published August 29, 2002 ("Ellis-2002") (Ex. 1007);

(4) U.S. Patent Application Publication No. 2005/0227611 A1, published October 13, 2005 ("Ellis-2005") (Ex. 1008); and

(5) Declarations of Kevin C. Almeroth, Ph.D. (Exs. 1002, 1026).

Patent Owner relies on the Declaration of Todd K. Moon, Ph.D. (Ex. 2016).

### *F. Prior Art and Asserted Grounds*

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 9, 15, 23 | 103(a) | Noreen |
| 9, 15, 23 | 103(a) | Noreen, Crosby |
| 10, 11 | 103(a) | Noreen, Crosby, Ellis-2002 |
| 9–11, 15, 23 | 103(a) | Ellis-2005 |
| 9–11, 15, 23 | 103(a) | Ellis-2005, Crosby |

Pet. 4.

## II. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus. Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

Petitioner contends that "[o]ne of ordinary skill in the art would have had a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and at least two years of experience in the communications or Internet-related industries, or the equivalent, with additional education substituting for experience and vice versa." Pet. 9–10 (citing Ex. 1002 ¶¶ 34, 40–42). Patent Owner "does not object to the level of skill proposed by Petitioner." PO Resp. 14.

Petitioner's description of the level of ordinary skill is generally consistent with the subject matter of the '081 Patent. In another proceeding involving the '081 patent, IPR2021-00721, we determined the level of ordinary skill was a bachelor's degree in computer science or electrical

engineering or a related field, and approximately three years of experience working in the communications or Internet-related industries, or other equivalent industry experience in the field. This description of the level of ordinary skill is similar to Petitioner's description.

For consistency, we determine that a person of ordinary skill in the art is a person with a bachelor's degree in computer science or electrical engineering or a related field, and approximately three years of experience working in the communications or Internet-related industries, or other equivalent industry experience in the field. A person with a master's degree in one of these fields with less industry experience would also qualify as a person of ordinary skill in the art.

### *B. Claim Construction*

Pursuant to 37 C.F.R. § 42.100(b), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and even extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (in the context of an *inter partes* review, applying *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

In the Petition, Petitioner states that it "does not believe that any term requires explicit construction to resolve the issues presented in this Petition." Pet. 11 (citing Ex. 1002 ¶¶ 31–33). In its Response, Patent Owner states that "[f]or the purposes of this proceeding, Patent Owner agrees" with Petitioner that no terms require explicit construction in order "[t]o resolve the particular grounds presented in [the] Petition." PO Resp. 14 (citing Ex. 2016 ¶ 43).

Patent Owner, however, subsequently requested, and with our approval, filed a Supplemental Brief changing its previously stated position on claim construction. In its Supplemental Brief, Patent Owner now argues that "Patent Owner asserted the '081 patent against Subaru of America Inc. ('Subaru') in a district court litigation,"[1] and in "the briefing [in that case] raised the same claim construction dispute that is also at issue in this proceeding regarding the proper construction of the term 'an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module' in claim element 9[c] of the '081 patent." PO Supp. Br. 2. Patent Owner states that "Subaru argued that the word 'or' in the portion of the limitation reciting 'an output of the first receiver module or the second receiver module' should be changed to 'and/or.'" *Id.* at 2–3 (citing Ex. 2018, 8).

In its Responsive Supplemental Brief, Petitioner argues that "the Board should disregard Patent Owner's Supplemental Brief (Paper 31) and new Exhibits 2018-2021" as "inadmissible and irrelevant," because

---

[1] *See StratosAudio, Inc. v. Subaru of America, Inc.*, 6:20-cv-01128-ADA (W.D. Texas).

"[w]hatever Subaru said in its motion to strike (Ex. 2018), filed in a district court action not involving Petitioner, is inadmissible hearsay and useless as evidence of claim construction." Pet. Supp. Br. 1.

For purposes of this Final Written Decision, we do not find it necessary to expressly construe any claim terms. We agree with the parties' original positions on claim construction, as expressed in the Petition and Patent Owner Response, that no terms require express construction in order to resolve the patentability of the challenged claims in this proceeding. *See* Pet. 11; PO Resp. 14. Because it is not necessary to expressly construe any claim terms in order to resolve the patentability of the challenged claims, the issues raised by the parties in their supplemental briefing are moot.[2]

### C. *Patentability Challenges*

As indicated above, Petitioner presents five grounds challenging the patentability of particular claims of the '081 Patent under 35 U.S.C. § 103(a). Petitioner challenges (Ground 1) claims 9, 15, and 23 as obvious over Noreen; (Ground 2) claims 9, 15, and 23 as obvious over Noreen and Crosby; (Ground 3) claims 10 and 11 as obvious over Noreen, Crosby, and Ellis-2002; (Ground 4) claims 9–11, 15, and 23 as obvious over Ellis-2005; and (Ground 5) claims 9–11, 15, and 23 as obvious over Ellis-2005 and Crosby. Pet. 4

#### 1. *Principles of Law on Obviousness*

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

---

[2] The parties' supplemental briefing pertains to limitation 9[c], which is undisputed with respect to the asserted ground based on Ellis-2005 and Crosby addressed herein. *See infra* Section II.D.1.iv.

invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. Reaching this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.*

*2. Relevant Prior Art*

*i. Crosby (Ex. 1006)*

Crosby is a U.S. Patent that issued on September 30, 2003, more than one year before the earliest priority date of the '081 Patent. Ex. 1001, codes (22), (60); Ex. 1006, code (45). Petitioner asserts that Crosby is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 13.

Crosby relates to an interactive radio system. Ex. 1006, code (57). For example, "[w]hile listening to a radio broadcast" on a user's mobile unit, the user "selects program segments of interest," e.g., advertisements, "by pressing an interactive radio control button" so that the user may later review those selected program segments of interest. *Id.* at code (57), 3:59–63. In particular, when the user selects program segments of interest, those selections, i.e., "commands," are forwarded to an interactive radio network operations center by the user's mobile unit. *Id.* at 6:4–9.

In addition to transmitting user commands responding to program segments of interest, if the radio "broadcast itself includes information encoded therein identifying the program segments," then "the mobile unit . . . generates a program attribute signal which specifically identifies the content of the [selected] program segment" to send to the network operations center. *Id.* at 4:51–58; *see id.* at 8:53–46. For example, broadcast

> digital radio signals are preferably encoded with signals identifying the broadcaster and the specific program segment being transmitted. If so . . . the network operations center directly accesses the program segment and vendor information databases based upon the program segment identified by the digital radio signals to retrieve information associated with the program segment selected by the [user].

*Id.* at 11:44–54.

In the alternative case that the radio broadcast does *not* include information which specifically identifies the selected program segments, then the network operations center identifies the selected program segment in an alternative manner. *Id.* at 8:48–43, 11:37–43. In particular, when the user selects program segments of interest, the mobile unit transmits, to the network operations center,

> a broadcast attribute signal identifying a carrier frequency of the radio broadcast and the date and time the broadcast was received; a location attribute signal identifying the geographical location of the mobile unit in GPS coordinates at the date and time the broadcast was received; and a subscriber identifier signal providing a subscriber ID or a mobile unit ID.

*Id.* at 7:27–37, 9:42–46. "In response to the signals, the network operations center determines the identity of the broadcaster based upon the carrier frequency of the broadcast and the geographical location of the mobile unit" using a broadcaster identification database. *Id.* at 7:37–41, 9:48–53. Next, the network operations center can "determine[] the specific program segment selected by the subscriber based upon the identity of the broadcaster and the date and time of the broadcast" using a program segment identifier database. *Id.* at 7:41–44, 9:46–61. The program segment identifier database includes "a program segment ID, the date and time of broadcast of the program segment, and the broadcaster ID for the broadcaster of the segment." *Id.* at 9:15–19, Fig. 5.

*ii. Ellis-2005 (Ex. 1008)*

Ellis-2005 is a U.S. Patent Application Publication dated October 13, 2005, more than one year before the earliest priority date of the '081 Patent. Ex. 1001, codes (22), (60); Ex. 1008, code (45). Petitioner asserts that Ellis-2005 is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 16.

Ellis-2005 relates to an interactive music application system which has two tuners, tunes to media channels, and obtains respective in-band data. Ex. 1008 ¶¶ 2, 7. For example, "a user is tuned to a first music channel, the music application may obtain music information from that channel using [a first] tuner that is tuned to that channel." *Id.* ¶ 8. Specifically, "music channel[s] may include an in-band data stream that contains the music

information" such as "track information, title information, artist information, graphics, web links, ordering information or other information related to the music programming carried on the music channel." *Id.* Furthermore, if the "user indicates a desire to view music information for a channel other than the one to which the first tuner is tuned, the music application directs a second tuner to tune to the other music channel and obtains the in-band music information from that channel." *Id.* That is, the "interactive music application may provide a user with an opportunity to listen to music programming on one music channel while viewing in-band music information for the music programming of another music channel." *Id.* ¶¶ 56, 94. A system that receives, outputs, and provides such interaction with video, audio, and data is shown in the schematic block diagram of Figure 4, reproduced below. *Id.* ¶¶ 14, 53.




*FIG. 4*

As shown in Figure 4, above, user music equipment 22 receives video, audio, and data at input 26. *Id.* ¶ 53. First tuner 50 accesses a music channel selected by the user. *Id.* ¶ 56. While listening to the music channel accessed by tuner 50, the user may browse for information on songs that are playing on other channels using second tuner 51. *Id.* ¶¶ 58–59. For example, "[a]s a user browses through music program listings, the music application instructs tuner 51 to tune to the browsed music channel so that music information on the music program that is being played on the browsed channel may be extracted for display . . . while tuner 50 remains tuned to the channel that the user is listening to." *Id.* ¶ 59.

Further, the digital channels received by the user music equipment include tracks; "[t]racks may include, for example, video tracks, audio tracks, and data or other suitable tracks." *Id.* ¶ 41. Tracks are transmitted in packets which "contain packet identifiers ('PIDs') identifying the track that each packet belongs to." *Id.* Additionally, a "PID map that indicates which PIDs correspond to which digital channels may also be transmitted in-band." *Id.* For example, in the case of a browsed music channel received via tuner 51, the PIDs for the browsed music channel are received by the user music equipment. *Id.* ¶¶ 60, 70.

Additionally, Ellis-2005 describes a feature which "provide[s] the user with an opportunity to purchase music merchandise (e.g., an album, record, CD, concert tickets, etc.) . . . associated with a music program." *Id.* ¶¶ 87, 98. "For example, the user may listen to one music program while ordering a CD for a music program on another music channel." *Id.* ¶ 87. "Merchandise that is associated with a music program may be identified, for example, by identifiers, graphics, or other information included in an in-band data stream on a music channel" and the "user may indicate a desire to purchase merchandise by, for example, pressing a 'BUY' key on remote control." *Id.* Accordingly, the user music equipment generates a merchandise request. *Id.* Further, the "merchandise request includes information necessary for ordering the merchandise based on the type of ordering scheme used. The request may include, for example, a merchandise identifier, a user identifier or account number, or other suitable information." *Id.* ¶ 88.

*D. Obviousness over Ellis-2005 and Crosby*

Petitioner asserts that all the challenged claims (9–11, 15, and 23) would have been obvious under 35 U.S.C. § 103(a) over the combination of

Ellis-2005 and Crosby. *See* Pet. 40–57. We begin our analysis with independent claim 9.

*1. Independent Claim 9*

*i. 9[pre] A system for combining multiple media*

Petitioner asserts that Ellis-2005 teaches the preamble of claim 9, "to the extent it is limiting." Pet. 40 (citing Ex. 1002 ¶¶ 126–127). Petitioner argues that "Ellis-2005 discloses a system, distribution equipment 21, that combines multiple media, such as music channels for presenting audio, such as music (first media) and information, such as text and graphics (second media), by using in-band sideband signals or out-of-band digital signals, for transmission to the user." Pet. 40 (citing Ex. 1008 ¶¶ 26, 31, Figs. 2a, 2b). Petitioner explains that "[a]t user equipment 22, different tuners receive the multiple media and present it to the user[,] [f]or example, when a user is tuned to a first tuner, listening to music, and 'indicates a desire to view music information' for another channel, the music application 'directs a second tuner' to tune to obtain 'the in-band music information from that channel' and display it to the user." Pet. 41 (citing Ex. 1008 ¶ 8). Petitioner's arguments are supported by the testimony of Dr. Almeroth. *See* Ex. 1002 ¶¶ 126–127.

Patent Owner does not contest Petitioner's evidence and arguments with respect to claim 9's preamble. *See* PO Resp 48–52.

We agree with Petitioner that Ellis-2005 meets the subject matter of the preamble because it describes a system for combining multiple media where music programs are distributed over a number of channels to users along with information on the music programs provided through in-band

data streams on the channels.[3] *See, e.g.*, Ex. 1008, code (57), ¶¶ 7–9; Ex. 1002 ¶¶ 126–127 (citing Ex. 1008 ¶¶ 8, 26, 31, Figs. 2a, 2b).

*ii. 9[a] a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium*

Petitioner asserts that Ellis-2005 teaches this limitation, where Ellis-2005 describes "user equipment 22 having 'a first receiver module,' tuner 50, which receives 'a first media content' including television video, audio, and data identifying the television content (e.g., program guide information)." Pet. 41 (citing Ex. 1008 ¶ 42, Fig. 1). For the recited "data enabling the identification of a specific instance" of the content, Petitioner argues that Ellis-2005's "tuner receives packet identifiers ('PIDs') with each track, which enable the system to distinguish between different tracks." Pet. 42 (citing Ex. 1008 ¶ 41). Petitioner argues that "PID maps may also be transmitted in-band to enable the identification of a specific instance of a media content, such as an audio track, by indicating 'which PIDs correspond to which digital channels.'" Pet. 42–43 (citing Ex. 1002 ¶ 129).

Petitioner also asserts that the identification of specific instances of media content "would have been obvious in further view of Crosby" because

> Crosby's system allows subscribers to 'select various advertisements, musical selections or the like while listening to the radio' and 'review information pertaining to the various program segments that have been selected' at a later time on the Internet, by way of unique program segment identifiers, which include 'a program segment ID, the date and time of broadcast

[3] We need not determine whether the preamble of claim 9 is limiting because Petitioner has shown that Ellis-2005 teaches the subject matter described in the preamble. *See Nidec*, 868 F.3d at 1017.

> of the program segment, and the broadcaster ID for the broadcaster of the segment.'

Pet. 43 (citing Ex. 1006, 3:59–4:19, 9:14–19).

Petitioner argues that a person of ordinary skill in the art "would have been motivated to combine the relevant teachings of Ellis-2005 and Crosby, and would have a reasonable expectation of success in doing so, because both relate to interactive radio systems for receiving multimedia at a mobile or television user and allowing the user to make selections." Pet. 40 (citing Ex. 1006, code (57); Ex. 1008, code (57); Ex. 1002 ¶¶ 120–125).

Petitioner also argues that a person of ordinary skill in the art "would have been motivated to incorporate Crosby's teaching of a program segment ID and other information necessary to identify a program segment, and time and date of broadcast of the program segment, as advantageous to Ellis-2005's teaching and suggestion to use 'identifiers, graphics, or other information included in an in-band data stream on a music channel.'" Pet. 43 (citing Ex. 1008 ¶ 87).

Petitioner further argues that "Ellis-2005 and Crosby would have ensured identification of the exact instance of the program segment and ensured accurate fulfillment of the user's selection." Pet. 43–44 (citing Ex. 1002 ¶ 131). Petitioner argues a person of ordinary skill in the art "would have had a reasonable expectation of success in using Crosby's identification of each instance because Ellis-2005 was already at least providing program identification information (if not identification of a specific instance) and would only have required the addition of a time and date stamp to implement Crosby's unique identification system of each program instance." *Id.* at 44.

Patent Owner argues that "Ellis-2005 uses the PIDs corresponding to the given signal streams to identify the locations in a channel where data for each signal stream is located." PO Resp. 44 (citing Ex. 2016 ¶ 104). Patent Owner argues that "PIDs and PID maps do not identify an instance or occurrence of the media content, only how the media content is transmitted in Ellis-2005's system." *Id.* Patent Owner argues that "in Ellis-2005 knowing PID information does not allow for distinguishing between two or more instances of the same media content, particularly when, for example, the same song may travel on the same audio track at various times of the day, each time the song is played." PO Resp. 45 (citing Ex. 2016 ¶ 105); PO Sur-reply 16–18.

With respect to Petitioner's asserted combination of Ellis-2005 and Crosby, Patent Owner argues that "neither Crosby nor Ellis-2005 are concerned with identifying a specific instance of media content." PO Resp. 49 (citing Ex. 2016 ¶ 113). Patent Owner argues that "[i]n Crosby's alternative embodiment, 'program segment identification information' and information 'identifying the broadcaster' is encoded in the broadcast signal" and "the system need not determine the program segment or date and time of broadcast and functions without the need of this information." PO Resp. 50 (citing Ex. 1006, 8:53–56, 11:44–58). "Thus," Patent Owner argues, "Crosby does not teach or suggest including date and time of broadcast in the encoded broadcast signal." PO Resp. 50 (citing Ex. 1006, 11:37–63; Ex. 2016 ¶ 115).

Patent Owner also argues that a person of ordinary skill in the art "would not have been motivated to include Crosby's date and time of broadcast in Ellis-2005 because the embodiment in Crosby most similar to Ellis-2005 operates without such information." PO Resp. 51 (citing

Ex. 2016 ¶ 117); PO Sur-reply 20–24. Patent Owner further argues that "neither Crosby nor Ellis-2005 specify a need to identify a specific instance of the media content." PO Resp 51 (citing Ex. 2016 ¶ 118).

Petitioner responds by arguing that "there is nothing in Element 9[a], the specification, or the prosecution history relating to distinguishing two or more instances of the same content. Element 9[a] instead requires data that ***enables the identification*** of a specific instance of the first media content." Pet. Reply 21 (citing Ex. 1026 ¶¶ 46–47). Petitioner argues that "Ellis-2005's PIDs and PID maps meet this limitation because they identify where the data is within the stream and distinguish between different tracks." *Id.* (citing Ex. 1026 ¶ 48; Ex. 1029, 77:17–78:7).

We agree with Petitioner that Ellis-2005's PIDs and PID maps meet the relevant portions of limitation 9[a] because they identify where the data is within the stream and distinguish between different tracks. Limitation 9[a] requires "*data enabling the identification of a specific instance of the first media content.*" We have not been directed to anything in the record that would require restricting the claim term "identification" to distinguishing between two or more instances of the same media content, as Patent Owner argues, as opposed to identifying a specific instance of media content by either where the data for that media content is within the stream or by distinguishing between different music "tracks" in the stream. *See* Ex. 1008 ¶ 41 ("Each digital channel may include, for example, a number of *tracks*. *Tracks* may include, for example, video tracks, audio tracks, and data or other suitable tracks. . . . The packets also contain packet identifiers ('PIDs') *identifying the track* that each packet belongs to." (emphasis added)), 46 ("Audio and video tracks may be played for the user by user music equipment 22. . . . Data tracks may be used by the music application

for obtaining in-band digital data displayed for users in music application display screens.”).

Patent Owner’s expert, Dr. Moon, agrees that the claim language does not recite that the system has to “discretely identify” each instance of the first media content. *See* Ex. 1029, 16:3–7. Indeed, Dr. Moon agrees that according to the Specification of the ’081 patent, a unique identifier can be used “to determine the location, the user device, the time of transmittal, the program and/or media content in the first media signal, the available options for response to the user of the device, and/or other identifying characteristic information.” Ex. 2016 ¶ 33 (citing Ex. 1001, 11:38–46).

Patent Owner’s other arguments are also unavailing because “[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.” *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). A reason to combine teachings from the prior art “may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved.” *WMS Gaming Inc. v. Int’l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (citing *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)). And, as Petitioner correctly points out, a person of ordinary skill in the art “would have considered Crosby for all that it teaches,” including all of its teachings regarding program segment ID, date, and time. Pet. Reply 22 (citing *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012)).

Here, Petitioner argues that a person of ordinary skill in the art would have been motivated to incorporate Crosby’s teaching of a program segment ID and other information necessary to identify a program segment, as well as

time and date of broadcast of the program segment, because it would be advantageous to Ellis-2005's teaching and suggestion to use identifiers and other information included in an in-band data stream on a music channel. Pet. 43 (citing Ex. 1008 ¶ 87). Petitioner argues that Ellis-2005 was already at least providing program identification information (even if that information is not considered identification of a specific instance of media content) and allowing selection from such information by the user to make a purchase, and would only have required the addition of a time and date stamp to implement Crosby's unique identification system of each program instance. Pet. 44.

Dr. Almeroth testifies, and we agree, that a person of ordinary skill in the art

> would have been motivated to combine the teachings of Ellis-2005 and Cro[sb]y at least because Ellis-2005 expressly envisions transmitting in-band, PIDs "identifying the track that each packet belongs to" as well as other "identifiers" needed to make purchases including, e.g., merchandise identifiers and user identifiers, . . . and would have understood that unique program segment identifiers that are associated with specific instances of media content, as exemplified by Crosby, could be used to identify both track and vendor information for a given media content.

Ex. 1002 ¶ 123 (citing Ex. 1006, 9:26–29, 10:7–35; Ex. 1008 ¶¶ 41, 87–88). Dr. Almeroth testifies that this combination of Ellis-2005 and Crosby "would have ensured identification of the exact instance of the program segment and ensured accurate fulfillment of the user's selection." Ex. 1002 ¶ 131. We credit the testimony of Dr. Almeroth, which is consistent with the disclosures of Ellis-2005 and Crosby.

Based on the complete record and for the reasons discussed herein, we find that Petitioner has demonstrated that the combination of Ellis-2005 and

Crosby meets the recited "*first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium*" of limitation 9[a].

We also find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the invention would have had sufficient reason to combine the teachings of Ellis-2005 and Crosby in the manner proffered by Petitioner because such a combination would have ensured identification of the exact instance of the program segment and ensured accurate fulfillment of the user's selection.

We further find that one of ordinary skill in the art would have had a reasonable expectation of success in using Crosby's identification of each instance because Ellis-2005 was already providing program identification information and the proposed combination would only have required the addition of a time and date stamp to implement Crosby's identification system of each program instance.

*iii. 9[b] a second receiver module configured to receive at least a second media content and uniquely identifying data specific to at least the second media content, the second media content received discretely from the first media content*

Petitioner asserts that "Ellis-2005 discloses 'a second receiver module' to receive 'a second media content.'" Pet. 44. According to Petitioner, "Ellis states that '[w]hen a user indicates a desire to view music information' for another channel than the one the first tuner is tuned to, 'the music application directs a second tuner,' tuner 51, 'to tune to the other music channel and obtains the in-band music information from that channel' such as text and graphics." *Id.* (citing Ex. 1008 ¶ 8). Petitioner argues that "[t]uner 51 receiving, e.g., music information and graphics, is a second receiver module receiving a second media content." Pet. 45.

Petitioner asserts that "Ellis-2005 also teaches or suggests 'uniquely identifying data specific to the second media content,' in the form of an 'identifier' and/or 'ordering information' that may be displayed to the user." *Id.* (citing Ex. 1008 ¶¶ 60 (tuner 51 receives PIDs for the browsed channel, i.e., second media content), 80 ("the music application may display the music program's . . . identifier"), 8 ("music information" includes, e.g., "ordering information")). "For example," Petitioner argues, "the user may be listening to one music program and choose to order 'a CD for a music program on another music channel.'" *Id.* (citing Ex. 1008 ¶ 87). "In this scenario," Petitioner explains, "a 'merchandise request' including 'information necessary for ordering the merchandise' may be generated by the system including, e.g., '***a merchandise identifier, a user identifier or account number***.'" Pet. 45 (citing Ex. 1008 ¶ 88) (emphasis added by Petitioner). According to Petitioner, a person of ordinary skill in the art

"would have considered such identifiers to uniquely identify data specific to the second media content." Pet. 45 (citing Ex. 1002 ¶¶ 133–134).

Petitioner further asserts that "Ellis-2005 discloses that 'the second media content [is] received discretely from the first media content.'" Pet. 45. Petitioner argues that examples of this "in the '081 Patent include second content data that is time or frequency multiplexed with the first content." Pet. 45 (citing Ex. 1001, claims 18, 19). "Similarly," Petitioner points out, "Ellis-2005 explains that 'each music channel [i.e., first media content] may carry an in-band data stream of the music information [i.e., second media content] for all music channels.'" Pet. 45–46 (citing Ex. 1008 ¶¶ 31, 43; Ex. 1002 ¶ 135).

Petitioner also argues that receiving "uniquely identifying data" would have been obvious in further view of Crosby, because "Crosby's system allows subscribers to 'select various advertisements, musical selections or the like while listening to the radio' and 'review information pertaining to the various program segments that have been selected' at a later time on the Internet, by way of unique program segment identifiers, which include 'a program segment ID, the date and time of broadcast of the program segment, and the broadcaster ID for the broadcaster of the segment.'" Pet. 46 (citing Ex. 1006, 3:59–4:19, 9:14–19).

Petitioner argues that a person of ordinary skill in the art "would have been motivated to incorporate Crosby's teaching of a program segment ID and other information necessary to identify a program segment, and time and date of broadcast of the program segment, as advantageous to Ellis-2005's teaching and suggestion to use 'identifiers, graphics, or other information included in an in-band data stream on a music channel.'" Pet. 46–47 (citing Ex. 1008 ¶ 87). Petitioner argues that "Ellis-2005 and Crosby would have

ensured identification of the exact instance of the program segment and ensured accurate fulfillment of the user's selection," and a person of ordinary skill in the art "would have had a reasonable expectation of success in using Crosby's identification of each instance because Ellis-2005 was already at least providing program identification information (if not identification of a specific instance) and would only have required the addition of a time and date stamp to implement Crosby's unique identification system of each program instance." Pet. 47 (citing Ex. 1002 ¶ 137).

Petitioner's arguments are supported by Dr. Almeroth's testimony. *See* Ex. 1002 ¶¶ 132–137.

Patent Owner does not respond to Petitioner's arguments and evidence concerning this limitation. *See* PO Resp. 43–52.

Based on the complete record and for the reasons discussed herein, we find that Petitioner has demonstrated that the combination of Ellis-2005's tuner 51 and Crosby's unique program segment identifiers meets the recited "*second receiver module configured to receive at least a second media content and uniquely identifying data specific to at least the second media content, the second media content received discretely from the first media content*" of limitation 9[b].

We also find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the invention would have had sufficient reason to combine the teachings of Ellis-2005 and Crosby in the manner proffered by Petitioner and would have had a reasonable expectation of success in doing so.

*iv. 9[c] an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module*

Petitioner asserts that Ellis-2005 teaches this limitation. Pet. 47 (citing Ex. 1002 ¶ 138). Petitioner argues that "Ellis-2005 discloses first and second receiver modules, i.e., tuners 50 and 51, which receive a first media content (such as music audio) and a second media content (such as text and graphics relating to music on another channel), respectively." Pet. 47. Petitioner points out that Ellis-2005's Figure 10 "provides a 'flowchart of illustrative steps' on how a user can 'listen to a music program carried on one channel while viewing in-band music information for a music program carried on another channel.'" Pet. 47–48 (citing Ex. 1001, Fig. 10; Ex. 1008 ¶ 93). Ellis-2005's Figure 10 is set out below.




Ellis-2005's Figure 10, above, is a flowchart of illustrative steps involved in providing a user with an opportunity to listen to a music program carried on one channel while viewing in-band music information for a music program carried on another. Ex. 1008 ¶ 21. Petitioner explains that in Figure 10, "Step 430 states that the system 'display[s] in-band music information from the second music channel while playing a music program from the first music channel.'" Pet. 48 (citing Ex. 1008, Fig. 10). "Thus," Petitioner argues, Ellis-2005's system (which includes both a visual display

and speakers for playing audio, as shown in Figures 3 and 4) is an output that "concurrently present[s] audio [from] the first tuner and text or graphics [from] the second tuner." *Id.*; *see* Ex. 1008 ¶¶ 8, 42–56 (describing the system of Figures 3 and 4). As Petitioner correctly explains, the user in Ellis-2005, tuned to the first tuner, listens to music and views information about that music on the display, then indicates a desire to view music information for a different channel, causing the second tuner to receive the desired music information, which is displayed to the user visually while the user is listening to the original music. *See* Pet. 16–17, 41–42 (citing Ex. 1008 ¶ 8), 44–45 (same).

Petitioner's arguments are supported by Dr. Almeroth's testimony. *See* Ex. 1002 ¶ 138.

Patent Owner does not respond to Petitioner's arguments and evidence concerning this limitation. *See* PO Resp. 43–52.

Based on the complete record and for the reasons discussed herein, we find that Petitioner has demonstrated that Ellis-2005's interactive music distribution system as described in Figure 10, Step 430, wherein the system displays in-band music information from a second music channel while playing a music program from a first music channel, meets the recited "*output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module*" of limitation 9[c].

*v. 9[d] an input module configured to receive at least a response input responsive to the second media content*

Petitioner asserts that Ellis-2005 teaches this limitation. Pet. 49 (citing Ex. 1002 ¶ 139). Petitioner argues that "Ellis-2005 discloses that the user may provide input via a remote control 40, responsive to the second

media content, by pressing a purchase button to buy the content." Pet. 49 (citing Ex. 1008 ¶ 87) ("The user may indicate a desire to purchase merchandise by, for example, pressing a 'BUY' key on remote control 40 when tuned to a music channel, when browsing through music program listings, after highlighting a music program listing in a music program listings screen, or when in any other suitable music application display screen.").

Petitioner's arguments are supported by Dr. Almeroth's testimony. *See* Ex. 1002 ¶ 139.

Patent Owner does not respond to Petitioner's arguments and evidence concerning this limitation. *See* PO Resp. 43–52.

Based on the complete record and for the reasons discussed herein, we find that Petitioner has demonstrated that Ellis-2005's description of a user providing input via remote control 40, which is responsive to a second media content, by pressing a purchase button to buy content, meets the recited "*an input module configured to receive at least a response input responsive to the second media content*" of limitation 9[d].

*vi. 9[e] a transmitting module configured to transmit a response message having at least the uniquely identifying data specific to the second media content to a computer*

Petitioner asserts that Ellis-2005 alone or in view of Crosby teaches this limitation. Pet. 49 (citing Ex. 1002 ¶ 140). "For example," Petitioner explains, "Ellis-2005 discloses that the music application may 'provide the user with an opportunity to purchase music merchandise . . . associated with a music program.'" Pet. 50 (citing Ex. 1008 ¶ 87). "Further," Petitioner notes, "Ellis-2005 discloses that 'identifiers' and 'ordering information' are transmitted to merchandising facility 10 when a purchase request is made by

the user specific to the second media content." Pet. 50 (citing Ex. 1008 ¶¶ 8, 87–88).

According to Petitioner, "Ellis-2005 also discloses that a 'merchandise request' includes necessary information for making a purchase including, e.g., 'a merchandise identifier, a user identifier or account number' and 'may be sent from the music application implemented on interactive music application equipment 17 to merchandising facility 10 over communications path 9 (FIG. 1)." Pet. 50 (citing Ex. 1008 ¶ 88). Petitioner argues that a person of ordinary skill in the art "would have understood these identifiers to uniquely identify data specific to the second media content as explained above with respect to Element 9[b]." Pet. 50 (citing Ex. 1002 ¶ 141).

Petitioner also asserts that "such unique identification would have been obvious in further view of Crosby." Pet. 50. Petitioner argues that "Crosby provides for unique program segment identifiers, which include 'a program segment ID, the date and time of broadcast of the program segment, and the broadcaster ID for the broadcaster of the segment.'" Pet. 50 (citing Ex. 1006, 9:14–19). Petitioner argues that a person of ordinary skill in the art "would have been motivated to incorporate Crosby's teaching of a program segment ID and other information necessary to identify a program segment, and time and date of broadcast of the program segment, as advantageous to Ellis-2005's teaching and suggestion to use 'identifiers, graphics, or other information included in an in-band data stream on a music channel.'" Pet. 51 (citing Ex. 1008 ¶ 87).

The combination of Ellis-2005 and Crosby, Petitioner argues, "would have ensured identification of the exact instance of the program segment and ensured accurate fulfillment of the user's selection. A [person of ordinary

skill in the art] would have had a reasonable expectation of success in using Crosby's identification of each instance because Ellis-2005 was already at least providing program identification information (if not identification of a specific instance) and would only have required the addition of a time and date stamp to implement Crosby's unique identification system of each program instance." Pet. 51 (citing Ex. 1002 ¶¶ 142–143).

Petitioner's arguments are supported by Dr. Almeroth's testimony. *See* Ex. 1002 ¶¶ 140–143.

Patent Owner does not respond to Petitioner's arguments and evidence concerning this limitation. *See* PO Resp. 43–52.

Based on the complete record and for the reasons discussed herein, we find that Petitioner has demonstrated that the combination of Ellis-2005's merchandise request that includes necessary information for making a purchase including information sent from the music application implemented on interactive music application equipment 17 to merchandising facility 10 over communications path 9 and Crosby's unique program segment identifiers meets the recited "*a transmitting module configured to transmit a response message having at least the uniquely identifying data specific to the second media content to a computer*" of limitation 9[e].

We also find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the invention would have had sufficient reason to combine the teachings of Ellis-2005 and Crosby in the manner proffered by Petitioner and would have had a reasonable expectation of success in doing so.

*vii. Conclusion on Independent Claim 9*

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that independent claim 9 is unpatentable under 35 U.S.C. § 103(a) as obvious over Ellis-2005 and Crosby.

*2. Dependent Claims*

Petitioner argues that the combination of Ellis-2005 and Crosby teaches the recited limitations of dependent claims 10, 11, 15, and 23. *See* Pet. 52–57.

*i. Dependent Claim 10*

Dependent claim 10 recites the limitation, "*[t]he system of claim 9 further comprising an output selection module configured to limit the output of the first and second media content based on a criterion.*" Petitioner asserts that Ellis-2005 teaches this limitation. Pet. 52–53.

Petitioner explains that "Ellis-2005 discloses that the two tuners, tuner 50 and tuner 51, can be adjusted to switch to different channels based on the 'favorites' (i.e., criterion) chosen by the user." *Id.* at 53. "For example," Petitioner points out, "Ellis-2005 states that '[t]he music application may also provide a user with the opportunity to set and navigate through favorite music channels.'" *Id.* (citing Ex. 1008 ¶ 77). According to Petitioner, "[t]he user may also set a music channel as a favorite by, for example, pressing a 'FAV' key on remote control 40 when the user has tuned to the channel," "highlighted a music program listing displayed in a music program listings screen," or "from a favorites set-up screen." *Id.* Petitioner explains that "[o]nce in favorites mode, 'the music application may obtain only information for favorite music channels and may limit BROWSE display

225 (FIG. 5b) and music program listings screen 180 (FIG. 7a) to displaying music program listings for favorite music channels if desired.'" *Id.* (citing Ex. 1008 ¶¶ 78, 97). "Thus," Petitioner concludes, "Ellis-2005 discloses 'an output selection module' that 'limit[s] the output of the first and second media content based on a criterion.'"

Petitioner's arguments are supported by Dr. Almeroth's testimony. *See* Ex. 1002 ¶¶ 144–145.

Patent Owner does not respond specifically to Petitioner's arguments and evidence concerning this limitation other than to state that "[d]ependent claims 10, 11, and 23 are not obvious in view of Ellis-2005 for the same reasons as claim 9" and that "Ellis-2005 in view of Crosby does not teach or suggest the challenged claims." PO Resp. 48 (citing Ex. 2016 ¶¶ 111–112).

Based on the complete record, we find that Petitioner has demonstrated that Ellis-2005's "Favorites" music channel feature teaches the subject matter recited in dependent claim 10 because this feature limits the output of the first and second media content based on the criterion of a user's selection of particular "favorite" music channels.

*ii. Dependent Claim 11*

Dependent claim 11 recites the limitation, "*[t]he system of claim 9 further comprising a computer storage device configured to store at least one of the first and second media content*." Petitioner asserts that Ellis-2005 teaches this limitation. Pet. 53–54.

Petitioner explains that "Ellis-2005 . . . discloses that '[s]et-top box 28 may also have digital channel selector 53, packet filter 55, and decoder 57 (or any suitable combination of such components) for obtaining the tracks of a particular digital channel from the signals that have been tuned to by tuners 50 and 51.'" Pet. 53 (citing Ex. 1008 ¶ 44). "Moreover," Petitioner

explains, "'[s]et-top box 28 may also have memory 59 for storing the PID map and for temporarily storing in-band information obtained by the music application using a second tuner.'" *Id.* According to Petitioner, "[d]igital channel selector 53 may obtain the PID map from the in-band data stream, store it in memory 59, and may determine which PIDs correspond to which digital channels." *Id.* Petitioner explains that "Ellis-2005 also discloses that '[t]he functions of control circuitry 42' which contains memory 59 'may be provided using the set-top box arrangement of FIG. 3' or 'integrated into an advanced television receiver such as a high-definition television (HDTV) receiver, personal computer television (PC/TV), digital or analog radio receiver, or any other such suitable component or combination of components.'" Pet. 54 (citing Ex. 1008 ¶ 53). "Thus," Petitioner concludes, "Ellis-2005 discloses 'a computer storage device configured to store at least one of the first and second media content.'" Pet. 54.

Petitioner's arguments are supported by Dr. Almeroth's testimony. *See* Ex. 1002 ¶¶ 146–147.

Patent Owner does not respond specifically to Petitioner's arguments and evidence concerning this limitation other than to state that "[d]ependent claims 10, 11, and 23 are not obvious in view of Ellis-2005 for the same reasons as claim 9" and that "Ellis-2005 in view of Crosby does not teach or suggest the challenged claims." PO Resp. 48 (citing Ex. 2016 ¶¶ 111–112).

Based on the complete record, we find that Petitioner has demonstrated that Ellis-2005's set-top box 28 with channel selector 53 and memory 59 meets the subject matter recited in dependent claim 11 because it can store PID maps and in-band information obtained from the data stream by the music application using a second tuner.

*iii. Dependent Claim 15*

Dependent claim 15 recites the limitation, "*[t]he system of claim 9, wherein, in response to receiving the response message, the computer server is configured to correlate the response message to the second media content with the specific instance of the first media content*." Petitioner asserts that Ellis-2005 teaches this limitation. Pet. 54–55.

Petitioner explains that "Ellis-2005 discloses that the music application may 'provide the user with an opportunity to purchase music merchandise . . . associated with a music program.'" *Id.* at 54 (citing Ex. 1008 ¶ 87). "Further," Petitioner explains, "Ellis-2005 discloses that 'identifiers' and 'ordering information' are transmitted to merchandising facility 10 when a purchase request is made by the user specific to the second media content." Pet. 55 (citing Ex. 1008 ¶¶ 8, 87–88). According to Petitioner, "Ellis-2005 also discloses that a 'merchandise request' includes necessary information for making a purchase including, e.g., 'a merchandise identifier, a user identifier or account number' and 'may be sent from the music application implemented on interactive music application equipment 17 to merchandising facility 10 over communications path 9 (FIG. 1).'" Pet. 55 (citing Ex. 1008 ¶ 88).

"Additionally," Petitioner points out, "Ellis-2005 states that '[t]he user may, for example, purchase merchandise that is related to the music program that the user is listening to.'" Pet. 55 (citing Ex. 1008 ¶ 87). "In this situation," Petitioner argues, a person of ordinary skill in the art "would have understood the response message for the second media content (i.e., merchandise request relating to the viewed music information) to be correlated with the specific instance of the first media content (i.e., the music program that the user is listening to)." Pet. 55 (citing Ex 1002 ¶ 149).

Petitioner's arguments are supported by Dr. Almeroth's testimony. *See* Ex. 1002 ¶¶ 148–149.

Patent Owner argues that none of the teachings described by Petitioner "relate to correlating the response message to the second media content with the specific instance of the first media content." PO Resp. 47–48. Patent Owner argues that that in Ellis-2005, "[t]he merchandise identifier by its very definition identifies the music the user wishes to purchase and does not 'enable identification of a specific instance of the first media content' since, for example, multiple broadcasts of the same song will have the same identifier." PO Resp. 46 (citing Ex. 2016 ¶ 108). Patent Owner also argues that Ellis-2005 "nowhere describes that information relating to the specific instance of the music being listened to from the first channel (i.e., Petitioner's purported data enabling identification of a specific instance of the first media content) is sent to the merchandise facility such that any correlation could occur." PO Resp. 47 (citing Ex. 2016 ¶ 109). According to Patent Owner, "Petitioner offers no explanation as to why a [person of ordinary skill in the art] would have understood such a correlation based on Ellis-2005." PO Resp. 46 (citing Ex. 2016 ¶ 107).

Petitioner responds by arguing that Patent Owner fails to properly consider all of what Ellis-2005 teaches with respect to claim 15. For example, Petitioner argues that with respect to claim limitation 9[a],[4] "Ellis-2005 discloses PIDs that are received by the tuners with each track, which enable the system to distinguish between different tracks, and PID maps that

---

[4] Claim 15 depends from independent claim 9, and therefore incorporates all of claim 9's limitations. 35 U.S.C. § 112 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

are transmitted in-band to enable the identification of a specific instance of a media content by indicating 'which PIDs correspond to which digital channels.'" Pet. Reply 25. Petitioner also argues that with respect to limitation 9[e], "Ellis-2005 discloses that 'identifiers' and 'ordering information' are transmitted to merchandising facility 10 when a purchase request is made by the user which uniquely identify data specific to the second media content." Pet. Reply (citing Ex. 1008 ¶¶ 8, 87–88).

Petitioner further argues that

> Ellis-2005 discloses that set-top box 28 may include "digital channel selector 53, packet filter 55, and decoder 57 . . . for obtaining the tracks of a particular digital channel from the signals that have been tuned to by tuners 50 and 51." [Ex. 1008 ¶ 44]. Moreover, set-top box 28 may comprise memory 59 "for storing the PID map" such that "[d]igital channel selector 53 may obtain the PID map from the in-band data stream, store it in memory 59, and may determine which PIDs correspond to which digital channels." *Id.*; *see also id.* ¶¶ 84–85. "If desired, the PID map may be preprogrammed into memory 59 of the music application." *Id.* ¶ 44. As depicted in Ellis-2005's Figures 1, 2a, and 3, . . . memory 59 within user music equipment 22 is a component of interactive music application equipment 17 that communicates over communication path 9 with the merchandise facility 10.

Pet. Reply 25–26 (citing Ex. 1008 ¶¶ 11–13; Ex. 1026 ¶¶ 56–57).

Petitioner argues, therefore, that a person of ordinary skill in the art

> would have understood that Ellis-2005's system is configured to correlate the PIDs and/or PID map information identifying a specific instance of the first media content that the user is listening to via tuner 50, stored or preprogrammed into memory 59, with a merchandise purchase request relating to content on another channel that the user is viewing simultaneously (second media content) via tuner 51. A [person of ordinary skill in the art] would have understood that this capability may be desirable, e.g., if a user finds merchandise that it wishes to purchase while

> browsing channels on tuner 51 but wants to remember the song that it was listening to on tuner 50 at the time it made the purchase request.

Pet. Reply 26 (citing Ex. 1026 ¶ 58).

In its Sur-reply, Patent Owner argues that Petitioner's reliance on the stored memory aspect of Ellis-2005 "is entirely new" and "should not be considered." PO Sur-reply 20. Patent Owner also argues that

> the mere storage of PIDs and PID maps in memory 59 and that memory 59 is part of the interactive music application equipment, does not demonstrate that the PIDs and PID maps are communicated to the merchandising facility, let alone used at the merchandising facility to correlate the purchased content of the first tuner with the specific instance of the content on the other tuner.

*Id.* at 19.

We disagree with Patent Owner that Petitioner's reliance on Ellis-2005's storage of PIDs and PID maps in memory is "entirely new" and "should not be considered." In its Response, Patent Owner asserts that "Petitioner has not shown that [Ellis-2005's] merchandising facility or any other computer system is configured to correlate the response message for purchasing from the second media content with the specific instance of the first media content." PO Resp. 47 (citing Ex. 2016 ¶ 109). Petitioner's explanation in its Reply describing the memory configuration and operation of Ellis-2005's system is a direct response to Patent Owner's assertion that Ellis-2005's system is not properly "configured" to correlate the response message in a manner that satisfies claim 15. Petitioner does this by first asserting that Patent Owner is not properly considering Ellis-2005 for all that it teaches with respect to claim 15.

Petitioner explains that with respect to limitation 9[a], "Ellis-2005 discloses PIDs that are received by the tuners with each track, which enable the system to distinguish between different tracks, and PID maps that are transmitted in-band to enable the identification of a specific instance of a media content by indicating 'which PIDs correspond to which digital channels.'" Pet. Reply 25. With respect to limitation 9[e], Petitioner explains that "Ellis-2005 discloses that 'identifiers' and 'ordering information' are transmitted to merchandising facility 10 when a purchase request is made by the user which uniquely identify data specific to the second media content." *Id.* (citing Ex. 1008 ¶¶ 8, 87–88). These arguments describe how Ellis-2005 teaches the "response message" to the second media content and the identified "specific instance of the first media content," which then appear again in claim 15.

Petitioner also explains that a person of ordinary skill in the art "would have understood that Ellis-2005's system is configured to correlate the PIDs and/or PID map information . . . with a merchandise purchase request relating to content on another channel that the user is viewing simultaneously (second media content)." Pet. Reply 26. Petitioner explains that "set-top box 28 may comprise memory 59 'for storing the PID map' such that '[d]igital channel selector 53 may obtain the PID map from the in-band data stream, store it in memory 59, and may determine which PIDs correspond to which digital channels.'" *Id.* at 25 (citing Ex. 1008 ¶¶ 84–85).

Each of these descriptions of Ellis-2005's system were previously provided and relied upon in the Petition to show how Ellis-2005 in combination with Crosby renders the challenged claims obvious. *See, e.g.*, Pet. 42–44 (describing PIDs and PID maps in Ellis-2005, and program segment IDs and other information in Crosby, with respect to limitation

9[a]); Pet. 50 (describing "identifiers" and "ordering information" with respect to limitation 9[e]); Pet. 54–55 (describing with respect to claim 15 how the use of "identifiers" and "ordering information" are used for a "merchandise request" sent from music application equipment 17 to merchandising facility 10 over communications path 9 so that "[t]he user may . . . purchase merchandise that is related to the music program that the user is listening to"); Pet 53–54 (explaining with respect to claim 11 how "[s]et-top box 28 may also have memory 59 for storing the PID map and for temporarily storing in-band information obtained by the music application using a second tuner" and "[d]igital channel selector 53 may obtain the PID map from the in-band data stream, store it in memory 59, and may determine which PIDs correspond to which digital channels"); *see also* Ex. 1002 ¶¶ 129–131, 141, 146–149.

Moreover, Petitioner's reply arguments are not the type of arguments that would warrant non-consideration, as Patent Owner requests. The Reply does not exceed the scope of the Petition, Petitioner is not attempting to introduce impermissible new matter, and the Reply does not raise a new theory of unpatentability. Indeed, the Federal Circuit has regularly held that "the petitioner in an *inter partes* review proceeding may introduce new evidence after the petition stage if the evidence is a legitimate reply to evidence introduced by the patent owner." *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1380–81 (Fed. Cir. 2018); s*ee also Apple Inc. v. Andrea Electronics*, 949 F.3d 697, 706–707 (Fed. Cir. 2020) (finding the Board abused its discretion for ignoring the petitioner's responsive arguments to issues raised in the patent owner's response, which did not "cite any new evidence or 'unidentified portions' of the [asserted prior art] reference"); *Chamberlain Group, Inc. v. One World Techs., Inc.*, 944 F.3d 919, 924–25

(Fed. Cir. 2019) ("Parties are not barred from elaborating on their arguments on issues previously raised.").

As explained above, we are persuaded by Petitioner's arguments that the PIDs and PID maps stored in memory in Ellis-2005 constitute "data enabling the identification of a specific instance of the first media content," and also that the combination of Ellis-2005 and Crosby (i.e., incorporating into Ellis-2005 the use of program segment IDs or other information necessary to identify program segments as taught by Crosby) teaches the limitation. *See supra* Section II.D.1.ii. With respect to the additional limitation of dependent claim 15, based on the complete record, we find that Petitioner has demonstrated that Ellis-2005's "merchandise request" (i.e., the response message for the second media content), which includes the necessary information for making a purchase including, e.g., "a merchandise identifier, a user identifier or account number," that is sent from the music application implemented on interactive music application equipment 17 to merchandising facility 10 over communications path 9, meets the subject matter recited in the claim because this feature allows the user to purchase merchandise that is related to the music program that the user is listening to at the time the purchase is made (i.e., correlated with the specific instance of the first media content). We credit the explanation provided by Dr. Almeroth, which is consistent with the disclosures of Ellis-2005 and Crosby. *See* Ex. 1002 ¶¶ 148–149; Ex. 1026 ¶¶ 55–58.

*iv. Dependent Claim 23*

Dependent claim 23 recites the limitation, "*[t]he system of claim 9, wherein the response message includes data that enables identification of a responder*." Petitioner asserts that Ellis-2005 alone or in view of Crosby teaches this limitation. Pet. 55–56.

Petitioner explains that "Ellis-2005 . . . discloses that when a user presses the 'buy' button to purchase merchandise (e.g., music album or record), a response message is sent that includes a 'user identifier.'" *Id.* at 56 (citing Ex. 1008 ¶ 88). Petitioner argues that a person of ordinary skill in the art "would have understood these identifiers to identify the responder." Pet. 56 (citing Ex. 1002 ¶ 151).

Petitioner also argues that "Crosby also explicitly discloses that the 'response message includes data that enables identification of a responder.'" Pet. 56. "For example," Petitioner argues, "Crosby discloses 'subscriber interface unit 214' that 'receives the subscriber ID for the subscriber of the mobile unit.'" Pet. 56 (citing Ex. 1006, 10:17–18). According to Petitioner, "[s]ubscriber interface unit 214 can access 'subscriber database 205, which provides the subscriber name and password and the e-mail for the subscriber' and 'process[es] purchase transactions directly on behalf of the subscriber using the stored credit card number for the subscriber.'" Pet. 56 (citing Ex. 1006, 10:24–29). "Moreover," Petitioner explains, "Crosby discloses that 'the network operations center maintains an e-mail address associated with the subscriber ID and transmits e-mail messages containing information corresponding to program segments selected by the subscriber via the designated e-mail address,' e.g., in response to 'INFO' or 'ORDER' commands." Pet. 56 (citing Ex. 1006, 7:57–61).

Petitioner argues that a person of ordinary skill in the art "would have been motivated to incorporate Crosby's teaching of additional information to accurately identify a responder/customer." Pet. 57. According to Petitioner, "Ellis-2005 already motivated the need to identify a responder/customer since a [person of ordinary skill in the art] would have understood it would have been common sense that a responder/customer would need to be

accurately identified in order to successfully complete order fulfillment and billing." *Id.* Petitioner argues that a person of ordinary skill in the art "would have had a reasonable expectation of success in using Crosby's particular type of information in a transaction since Ellis-2005 already describes providing at least some, if not sufficient identifying information and the combination would have only required the addition of the type of information disclosed in Crosby." *Id.* (citing Ex. 1002 ¶¶ 152–153).

Petitioner's arguments are supported by Dr. Almeroth's testimony. *See* Ex. 1002 ¶¶ 150–153.

Patent Owner does not respond specifically to Petitioner's arguments and evidence concerning this limitation other than to state that "[d]ependent claims 10, 11, and 23 are not obvious in view of Ellis-2005 for the same reasons as claim 9" and that "Ellis-2005 in view of Crosby does not teach or suggest the challenged claims." PO Resp. 48 (citing Ex. 2016 ¶¶ 111, 112).

Based on the complete record, we find that Petitioner has demonstrated that the combined teachings of Ellis-2005 and Crosby meet the subject matter recited in dependent claim 23 because the use of Crosby's additional information to accurately identify a responder/customer (e.g. subscriber name, password, and e-mail) combined with Ellis-2005's need to identify a responder/customer (i.e., "user identifier") would allow accurate identification of the responder/customer to successfully complete order fulfillment and billing.

We also find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the invention would have had sufficient reason to combine the teachings of Ellis-2005 and Crosby in the manner proffered by Petitioner and would have had a reasonable expectation of success in doing so.

*v. Conclusion on Dependent Claims*

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that dependent claims 10, 11, 15, and 23 are unpatentable under 35 U.S.C. § 103(a) as obvious over Ellis-2005 and Crosby.

*E. Other Asserted Grounds*

Petitioner also asserts that the challenged claims would have been obvious over Ellis-2005 alone, and over Noreen, Crosby, and Ellis-2002, in various combinations. *See* Pet. 4, 23–57. However, because Petitioner has shown that all of the challenged claims are unpatentable as discussed *supra*, we do not reach these other asserted grounds. *See Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984) ("The Commission . . . is at perfect liberty to reach a 'no violation' determination on a single dispositive issue."); *Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (recognizing that "[t]he Board has the discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

III. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 9–11, 15, and 23 of U.S. Patent No. 8,166,081 B2 are unpatentable on the bases set forth in the following table.[5]

---

[5] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 *Notice*

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 9, 15, 23 | 103(a) | Noreen[6] | | |
| 9, 15, 23 | 103(a) | Noreen, Crosby | | |
| 10, 11 | 103(a) | Noreen, Crosby, Ellis-2002 | | |
| 9–11, 15, 23 | 103(a) | Ellis-2005 | | |
| 9–11, 15, 23 | 103(a) | Ellis-2005, Crosby | 9–11, 15, 23 | |
| **Overall Outcome** | | | 9–11, 15, 23 | |

*Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[6] Because each of the challenged claims is held unpatentable on the ground combining Ellis-2005 and Crosby as a basis for unpatentability, we do not reach the other asserted grounds in the Petition.

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 9–11, 15, and 23 of U.S. Patent No. 8,166,081 B2 are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Ryan Yagura
Nicholas Whilt
Caitlin Hogan
Clarence Rowland
William Fink
O'MELVENY & MYERS LLP
ryagura@omm.com
nwhilt@omm.com
chogan@omm.com
crowland@omm.com
tfink@omm.com

Ben Haber
IRELL & MANELLA LLP
bhaber@irell.com

FOR PATENT OWNER:

John Scheibeler
Jonathan Lamberson
Hallie Kiernan
WHITE & CASE LLP
jscheibeler@whitecase.com
jonathan.lamberson@whitecase.com
hallie.kiernan@whitecase.com

Trials@uspto.gov
571.272.7822

Paper 63
Entered: January 24, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

VOLKSWAGEN GROUP OF AMERICA, INC.,
Petitioner,

v.

STRATOSAUDIO, INC.,
Patent Owner.

---

IPR2021-00721
Patent 8,166,081 B2

---

Before JUSTIN T. ARBES, HYUN J. JUNG, and
KEVIN C. TROCK, *Administrative Patent Judges*.

Opinion for the Board filed by *Administrative Patent Judge* TROCK.

Opinion Dissenting filed by *Administrative Patent Judge* ARBES.

TROCK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed herein, we determine that Volkswagen Group of America, Inc. ("Petitioner") has shown by a preponderance of the evidence that claims 9–11 and 23 (the "challenged claims") of U.S. Patent No. 8,166,081 B2 (Ex. 1001, "the '081 Patent") are unpatentable. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

## *A. Procedural History*

Petitioner Volkswagen Group of America, Inc. filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 9–11 and 23 of the '081 Patent. Patent Owner StratosAudio, Inc. filed a Preliminary Response. Paper 6. Pursuant to an Order, Paper 11, Petitioner filed a Reply, Paper 12, and Patent Owner filed a Sur-reply, Paper 14 to address issues raised in Patent Owner's Preliminary Response. Based upon the record at that time, we instituted *inter partes* review on all challenged claims on the grounds presented in the Petition. Paper 16 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response, Paper 27 ("PO Resp."), Petitioner filed a Reply, Paper 31 ("Pet. Reply"), and Patent Owner filed a Sur-reply, Paper 36 ("PO Sur-reply").

On June 2, 2022, we granted a Motion for Joinder with IPR2021-00721 filed by Mazda Motor of America, Inc., Subaru of America, Inc., and Volvo Car USA, LLC in IPR2022-00203. *See* Paper 37. Pursuant to that Order, Mazda Motor of America, Inc., Subaru of America, Inc., and Volvo Car USA, LLC maintained a secondary role in this proceeding.

On July 21, 2022, we issued an Order, Paper 43, terminating Mazda Motor of America, Inc. from this proceeding due to a settlement.

On July 22, 2022, an oral hearing was held. A transcript of the hearing is made part of the record. Paper 52 ("Tr.").

On September 29, 2022, we issued an Order, Paper 56, terminating Volvo Car USA, LLC from this proceeding due to a settlement.

Concurrently with this Final Written Decision we are issuing an order terminating Subaru of America, Inc., from this proceeding due to a settlement.

*B. Related Matters*

The parties identify the following as related matters:

- *StratosAudio, Inc. v. Hyundai Motor America*, No. 20-cv-01125-ADA (W.D. Tex.);
- *StratosAudio, Inc. v. Mazda Motor of America, Inc.*, No. 20-cv-01126-ADA (W.D. Tex.).
- *StratosAudio, Inc. v. Subaru of America, Inc.*, No. 20-cv-01128-ADA (W.D. Tex.).
- *StratosAudio, Inc. v. Volvo Cars USA, LLC*, No. 20-cv-01129-ADA (W.D. Tex.).
- *StratosAudio, Inc. v. Volkswagen Group of America, Inc.*, No. 6:20-cv-1131 (W.D. Tex.);[1]

Pet. 1; Paper 4, 1.

[1] Patent Owner identifies this proceeding as *StratosAudio, Inc. v. Volkswagen Group of America, Inc.*, No. 20-cv-01127-ADA (W.D. Tex.). Paper 4, 1. The correct case number appears to be 6:20-cv-1131-ADA. Ex. 2006, 1.

*C. The '081 Patent*

The '081 Patent relates to media advertising and associating an advertising media signal with another media signal. Ex. 1001, 1:18–20. The '081 Patent explains that it is generally desirable to associate products with specific characteristics and such associations may increase the chance that a potential customer will decide to purchase a product when the product is associated with a favorable characteristic. *Id.* at 1:22–30. In view of this, the '081 Patent states that an advertisement may be more effective if it is associated with an image of a celebrity or another media element that exhibits favorable characteristics. *Id.* at 1:30–34.

The '081 Patent describes a media enhancement system that is configured to associate a secondary media signal (e.g., an advertisement) to a primary media signal (e.g., a radio broadcast). *Id.* at 3:8–12. The '081 Patent explains that the secondary media signal may be based on the content of the primary media, user characteristics (e.g., demographic and/or geographic information), and/or third party preferences (e.g., the goals of advertisers). *Id.* at 3:17–21.

The '081 Patent discloses one example in which a radio station transmits a song in a first media signal that is received by a user enabled-device (e.g., a cellular phone with a radio). *Id.* at 3:27–30. A media association system analyzes the song to determine what media elements can be associated with the song, and the media association system provides a second media signal (e.g., an advertisement) to the user enabled-device. *Id.* at 3:30–36. While the user enabled-device is playing the song, the user enabled-device displays the media content in the second media signal (e.g., a still or moving picture of the advertised product). *Id.* at 3:37–40. The '081 Patent discloses another embodiment in which a user enabled-device is

playing a song from a first media signal, media content from a second media signal (e.g., a still or moving picture with selectable audio of an advertised product) is displayed by the user enabled-device, and the audio track for the first media signal is paused upon selection of the second media signal audio. *Id.* at 3:41–47.

Figure 1A of the '081 Patent is reproduced below.

FIG. 1A




Figure 1A, above, is a block diagram that depicts signals and identifiers correlated and transmitted between elements of a media enhancement system. *Id.* at 2:41–43. The system can include first transmitter 3, control management system 100, media association system 2, primary device 4, and advertisement entity 6. *Id.* at 8:11–16. First transmitter 3 can be broadcast content from a radio station, from over the internet, through a cable line, or satellite, and/or through other communication methods. *Id.* at 8:17–24. For instance, first transmitter 3

can send first media signal 111 that is received by primary device 4. *Id.* at 8:41–43.

Figure 1B of the '081 Patent is reproduced below.

FIG. 1B




According to the '081 Patent, Figure 1B, above, is a block diagram illustrating that media association system 2 can send or transmit secondary or related media signal 114, using information regarding the media content of first media signal 111, to primary device 4 and/or ancillary device 5 through an Internet connection. *Id.* at 9:34–37, 9:39–48. Advertisement entity 6 can send advertisement signal 113 to media association system 2 so advertisement signal 113 is provided to primary device 4 upon the latter receiving a specific song from first transmitter 3 via first media signal 111. *Id.* at 10:24–29.

The ’081 Patent explains that unique identifier 115 can be provided for each media signal (i.e., first media signal 111 and advertisement media signal 113) to facilitate the assignment and/or sending of advertisement media signal 113 with first media signal 111. *Id.* at 12:66–13:3. According to the ’081 Patent, unique identifier 115 can be stored in a database and/or other location, such as control management system 100, along with other relevant information. *Id.* at 13:13–15. The ’081 Patent discloses that unique identifier 115 can be used by media association system 2, advertisement entity 6, first transmitter 3, and/or primary device 4 and/or control management system 100 to track and/or record the results of any signal and to determine whether the signal should be provided to primary device 4 and/or the user. *Id.* at 13:16–22.

Figure 3 of the ’081 Patent is reproduced below.

FIG. 3




Figure 3, shown above, is an illustration that depicts primary device 4, such as a radio-enabled cellular phone, with display panel 450 that is connected to media association system 2. *Id.* at 2:50–51, 18:55–57, 19:11–13, 19:17. Primary device 4 receives first media signal 111 (not shown in Fig. 3) via receiver 455 and/or wire data connection 470. *Id.* at 18:57–59. First media signal 111 includes, for example, a radio program that primary device 4 can play to a user via speaker 453. *Id.* at 18:61–63. Display panel 450 can show information relating to the radio program being played. *Id.* at 19:13–15. For instance, upper portion 451 of the display panel can include textual information corresponding to the radio's music. *Id.* at 19:17–22. The information about the radio's music may be obtained from a Radio Broadcast Data System (RBDS) and/or Radio Data System (RDS) signal

accompanying first media signal 111 when the latter is in the form of a radio signal. *Id.* at 24:63–65. Lower panel 452 displays advertisement media signal 113 (not shown in Fig. 3), which may comprise any form of media content. *Id.* at 12:40–42, 19:45–46.

Primary device 4 can also send signals to transmitter 3, media association system 2, control management system 100, and/or advertisement entity 6. *Id.* at 15:9–12. For example, the signals from primary device 4 can be responses to interactive media signals. *Id.* at 15:12–14. Primary device 4 can transmit user behavior, can report location, direction of motion, and/or speed, and can detect other information about a user and/or the user's location and/or environment. *Id.* at 15:17–27. The '081 Patent explains that this information can be used by media association system 2 to determine what media and/or advertisements to send to primary device 4 to obtain a user's reaction and/or what media and/or advertisements are likely to elicit a positive reaction at a given time and/or when the user is in a given state or environment. *Id.* at 15:27–34.

*D. Challenged Claims*

Petitioner challenges claims 9–11 and 23. Claim 9 is the only independent claim. Claim 9 is reproduced below:

> 9[pre] A system for combining multiple media comprising:
>
> 9[a] a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium;
>
> 9[b] a second receiver module configured to receive at least a second media signal content and uniquely identifying data specific to at least the second media content,

9[c] the second media content received discretely from the first media content;

9[d] an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module;

9[e] an input module configured to receive at least a response input responsive to the second media content; and

9[f] a transmitting module configured to transmit a response message having at least the uniquely identifying data specific to the second media content to a computer server.

Ex. 1001, 35:22–41 (bracketed labelling designated by Petitioner; *see* Pet. 15–42).

*E. Evidence*

Petitioner relies upon the following evidence:

(1) U.S. Patent No. US 6,349,329 B1, issued February 19, 2002 ("Mackintosh") (Ex. 1004);

(2) U.S. Patent Application Publication No. 2005/0262542 A1, published November 24, 2005 ("DeWeese") (Ex. 1005); and

(3) Declarations of Tim A. Williams, Ph.D. (Exs. 1003, 1016).

Patent Owner relies on the declaration of Todd Moon, Ph.D. (Ex. 2019).

### *F. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| References | Basis | Claims Challenged |
|---|---|---|
| Mackintosh | § 102(b) | 9–11, 23 |
| Mackintosh | § 103(a) | 9–11, 23 |
| DeWeese | § 102(b) | 9–11, 23 |
| DeWeese | § 103(a) | 9–11, 23 |

Pet. 3.

## II. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

Whether a reference anticipates is assessed from the perspective of an ordinarily skilled artisan. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008) ("[T]he meaning of a prior art reference requires analysis of the understanding of an artisan of ordinary skill."). In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus. Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

Petitioner contends that "a person of ordinary skill in the art ('POSITA') would have had at least a B.S. in computer science or electrical engineering or a related field, and approximately three years of experience working in the communications or Internet-related industries" and that this is approximate because "a higher education or skill level might make up for

less experience, and vice-versa; for example, a POSITA could have a master's degree with no industry experience." Pet. 7 (citing Ex. 1003 ¶ 33). Patent Owner does not dispute this level of skill. PO Resp. 11–12.

Petitioner's description of the level of ordinary skill is generally consistent with the subject matter of the '081 Patent. We agree with Petitioner's description with the exception of the qualifier "at least" to keep the description from extending to a level beyond that of ordinary skill.

Accordingly, for purposes of this Final Written Decision, a person of ordinary skill in the art is a person with a bachelor's degree in computer science or electrical engineering or a related field, and approximately three years of experience working in the communications or Internet-related industries, or other equivalent industry experience in the field. A person with a master's degree in one of these fields with less industry experience would also qualify as a person of ordinary skill in the art.

*B. Claim Construction*

Pursuant to 37 C.F.R. § 42.100(b), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and even extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v.*

*Zhongshan Broad Ocean Motor Co*., 868 F.3d 1013, 1017 (Fed. Cir. 2017) (in the context of an *inter partes* review, applying *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

*1. "media content"*

Petitioner asserts that it adopts the '081 Patent's definition of "media content," which is:

> [T]he terms "media" or "media content" are broad terms that comprise any form of content, including without limitation, graphics, videos, sounds, text, text messages, interactive applications, vibrations, television and/or radio programming, podcasts, movies, songs, games, telephone conversations, speeches, news, information, advertisements, polls votes, personal messages, and/or other physical manifestations capable of communicating a concept or idea.

Pet. 8 (quoting Ex. 1001, 5:22–29; citing Ex. 1003 ¶¶ 39–40). Patent Owner does not dispute Petitioner's construction. PO Resp. 16.

While the '081 Patent does not provide a strict definition for the term "media content," the specification does state that "the terms 'media' or 'media content' are broad terms that comprise any form of content." Ex. 1001, 5:20–23. The '081 Patent also provides a number of different examples of media or media content, such as "graphics, videos, sounds, text, text messages . . . television and/or radio programming, podcasts, movies, songs, games, telephone conversations, speeches, news, information, advertisements, polls votes, [and] personal messages." *Id.* at 5:24–28.

For purposes of this Decision, we do not find it necessary to expressly construe the term "media content." *See Vivid Techs.*, 200 F.3d at 803 (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"). To the extent that

the determination of the meaning of this claim term is necessary, we use its ordinary and customary meaning.

*2. "present . . . media content"*

Petitioner argues the term "present . . . media content," which appears in claim 9, "should be construed to mean 'provide an output, related to a media content, that can be sensed by the user,' for example, display, audio, and vibration." Pet. 8–9 (citing Ex. 1001, 5:22–29, 5:36–40, 19:1–64; Ex. 1003 ¶¶ 42–44). Patent Owner does not dispute Petitioner's construction. PO Resp. 16.

Petitioner points out that the '081 Patent explains that media content can be presented in various ways. The '081 Patent states, and Petitioner points out, that "the terms 'display,' 'present,' their synonyms, and their alternative conjugations should be used interchangeably and be broadly interpreted as providing media to be sensed by the user." Pet. 9 (citing Ex. 1001, 5:36–40; Ex. 1003 ¶ 43).

Petitioner also points out that the '081 Patent explains that media content "need not be presented through the display panel, but could alternatively be presented through the speaker, a vibration system, and/or any other primary device output." Pet. 9 (citing Ex. 1001, 19:52–56, *see also id.* at 19:1–65; Ex. 1003 ¶ 44).

For purposes of this Decision, we do not find it necessary to expressly construe the term "present . . . media content." To the extent that the determination of the meaning of this claim term is necessary, we use its ordinary and customary meaning.

*3. first/second receiver module*

The terms "*first receiver module*" and "*second receiver module*" are recited in independent claim 9. *See* Ex. 1001, 35:22–31. Patent Owner

asserts that the recited claim terms "do not require a particular construction," but "maintains that the Board should interpret the claim to require two distinct receiver modules." PO Resp. 12. "In view of the totality of Claim 9," Patent Owner argues, "the Board should understand *first receiver module* and *second receiver module* as two separate and distinct receiver modules." *Id.* (citing Ex. 2019 ¶ 50).

Petitioner argues that Patent Owner's proposal "attempts to improperly import additional limitations into the claims," and "seeks to rewrite [claims that] are clear and unambiguous in their original form, both on their own and in light of the specification." Pet. Reply 4, 6. Petitioner points out that Patent Owner does not "provide an actual construction for the Board to adopt," and argues that "there is no construction for the Board to consider." *Id.* at 5. Petitioner also argues that Patent Owner's "interpretation introduces additional ambiguity as to what constitutes 'separate and distinct' receiver modules." *Id.* at 6.

We agree with Patent Owner that the claim terms, "*first receiver module*" and "*second receiver module*," do not require a particular construction. But as the proponent of a particular "interpretation" or "understanding" of these terms, Patent Owner has not shown that the ordinary and customary meaning of "*first receiver module*" and "*second receiver module*" are somehow deficient or deprive claim 9 of its clarity. We also agree with Petitioner that Patent Owner's proposal would improperly add limitations to the claim as well as create ambiguity as to what does, or does not, constitute "separate and distinct" receiver modules.

Moreover, as the proponent of the proposed "interpretation" or "understanding" of the claim terms, Patent Owner has not justified incorporating the additional limitations of "separate and distinct" modules

into claim 9, and Patent Owner's arguments for doing so are flawed because they ignore key aspects of the '081 Patent's specification that provide important context to the claim language "*module*."

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313 (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)); s*ee also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.").

For example, the '081 Patent specification explains that:

> *in general the word 'module,' as used herein, refers to logic embodied in hardware and/or firmware, and/or to a collection of software instructions*, possibly having entry and/or exit points, written in a programming language. . . . It will be appreciated that software modules may be callable from other modules and/or from themselves, and/or may be invoked in response to detected events and/or interrupts. . . . Generally, *the modules described herein refer to logical modules that may be combined with other modules or divided into sub-modules despite their physical organization or storage*.

Ex. 1001, 6:47–7:8 (emphases added).

This use of the term "module" in the '081 Patent specification explains to one of ordinary skill in the art that a "module" may be "logic embodied in hardware" and/or "firmware," and/or "a collection of software instructions." *Id.* at 6:47–49. Moreover, this use of the term "module" also explains to one of ordinary skill in the art that generally the "modules" being described refer to "logical modules" that "may be combined with other

modules" or "divided into sub-modules" despite their physical organization or storage. *Id.* at 7:5–8.

The parties here do not appear to dispute that claim 9 does, in fact, recite two receiver modules, i.e. "*a first receiver module*" and "*a second receiver module*." *See, e.g.*, Pet. 25 ("Mackintosh's computer [212/702], which includes 'communications interface 724,' corresponds to the claimed 'first receiver module'"), *id.* at 32 ("a [person of ordinary skill in the art] would have understood that the communication interface [724] of Mackintosh's user terminal/computer [212/702] corresponds to the claimed 'second receiver module'"); PO Resp. 1–2 ("The [claimed] system is configured to present concurrently both the first and second media on the output of either the first receiver module *or* the second receiver module.").

Rather, the disagreement here seems to stem from the parties misconstruing each other's arguments, and not from any inherent ambiguity in the claim language. For example, Petitioner is not arguing that claim 9 "be read as having only a single receiver module," as Patent Owner asserts. *See* PO Resp. 13. Rather, Petitioner is arguing that the '081 Patent's "specification contemplates *a single device having the necessary modules* for receiving both the first and second media content." Pet. Reply 9 (citing Ex. 1016 ¶¶ 26–27) (emphasis added); *see also id.* at 10 ("The ['081 patent] specification therefore also describes the functionality of *the claimed first and second receiver modules occurring at a single device which uses multiple receiver modules* to receive both sets of media content.").

In its Sur-reply, Patent Owner eventually concedes "that the specification of the '081 patent supports a reading where one device can have the 'necessary modules for receiving both the first and second media content.'" PO Sur-reply 2 (citing Pet. Reply 8–10). Patent Owner finally

articulates the misunderstanding between the parties when it states, "Patent Owner never argued claim 9 requires two 'devices.' Patent Owner instead pointed out that the claim requires two distinct ***modules***." *Id.* (citing PO Resp. 12–15).

For these reasons, we do not find it necessary to expressly construe or interpret the claim terms "*first receiver module*" and "*second receiver module*" as Patent Owner proposes. To the extent that the determination of the meaning of these terms is necessary, however, we use their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the claims, the specification, the prosecution history and relevant extrinsic evidence. This understanding of the term "module" is informed by its description in the specification of the '081 Patent as "logic embodied in hardware and/or firmware, and/or . . . a collection of software instructions," which "may be callable from other modules and/or from [itself], and "may be combined with other modules or divided into sub-modules." *See* Ex. 1001, 6:47–7:8.

4. *"on an output of the first receiver module or the second receiver module"*

Claim 9 recites in pertinent part, "an output system configured to present concurrently the first media content **and** the second media content on an output of the first receiver module **or** the second receiver module." Ex. 1001, 35:22, 32–35 (emphasis added).

Although the parties have not formally requested a construction of this limitation, it is clear from the briefing and the oral argument that the parties dispute the meaning and the scope of this limitation. In essence, the parties dispute whether this portion of claim 9 requires one output or two outputs. For example, Patent Owner argues, "[e]lement 9[d], requires two outputs"

(PO Resp. 42), and "you have to have two of these modules receiving data discretely, each with their own output" (Paper 52, 47:15–17). Whereas Petitioner argues, "the claims are satisfied when a single system includes a first and second receiver module and outputs the first and second media content concurrently" (Pet. Reply 25), and "We don't believe . . . that two separate outputs, one existing on each of these separate and distinct modules is required. Instead, a single device having a single output system as shown in Fig. 3 of the '081 Patent is sufficient" (Paper 52, 13:16–22).

The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention when read in the context of the specification and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Id.* at 1313.

Here, claim 9 selectively uses the conjunctive "and" and the disjunctive "or" within the same phrase: "an output system configured to present concurrently the first media content **and** the second media content on an output of the first receiver module **or** the second receiver module." Ex. 1001, 35:32–35 (emphases added).

Our reviewing court has consistently interpreted the word "or" to mean that items in a sequence are alternatives to each other. *See Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1311 (Fed. Cir. 2002). Given this understanding, in our view the phrasing of limitation 9[d] means that: 1) the output system must be able to present, at the same time, both the first **and** the second media content on an output of the first receiver module; **or** 2) the

output system must be able to present, at the same time, the first **and** the second media content on an output of the second receiver module.

This understanding of the output system of claim 9 is consistent with the ’081 Patent specification. For example, the ’081 Patent specification describes an embodiment having “an output module configured to output a primary media content from the first media signal and output a secondary media content from the second media signal.” Ex. 1001, 2:2–5.

This understanding of the output system of claim 9 is also consistent with the testimony of Dr. Williams, who explains how one of ordinary skill in the art would understand the ’081 Patent. *See* Ex. 1016 ¶¶ 30–35. Dr. Williams provides examples from the ’081 Patent specification consistent with this understanding of the output system recited in claim 9. Dr. Williams testifies that “outputting audio data (‘first media content’), for example via a speaker, with corresponding visual data (‘second media content’), for example via a display, using a single device would be sufficient to satisfy the claim.” *Id.* ¶ 32 (citing Ex. 1001, Fig. 3). Dr. Williams points out numerous examples described in the ’081 Patent where different media content are presented concurrently on a single device’s output. *Id.*

While this understanding of limitation 9[d] acknowledges the existence of two modules, each having an output, i.e. “an output of the first receiver module,” and “an output of the second receiver module,” it does not necessarily follow that the outputs of these modules are separate and distinct physical structures as Patent Owner argues. *See, e.g.*, PO Resp 1 (“A second receiver module with its own separate output, receives a second media content”), *id. at* 43 (“Petitioner does not identify a second ‘output’ that is

distinct from this first 'output.' For example, there is no second device with its own separate display" (internal citations omitted)).

As we discussed above with respect to the claim term "module," the '081 Patent specification explains that a "module" may be "logic embodied in hardware" and/or "firmware," and/or "a collection of software instructions." Ex. 1001, 6:47–49. This use of the term "module" also explains to one of ordinary skill that generally the "modules" being described refer to "logical modules" that "may be combined with other modules" or "divided into sub-modules" despite their physical organization or storage. *Id.* at 7:5–8.

Patent Owner acknowledged at oral argument that one module could be a submodule of another. "Could one module be a submodule of another? You know, potentially, it could. I don't know that anything excludes that." Tr. 48:13–15. Because the receiving modules may be logical submodules of one another, and therefore not necessarily separate physical structures or components, it follows that their outputs may not necessarily be separate physical structures either, but may maintain their identity and distinction through the use of logic or software or other technical means. Dr. Williams, for example, explains how the '081 Patent "expressly contemplates first and second media content being transmitted and received discretely using a single, subdivided signal. This would be achieved, for example, by multiplexing or interleaving the two types of content." Ex. 1016 ¶ 75.

For these reasons, we construe the limitation "*an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module*" to mean either: 1) the output system must be able to present, at the same time, both the first and the second media content on an

output of the first receiver module; or 2) the output system must be able to present, at the same time, the first and the second media content on an output of the second receiver module. Although we understand claim 9 to be reciting two receiving modules, i.e. a "first receiving module" and a "second receiving module," each having an output, we do not understand claim 9 to require that the receiving modules and their outputs must be separate and distinct physical structures or components.

*C. Patentability Challenges*

As indicated above, Petitioner presents four grounds challenging the patentability of particular claims of the '081 Patent under 35 U.S.C. §§ 102, 103. Petitioner challenges claims 9–11 and 23 as (1) anticipated by Mackintosh, (2) as obvious over Mackintosh, (3) as anticipated by DeWeese, and (4) as obvious over DeWeese. Pet. 3.

*1. Principles of Law*

To anticipate a claim under 35 U.S.C. § 102, "a single prior art reference must expressly or inherently disclose each claim limitation." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008). Accordingly, "the dispositive question regarding anticipation [i]s whether *one skilled in the art* would reasonably understand or infer from the [prior art reference's] teaching" that every claim element was disclosed in that single reference. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003).

Anticipation cannot be proven by "multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Microsoft Corp. v. Biscotti, Inc.,* 878 F.3d 1052, 1069 (Fed. Cir. 2017); *see also Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). Rather, the reference must "clearly and unequivocally disclose the

claimed [invention] or direct those skilled in the art to the [invention] without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference." *Net MoneyIN*, 545 F.3d at 1371 (quoting *In re Arkley*, 455 F.2d 586, 587 (CCPA 1972)). Thus, while "[s]uch picking and choosing may be entirely proper in the making of a 103, obviousness rejection . . . it has no place in the making of a 102, anticipation rejection." *Arkley*, 455 F.2d at 587–88.

A claim is unpatentable as obvious under 35 U.S.C. § 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2006). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) so-called "secondary considerations," including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).[2]

*2. Relevant Prior Art*

*i. Mackintosh (Ex. 1004)*

Mackintosh is a U.S. Patent that issued on February 19, 2002, more than one year before the earliest priority date of the '081 Patent. Ex. 1001, code (22), (60); Ex. 1004, code (45). Petitioner asserts that Mackintosh is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 9.

[2] Neither party has presented any evidence on the fourth *Graham* factor.

Mackintosh relates to broadcast materials and to a system and method for coordinating the delivery of supplemental information with broadcast materials. Ex. 1004, 1:19–22. Mackintosh describes supplemental material as including, for instance, images, video clips, audio clips, data, or other materials that may be provided to a user in conjunction with broadcast materials. *Id.* at 2:57–60. Mackintosh explains:

> According to one aspect of the invention, supplemental materials can be provided to a user in a coordinated fashion with the broadcast materials being delivered. The supplemental materials can be provided in a coordinated fashion such that they relate to the actual broadcast materials as they are being streamed or otherwise delivered to the user. For example, according to one embodiment, the broadcast material is delivered to the user in segments such as, for example, tracks of music, advertisements, and promotional materials in a radio broadcast. In this embodiment, the supplemental materials can be coordinated with the individual segments (e.g., tracks) such that supplemental materials relating to the segments can be provided as the segments are being provided to the user.

*Id.* at 2:43–56.

Mackintosh describes an example in which radio broadcast materials are broadcast over the Internet. *Id.* at 2:66–3:1. For instance, the radio broadcast can include a plurality of tracks that are streamed to a user via the Internet, such as music tracks, advertising tracks, DJ voice or introduction tracks, promotional tracks, and any other track a station may wish to broadcast. *Id.* at 3:1–7. Mackintosh states that the tracks can identify a track, the type of track, and other pertinent or relevant information regarding a particular track. *Id.* at 3:7–11.

Figure 5 of Mackintosh is reproduced below.




*Fig. 5*

Figure 5, above, depicts an example in which radio station 204 provides broadcast materials to a listener at user terminal 212. *Id.* at 4:28–31, 8:31–34. Specifically, radio station 204 provides its broadcast materials to broadcast Internet service provider 208. *Id.* at 8:40–41. In turn, Internet service provider 208 provides the broadcast materials in a digital format to user terminal 212 via Internet 210. *Id.* at 9:48–51.

Figure 7 of Mackintosh is reproduced below.




Fig. 7

Figure 7, above, shows an exemplary user interface for a player. *Id.* at 4:37–39. The player can include four parts: data window 302, player interface 304, history window 306, and advertising window 308. *Id.* at 12:35–37. Mackintosh discloses that data window 302 can include album image 322, artist or album or track information 324, buy now button 326, and additional information selection area 328. *Id.* at 12:55–61. Mackintosh explains that buy now button 326 can be used to activate a link to a source so a user can purchase the album title being played, such as by accessing a supplier's web site and allowing the user to purchase the album online. *Id.* at 14:21–26.

*ii. DeWeese (Ex. 1005)*

DeWeese is a U.S. Patent Application Publication that published on November 24, 2005, more than one year before the earliest priority date of the '081 Patent. Ex. 1001, code (60); Ex. 1005, code (43). Petitioner asserts that DeWeese is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 13.

DeWeese relates to television chat system and "to techniques for supporting chat communications in a television environment that may include an interactive television program guide." Ex. 1005 ¶ 2. Figure 1A of DeWeese is reproduced below.




FIG. 1A

Figure 1A, above, is a diagram of television chat system 10. *Id.* ¶¶ 19, 51. System 10 includes main facility 12 that may have program guide database 14 that stores program guide information, such as television program guide listing data, and allows system 10 to support an interactive television program guide. *Id.* ¶ 51. DeWeese explains that information from database 14 may be transmitted to television distribution facility 16 via communications link 18. *Id.* According to DeWeese, the program guide information includes television program listings data, such as program times,

channels, titles, descriptions, etc. and may also include information on chat groups that are available for particular television programs or channels. *Id.* ¶ 53.

DeWeese explains that television distribution facility 16 distributes the program guide data and other information to user television equipment 20 via communications paths 24. *Id.* ¶ 55. Communication paths 24 allow television distribution facility 16 "to distribute scheduled television programming, pay programming, real-time communications, chat requests and other video and audio information to user television equipment 20 in addition to non-video program guide information and communications." *Id.*

Figure 9 of DeWeese is reproduced below.




*FIG. 9*

Figure 9, above, depicts display screen 200 containing video for television program 202 in one region 203 of display screen 200 and chat room region 206. *Id.* ¶¶ 31, 93. DeWeese describes chat room participants

sending chat messages, which appear in chat room region 206. *Id.* DeWeese also discloses that advertisement 201 may also be displayed in region 205. *Id.*

*D. Anticipation by Mackintosh*

Petitioner contends that Mackintosh anticipates claims 9–11 and 23 under 35 U.S.C. § 102(b). Pet. 15–52; Pet. Reply 13–21. Patent Owner argues that Mackintosh fails to disclose all the recited limitations of the challenged claims. PO Resp. 25–38; PO Sur-reply 9–18. Claim 9 is the only challenged independent claim. The remaining challenged claims, 10, 11, and 23, all depend from claim 9. We first discuss independent claim 9.

*1. Independent Claim 9*

In response to Petitioner's evidence and arguments that Mackintosh anticipates independent claim 9 of the '081 Patent (*see* Pet. 15–52), Patent Owner argues that Mackintosh fails to disclose specific limitations recited by claim 9 (*see* PO Resp. 25–38). These contested limitations include portions of limitation 9[a]: "*data enabling identification of a specific instance of the first media content*"; 9[b]: "*a second receiver module*"; and 9[d] "*an output of the first receiver module or the second receiver module*".

We begin with a review of Petitioner's evidence and arguments with respect to limitations 9[a] "*a first receiver module . . .* " and 9[b] "*a second receiver module . . .* ".

*i. Limitation 9[a]: a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium;*

With respect to limitation 9[a], Petitioner asserts that:

> Mackintosh's computer,[3] which includes "communications interface 724," corresponds to the claimed "first receiver module"; and, it is configured to receive (i) "broadcast material" (audio data), which corresponds to the claimed "first media content," and (ii) "program data," which corresponds to the claimed "data enabling the identification of a specific instance of the first media content from a first broadcast medium."

Pet. 25 (citing Ex. 1003 ¶ 74).

Figures 5 and 10 of Mackintosh are shown below, side by side.




Fig. 5




Fig. 10

With respect to Mackintosh's Figure 5 (above, left) and Figure 10 (above, right), Petitioner asserts that Mackintosh "discloses that a broadcaster (shown as 'broadcast internet service provider 208' and 'broadcast server 509,' respectively) transmits broadcast material, including

[3] Petitioner states in a footnote that "[f]or ease of reference, Petitioner will hereinafter refer to each of Mackintosh's 'user terminal 212' and 'computer system 702' as 'computer.'" Pet. 19 n.1 (citing Ex. 1003 ¶ 61).

audio and program data, to a user (shown, respectively, as 'user terminal 212' and 'player 510')." Pet. 21–22 (citing Ex. 1004, Figs. 5, 10, 8:40–49, 9:48–50; Ex. 1003 ¶ 67).

Petitioner also asserts that "[t]he 'program data' that is sent with the audio data 'can include, for example, a cut number, a category of the cut, and a duration of the cut.'" Pet. 22. According to Petitioner, Mackintosh explains that each "cut code correspond[s] to and uniquely identif[ies] a segment from the standpoint of the radio station." Pet. 22–23 (citing Ex. 1004, 9:18–19, 21:21–25; Ex. 1003 ¶ 68). Petitioner argues that "the station ID and the cut number, collectively, correspond to the claimed data that enable the identification of a specific instance of the first media content." Pet. 23 (citing Ex. 1003 ¶ 68).

Petitioner asserts that "Mackintosh further discloses that 'player' software (*e.g.*, 'software application resident on user terminal 212' or 'player 510' running on 'computer system 702') 'play[s] the broadcast material broadcast from the broadcast Internet service provider 208.'" Pet. 23 (citing Ex. 1004, 12:18–22, 21:56–67).

Petitioner explains that "Mackintosh's computer, on which the 'player' software operates, includes a 'communications interface 724,' which 'allows software and data to be transferred between computer system 702 and external devices.'" Pet. 24 (citing Ex. 1004, 24:55–58; Ex. 1003 ¶ 72).

Petitioner's arguments are supported by the testimony of Dr. Williams. *See* Ex. 1003 ¶¶ 67–74.

ii. *Limitation 9[b]: a second receiver module configured to receive at least a second media signal content and uniquely identifying data specific to at least the second media content;*

With respect to limitation 9[b], Petitioner asserts that "the communication interface of Mackintosh's user terminal/computer corresponds to the claimed 'second receiver module.'" Pet. 32 (citing Ex. 1003 ¶ 86).

Petitioner argues that in Mackintosh, "to enhance the broadcast experience, a server provides 'supplemental materials' to the listener of the broadcast." Pet. 25–26 (citing Ex. 1003 ¶ 75). Mackintosh, Petitioner argues, "teaches that the 'supplemental materials' can broadly include 'images, video clips, audio clips, data, or other materials that may be provided to the user in conjunction with the broadcast materials. . . . The supplemental materials can also include advertising information that is provided to the user during particular segments of the broadcast material.'" Pet. 26 (citing Ex. 1004, 2:57–62, 10:32–33, 22:55–60; Ex. 1003 ¶ 76).

Mackintosh's Figure 7 is shown below.




Fig. 7

Petitioner explains that:

> Mackintosh discloses, with respect to figure 7 [shown above], that its software player—which displays the "supplemental materials" to the user—includes "data window 302" that can include "an album image 322, artist or album or track information 324, a buy now button 326, and additional information selection area 328," as well as "a history window 306, and an advertising window 308.

Pet. 27 (citing Ex. 1004, 12:35–46, 12:55–63, Fig. 7; Ex. 1003 ¶ 78).

Petitioner also points out that:

> Mackintosh explains that various elements of the "supplemental materials," which are graphically represented in the player, include links that direct a user to a website, hosted by a server, where the user can obtain additional information (such as learning about tour information) or take a particular action (such as purchasing the music or a product/service being advertised).

Pet. 29 (citing Ex. 1004, 23:26–24:4; Ex. 1003 ¶ 79).

Petitioner argues that any of Mackintosh's four described "elements of the 'supplemental materials'—*i.e.*, (i) the 'buy now' button, (ii) the 'tours and tickets' button, (iii) the 'artist archives' button, or (iv) the 'advertisement' shown in the banner—correspond to the claimed 'second media content.'" Pet. 31 (citing Ex. 1003 ¶ 83). Petitioner argues that

> [t]he underlying link or URL that takes the user to the website relating to that element corresponds to the claimed 'uniquely identifying data specific to at least the second media content' because each link or URL (i) relates specifically to the particular element (*e.g.*, to the advertisement shown in the banner or to the tour information related to the artist being played); (ii) accompanies the graphical representation of that particular element; and (iii) is used to retrieve additional information about, or take a particular action regarding, the specific element.

Pet. 31–32 (citing Ex. 1003 ¶¶ 84–85).

Petitioner's arguments are supported by the testimony of Dr. Williams. *See* Ex. 1003 ¶¶ 75–86.

*iii. Patent Owner argues that Mackintosh fails to teach a second receiver module*

Patent Owner argues that "Petitioner gives the impression that two separate parts of Mackintosh's system describe the *first receiver module* (element 9[a])[4] and the *second receiver module* (element 9[b])." PO Resp. 25. "While on the surface," Patent Owner argues, "the two components Petitioner identifies (a 'computer' and a 'communications interface') are different words, a closer review of Mackintosh reveals that Petitioner is

---

[4] Patent Owner refers to the different terms of claim 9 as "elements," while the Board refers to them as "limitations" following the guidance in *Festo v. Shoketsu*, 234 F.3d 558, 563 n.1 (Fed. Cir. 2000) (en banc), *judgment vacated on other grounds*, 520 U.S. 1111. But for purposes of this Decision, it is understood that both words are referring to the same thing when referencing the same claim terms.

actually relying on only one component—the 'communications interface'—to satisfy both element 9[a] and 9[b]." *Id.* (citing Ex. 2019 ¶ 68). "Because the claim requires two receiver modules," Patent Owner argues, "Mackintosh fails to anticipate." PO Resp. 25 (citing Ex. 2019 ¶ 68).

To support its argument, Patent Owner points out Petitioner's assertion that "Mackintosh's computer, which includes 'communications interface 724,' corresponds to the claimed 'first receiver module.'" PO Resp. 25 (citing Pet. 25; Ex. 2019 ¶ 69). "Petitioner then asserts," Patent Owner argues, "that 'a [person of ordinary skill in the art] would have understood that the communication interface of Mackintosh's user terminal/computer corresponds to the claimed 'second receiver module.'" PO Resp. 25 (citing Pet. 32; Ex. 2019 ¶ 69).

Patent Owner argues that Petitioner's expert, Dr. Williams, "agrees that claim 9 of the '081 patent requires two separate modules." PO Resp. 26. In support of this argument, Patent Owner cites Dr. Williams's deposition testimony where Dr. Williams states that "the second media content received discretely from the first media content would require that different resources be applied to the reception of the second media content than the first media content and those resources can be hardware and/or software." PO Resp. 26 (quoting Ex. 2020, 25:5–14 (discussing "received discretely" in connection with related U.S. Patent No. 9,355,405 B2 ("the '405 patent")); *see also id.* at 23:25–26:17, 49:22–50:6 (acknowledging that his understanding of "received discretely" in the '081 patent is the same as his understanding of the claim term in the '405 patent).

Patent Owner alleges that:

> Petitioner combines different embodiments in Mackintosh in support of its assertion that Mackintosh shows a *first* and *second*

> *receiver module*. Ex. 2019 ¶ 71. To bridge the gap between the two embodiments, Petitioner creates the term "computer" to refer to different aspects within each embodiment. Pet. 19 n.2 (citing Ex. 1003 ¶ 61); Ex. 2019 ¶ 71. In particular, Petitioner says that "computer" refers to the "user terminal 212" in Figure 5 and the "computer system 702" in Figure 13. Pet. 19 n.2 (citing Ex. 1003 ¶ 61); Ex. 2019 ¶ 71).

PO Resp. 26.

"Regardless of which embodiment is considered," Patent Owner argues, "Mackintosh explains that 'user terminal 212'/'computer system 702' both communicate with external devices in the same manner." *Id.* at 27. Patent Owner argues that "Mackintosh's 'user terminal 212' includes an appropriate 'communication interface' to allow for delivery of the broadcast medium." *Id.* (citing Ex. 1004, 5:28–34; Ex. 2019 ¶ 72).

"Similarly," Patent Owner argues, "as indicated in Mackintosh's Fig. 13 (reproduced below), the 'computer system 702' has only a single interface that receives external data—the 'communications interface 724.'" PO Resp. 27 (citing Ex. 1004, 24:55–58 ("Communications interface 724 allows software and data to be transferred between computer system 702 and external devices."); Ex. 2019 ¶ 72; *see also* Pet. 24 (citing the same). Patent Owner asserts that "Petitioner's expert confirmed this during redirect deposition, where he pointed to Mackintosh's 'communication interface' as corresponding to both the 'first receiver module' and the 'second receiver module' in the challenged claims." PO Resp. 27 (citing Ex. 2020, 159:20–161:13).

Patent Owner provides Mackintosh's Figure 13, shown below.




*Fig. 13*

According to Mackintosh, Figure 13, above, depicts the architecture of computer system 702, including communications interface 724, which "allows software and data to be transferred between computer system 702 and external devices . . . via a channel 728." Ex. 1004, 24:55–66.

Patent Owner argues, "[f]or either the 'user terminal 212' or 'computer system 702'—both of which Petitioner labeled 'computer'—the device uses the 'communication interface' to receive media content." PO Resp. 28 (citing Ex. 2019 ¶ 73). Patent Owner argues that "Petitioner's identification of the first and second receiver module is, therefore, to the same interface, not a *first receiver module* and *second receiver module*." PO Resp. 28 (citing Ex. 2019 ¶ 73). "For this reason alone," Patent Owner

argues, "Mackintosh fails to anticipate claim 9 of the '081 patent." PO Resp. 28 (citing Ex. 2019 ¶ 73). We agree.

In order to establish that independent claim 9 is anticipated by Mackintosh under 35 U.S.C § 102(b), Petitioner must prove, by a preponderance of the evidence, that one of ordinary skill in the art would reasonably understand or infer from Mackintosh that every limitation of claim 9 is disclosed, either expressly or inherently. 35 U.S.C. §§ 102, 316(e); *Finisar*, 523 F.3d at 1334; *Dayco*, 329 F.3d at 1368.

Moreover, anticipation cannot be proven by "multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Microsoft*, 878 F.3d at 1069; *see also Net MoneyIN*, 545 F.3d at 1371. Rather, Mackintosh must "clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference." *Net MoneyIN*, 545 F.3d at 1371 (quoting *In re Arkley*, 455 F.2d 586, 587 (CCPA 1972)).

Independent claim 9 (with Petitioner's labeling of limitations) recites the following in pertinent part:

> 9. A system for combining multiple media comprising:
>
> [a] a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium;
>
> [b] a second receiver module configured to receive at least a second media signal content and uniquely identifying data specific to at least the second media content, the second media content received discretely from the first media content;

Ex. 1001, 35:22–31.

The parties do not dispute that claim 9 recites two receiver modules, "*a first receiver module*," and "*a second receiver module*." In our view, Petitioner's identification of what in Mackintosh constitutes the claimed "*first receiver module*," and "*second receiver module*" is ambiguous and confusing to the point of being indeterminable.

First, Petitioner's identification of the claimed "*first receiver module*" is ambiguous. Petitioner begins by stating that "Mackintosh discloses that the broadcast and supplemental materials," which Petitioner identifies as the claimed "*first media content*" and "*second media content*," respectively, "can be presented to its users on a device such as 'user terminal 212,' or, more specifically, 'computer system 702.'" Pet. 18–19; *see also* Pet. 25 (identifying "'broadcast material' (audio data)" as the claimed "*first media content*"); Pet. 31 (identifying "supplemental materials" as the claimed "*second media content*").

Petitioner then explains in a footnote that "[f]or ease of reference, Petitioner will hereinafter refer to each of Mackintosh's 'user terminal 212' and 'computer system 702' as 'computer.'" Pet. 19 n.2. This creates ambiguity because whenever Petitioner subsequently uses the term "computer" with reference to Mackintosh, one does not know whether Petitioner is referring to Mackintosh's "user terminal 212" or Mackintosh's "computer system 702."

Petitioner goes on to state that "Mackintosh's computer, which includes 'communications interface 724,' corresponds to the claimed 'first receiver module.'" Pet. 25. This statement has two levels of ambiguity. It is not clear from this statement whether Petitioner is mapping "Mackintosh's computer" as a whole to the claimed "*first receiver module*," or mapping

"Mackintosh's computer, which includes 'communications interface 724'" to the "*first receiver module*," or only mapping "communications interface 724" to the "*first receiver module*." It is also not clear that when Petitioner uses the term "Mackintosh's computer" whether Petitioner is referring to Mackintosh's "user terminal 212" or Mackintosh's "computer system 702".

Second, Petitioner's identification of the claimed "*second receiver module*" is confusing. In the Petition, Petitioner asserts that a person of ordinary skill in the art "would have understood that the communication interface of Mackintosh's user terminal/computer corresponds to the claimed 'second receiver module.'" Pet. 32 (citing Ex. 1003 ¶ 86). But here, Petitioner does not identify Mackintosh's "communication interface," "user terminal," or "computer" by using Mackintosh's identifying numerals such as "communication interface 724," "user terminal 212," or "computer system 702," which would help clarify exactly which components of Mackintosh's disclosure Petitioner is mapping to the claimed "*second receiver module*" and how these components relate to and interact with each other. *See, e.g.*, Ex. 1004, Figs. 5, 13.

But even Petitioner and its expert, Dr. Williams, seem confused as to exactly which components of Mackintosh's disclosure they are using to map to the claimed "*second receiver module.*" In an effort to clarify some of the ambiguity in the record, the Board requested post-hearing briefing from the parties, asking the parties to specifically "identify where in the substantive papers [they] argued that Mackintosh does, or does not, disclose a '*first receiver module*' and a '*second receiver module*,' and provide a brief summary of the evidence of record [they] cited in support of those arguments," among other things. *See, e.g.*, Paper 47, 6–7. Here, Petitioner responded by stating that "Mackintosh's computer 702 discloses the claimed

'*first receiver module*,'" and "Mackintosh's communications interface 724 corresponds to the '*second receiver module*.'" Paper 50, 6–7.

Petitioner's post-hearing identification of "Mackintosh's computer 702" as the claimed "*first receiver module*" and "Mackintosh's communications interface 724" as the claimed "*second receiver module*," however, directly conflicts with Petitioner's expert testimony where Dr. Williams identifies Mackintosh's "communications interface" as the claimed "*first receiver module*" and "*second receiver module*."

During his deposition, Dr. Williams testified as follows:

> Q. Yes. I was directing your
> attention to page 40 of your '081
> declaration with respect to limitation
> 9[c]. Are you there?
>
> A. Yes.
>
> Q. With reference to this section,
> and any of the preceding sections, what
> constitutes in your opinion the first
> receiver module in Mackintosh?
>
> A. So as I discussed in
> paragraph 74 of my '081 report, *the first
> receiver module would correspond to the
> communications interface* and that's
> configured to receive broadcast material
> that corresponds to the first media
> content. And program materials
> corresponds to the claim data enabling the
> identification of a specific instance of
> the first media content from a first
> broadcast medium.
> So, again, as we've discussed
> throughout the day, the receiver is the --
> it is the hardware and software that takes

> the information off of the modulated signal that was used to communicate to that -- that receiver and presents that information to the user. So it's the entire process.
>
> Q. And then what constitutes the second receiver module in Mackintosh?
>
> A. So *the communications interface of Mackintosh's computer corresponds to the claimed second receiver module* which has -- as I explained previously -- include all the hardware and software required to perform the task of taking that information from the modulated stream and presenting it to the user. So it's all the way through the -- the receiving process.
>
> And as I pointed out in 9[c], the -- it includes elements of the computer in Mackintosh.

Ex. 2020, 159:15–161:13 (emphasis added). [5]

The record is confusing. Is it, as Petitioner states in its post-hearing brief, that "Mackintosh's computer 702 discloses the claimed '*first receiver module*,'" and "Mackintosh's communications interface 724 corresponds to the '*second receiver module*'"? Paper 50, 6–7. Or is it as Petitioner's expert, Dr. Williams, testifies at deposition, that "the first receiver module would correspond to the communications interface," and "the communications interface of Mackintosh's computer corresponds to the

[5] Dr. Williams' testimony is also at odds with Petitioner's Reply, where Petitioner alleges that Patent Owner "incorrectly argues that the Petition relies on Mackintosh's communication interface to disclose the first and second receiver modules— which it does not." Pet. Reply 14.

claimed second receiver module"? Ex. 2020, 160–161. Simply put, based on this record, we cannot tell. *See Microsoft Corp. v. FG SRC, LLC*, 860 F. App'x 708, 713 (Fed. Cir. June 17, 2021) (non-precedential) ("It is not the Board's job to cobble together assertions from different sections of a petition or citations of various exhibits in order to infer every possible permutation of a petitioner's arguments. Arguments in a petition must be made with particularity, not opacity . . . .").

This is not to say that a single feature or element of a prior art reference cannot satisfy more than one limitation. Indeed, in our Institution Decision we pointed out to the parties that the '081 Patent specification explains that in general its use of the word "module" refers to logic embodied in hardware and/or software instructions that may be combined with other modules, and are not necessarily separate physical components as Patent Owner asserted. *See* Dec. 43–44. We even invited the parties to address the issue in their subsequent briefing of whether a single feature or element of a reference, such as Mackintosh's "communication interface," may satisfy more than one limitation of claim 9 of the '081 Patent. *See id.* at 44 n.7. We cannot tell whether the parties accepted our invitation.

But even if we were somehow able to discern that Petitioner is indeed relying on Mackintosh's communication interface 724 to disclose both the claimed "*first receiver module*" and "*second receiver module*" of claim 9, which we cannot based on this record, Petitioner does not provide a persuasive explanation as to how Mackintosh's communication interface 724 accomplishes this task such that one of ordinary skill in the art would reasonably understand or infer that Mackintosh clearly and unequivocally discloses two receiver modules. *Net MoneyIN*, 545 F.3d at 1371; *Dayco*, 329 F.3d at 1368.

Based on the record, Petitioner has not demonstrated that Mackintosh discloses the claimed "*first receiver module*" and "*second receiver module*" of independent claim 9. Because we find that Petitioner has not demonstrated Mackintosh's disclosure of a "*first receiver module*" and a "*second receiver module*," we do not reach the other limitations of claim 9.

*iv. Petitioner's alternative disclosure*

In its Reply, Petitioner argues that "[e]ven if [Patent Owner's] erroneous interpretation were adopted, Mackintosh still discloses two distinct receiver modules." Pet. Reply 14 (citing Ex. 1004, 19:59–20:22, Fig. 8; Ex. 1003 ¶¶ 88–89; Ex. 1016 ¶¶ 40–41). "For example," Petitioner argues, "and in direct response to [Patent Owner's] unsupported claim interpretation, Mackintosh discloses a 'player' that 'includes several modules for receiving materials, coordinating materials, and playing the materials via the player.'" Pet. Reply 14 (citing Ex. 1004, 19:63–66, Fig. 8 (emphasis omitted).

The problem with Petitioner's alternative disclosure is two-fold. First, it is late. If Petitioner had wanted to argue an alternative disclosure in Mackintosh to demonstrate how Mackintosh anticipates the challenged claims, Petitioner could have included this disclosure of Mackintosh's "player" in the Petition. It did not. *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding . . . patent owner response, or decision on institution."); *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 775 (Fed. Cir. 2018) (concluding that the Board did not abuse its discretion in refusing to consider portions of a reply declaration "rais[ing] a new obviousness argument for [a claim] limitation that could have been made in the petition" but was not); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–70 (Fed. Cir. 2016)

(concluding that the Board did not abuse its discretion in refusing to consider reply brief arguments advocating a "new theory" of unpatentability under 37 C.F.R. § 42.23(b)); Patent Trial and Appeal Board Consolidated Trial Practice Guide (Nov. 2019), 74, *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated ("'Respond,' in the context of 37 C.F.R. § 42.23(b), does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing. While replies . . . can help crystalize issues for decision, a reply . . . that raises a new issue or belatedly presents evidence may not be considered.").

Second, even if we were to consider this late disclosure of Mackintosh's "player," it is substantively deficient as well. For example, Petitioner cites the alternative disclosure of a "player" that "includes several modules for receiving materials, coordinating materials, and playing the materials via the player." Pet. Reply 14 (citing Ex. 1004, 19:63–66, Fig. 8) (emphasis omitted); *see also id.* at 17 (citing Ex. 1004, 20:10–13, 20:23–31). Petitioner provides this alternative disclosure of a "player" because Patent Owner argues that claim 9 requires "two distinct receiver modules." *Id.* But claim 9 contains many more limitations than just two "receiver module[s]."

For example, the first receiver module of the "player" would need to be "configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium," and the second receiver module of the "player" would need to be "configured to receive at least a second media signal content and uniquely identifying data specific to at least the second media content, the second media content received discretely from the first media content." *See* Ex. 1001, 35:22–31. In addition, there are limitations directed to an output system concerning the first and second receiver modules, as well as an input

module limitation and a transmitting module limitation. *See* Ex. 1001, 35:32–47. Petitioner's Reply, however, never maps the alternative "player" to claim 9's other limitations to demonstrate that claim 9 is unpatentable under 35 U.S.C. § 102(b), as Patent Owner correctly points out. *See* PO Sur-reply 11; *see also* Ex. 2022, 37:3–8, 39:15–21 (Dr. Williams testifying that he "ha[s] not expressed an opinion" as to what would map to the output limitation of claim 9 under Petitioner's alternative theory).

For these reasons, we find Petitioner's alternative disclosure of a "player" to be deficient.

*v. Conclusion on Independent Claim 9*

Based upon consideration of the entire record, we are not persuaded by Petitioner's arguments and evidence and determine that Petitioner has not demonstrated by a preponderance of the evidence that Mackintosh anticipates independent claim 9 under 35 U.S.C. § 102(b).

*2. Dependent Claims 10, 11, and 23*

Petitioner contends that Mackintosh anticipates dependent claims 10, 11, and 23 under 35 U.S.C. § 102(b). *See* Pet. 47–49 (claim 10), 49–51 (claim 11), and 52 (claim 23). Claims 10, 11, and 23 each depend directly from independent claim 9. Because Petitioner has not established that Mackintosh discloses all of the limitations of independent claim 9, Petitioner cannot establish that Mackintosh discloses all the limitations of dependent claims 10, 11, and 23.

Based upon consideration of the entire record, we are not persuaded by Petitioner's arguments and evidence and determine that Petitioner has not demonstrated by a preponderance of the evidence that Mackintosh anticipates dependent claims 10, 11, and 23 under 35 U.S.C. § 102(b).

*E. Obviousness over Mackintosh*

Petitioner contends claims 9–11 and 23 are unpatentable as obvious under 35 U.S.C. § 103(a) over Mackintosh. Pet. 52–53.

Petitioner argues that "it would have been obvious to a [person of ordinary skill in the art] to combine the features from the various embodiments [of Mackintosh], and a [person of ordinary skill in the art] would have had a reasonable expectation of success in doing so, as it would have been nothing more than routine design and implementation to apply various configurations." *Id.* (citing Pet. § V.B.1.9[f]; Ex. 1003 ¶ 114).

Petitioner also argues that "[t]he features of Mackintosh's invention are additive and compatible with each other, and Mackintosh itself explicitly characterizes its various disclosures as, *e.g.*, 'specific application[s] of this generalized system.'" Pet. 53 (citing Ex. 1004, 8:17–21, 19:1–7, 19:55–61; Ex. 1003 ¶ 115). Petitioner concludes that "a [person of ordinary skill in the art] would have found the motivation to combine various embodiments of Mackintosh's invention (to the extent they are found to be distinct embodiments at all, and not exemplary applications of the invention as a whole) within Mackintosh itself." Pet. 53 (citing Ex. 1003 ¶ 116).

Patent Owner argues that the Petition fails to address adequately certain of the factual inquiries articulated in *Graham* that are necessary to make an obviousness determination, including: (1) the scope and content of the prior art; and (2) any differences between the claimed subject matter and the prior art. PO Resp. 51–55 (citing *Graham*, 383 U.S. 17–18).

With respect to the first *Graham* factor, Patent Owner asserts that the Petition's "obviousness analysis provides no specificity regarding what is taught in the prior art." *Id.* at 52. Patent Owner argues the Petition "only makes conclusory remarks that the various embodiments taught in

Mackintosh would have been combinable," and Petitioner only "generically states that it may be possible to use features from different embodiments or applications within Mackintosh." *Id.* at 53 (citing Pet. 80).

With respect to the second *Graham* factor, Patent Owner argues that the Petition does not "point to any claim limitation at all, let alone refer to any disclosure in [Mackintosh] that allegedly map[s] to any claim limitation. Nor does Petitioner explain what the difference is between the reference and the claim, as required by this factor." *Id.* at 53–54.

In its Reply, Petitioner does not respond to Patent Owner's arguments concerning Petitioner's lack of analysis and evidence of obviousness. *See* Pet. Reply *passim*.

We agree with Patent Owner. Petitioner's obviousness analysis is deficient in that it does not provide an adequate articulation of the necessary factual analysis set forth in *Graham.* For example, the Petition's obviousness analysis does not articulate what differences exist between the claimed subject matter and Mackintosh's teachings, which of Mackintosh's embodiments would need to be modified or combined in order to meet the claim limitations, how Mackintosh's embodiments would have been modified or combined, and why such a modification or combination would have been desirable to one of skill in the art at the time of the claimed invention. Petitioner's conclusory statements with respect to obviousness, without more, are irreparably lacking in detail.

Based upon consideration of the entire record, we are not persuaded by Petitioner's arguments and evidence and determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 9–11 and 23 are unpatentable as obvious under 35 U.S.C. § 103(a) over Mackintosh.

*F. Anticipation by DeWeese*

Petitioner contends that DeWeese anticipates claims 9–11 and 23 under 35 U.S.C. § 102(b). Pet. 53–80; Pet. Reply 21–28. Patent Owner argues that DeWeese fails to disclose all the recited limitations of the challenged claims. PO Resp. 38–48; PO Sur-reply 18–23. Claim 9 is the only challenged independent claim. The remaining challenged claims, 10, 11, and 23, all depend from claim 9. We first discuss independent claim 9.

*1. Independent Claim 9*

In response to Patent Owner's evidence and arguments that DeWeese anticipates independent claim 9 of the '081 Patent (*see* Pet. 53–75), Patent Owner argues that DeWeese fails to disclose specific limitations recited by claim 9 (*see* PO Resp. 38–46). These contested limitations include portions of limitations 9[a]: "*data enabling identification of a specific instance of the first media content*"; 9[b]: "*a second receiver module configured to receive . . . the second media content*"; 9[c]: "the second media content received discretely from the first media content"; and 9[d]: "*an output of the first receiver module or the second receiver module*".

We begin with a review of Petitioner's evidence and arguments with respect to limitation 9[a] "*a first receiver module . . .* " and 9[b] "*a second receiver module . . .* " and then consider Patent Owner's evidence and arguments concerning the contested limitations of claim 9.[6]

[6] We have considered the entire record and determine that for the uncontested limitations of claim 9, that Petitioner has established that DeWeese's disclosure satisfies those limitations.

i. *Limitation 9[a]: a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium*

For limitation 9[a], Petitioner asserts that

> DeWeese's "set-top box 26" corresponds to the claimed "first receiver module"; and, set-top box 26 is both configured to receive "television programming," which corresponds to the claimed "first media content … from a broadcast medium," and configured to receive "program guide data," which corresponds to the claimed "data enabling the identification of a specific instance of the first media content from a first broadcast medium."

Pet. 58–59 (citing Ex. 1003 ¶ 124).

Petitioner provides DeWeese's Figure 1A, shown below.




*FIG. 1A*

DeWeese's Figure 1A, above, is a diagram of a television chat system.

Petitioner explains that Figure 1A

> illustrates DeWeese's "television chat system 10," which includes a "television distribution facility 16," "communication paths 24," and "user television equipment 20." Ex. 1005, ¶¶51, 55, Fig. 1A; Ex. 1003, ¶122. User television equipment 20 includes a "set-top box 26." Ex. 1005, ¶56; Ex. 1003, ¶122. DeWeese discloses that "television and audio channels (analog, digital, or both analog and digital) may be provided to set-top boxes 26 via communications paths 24." Ex. 1005, ¶56; Ex. 1003, ¶122. "Communication paths 24 … allow television distribution facility 16 to distribute scheduled television programming, pay programming … to user television equipment 20 in addition to non-video program guide information and communications."

Pet. 57 (citing Ex. 1005 ¶ 55; Ex. 1003 ¶ 122).

Petitioner goes on to explain that "DeWeese's figure 1A also illustrates that television chat system 10 includes a main facility 16 that sends program guide information to television distribution facility 16, which in turn distributes 'program guide data and other information to the user television equipment 20 of multiple users via communications paths 24'" and that "DeWeese further discloses that 'program guide information . . . includes television program listings data such as program times, channels, titles, descriptions, etc.'" Pet 57–58 (citing Ex. 1005 ¶¶ 51, 53, 55; Ex. 1003 ¶ 123).

According to Petitioner, "DeWeese further discloses that 'program guide information . . . includes television program listings data such as program times, channels, titles, descriptions, etc.'" Pet. 58 (citing Ex. 1005 ¶ 53; Ex. 1003 ¶ 123). Petitioner argues that a person of ordinary skill in the art "would have found that DeWeese's 'program guide data' enables the identification of a specific instance of a television program." Pet. 58.

*ii. Limitation 9[b]: a second receiver module configured to receive at least a second media signal content and uniquely identifying data specific to at least the second media content*

For limitation 9[b], Petitioner asserts that "DeWeese's 'DOCSIS modem' corresponds to the claimed 'second receiver module'." Pet. 63 (citing Ex. 1005 ¶¶ 58–59; Ex. 1003 ¶ 131). According to Petitioner, "[t]he DOCSIS modem is configured to receive 'real-time communications and chat requests,' which correspond to the claimed 'second media content'." Pet. 63 (citing Ex. 1005 ¶¶ 58–59, Fig. 9; Ex. 1003 ¶ 131).

Petitioner asserts that the "DOCSIS modem is also configured to receive a 'unique user identification code' associated with the real-time communications and chat requests, which code uniquely identifies a particular communication or request within the context of the chat session associated with the specific instance of the program being played." Pet. 63 (citing Ex. 1005 ¶¶ 76, 141; Ex. 1003 ¶ 131). "Therefore," Petitioner argues, "the 'unique user identification code' corresponds to the claimed 'uniquely identifying data specific to at least the second media content'." Pet 63–64 (citing Ex. 1003 ¶ 131).

Referring to DeWeese's Figure 1A, shown above, Petitioner explains that

> DeWeese's television chat system 10, which includes a "chat equipment 22 such as a chat server," "communication paths 24," and "user television equipment 20." Ex. 1005, ¶¶51, 57, Fig. 1A; Ex. 1003, ¶125. User television equipment 20 includes a "set-top box 26," which "may include a DOCSIS modem for use in two-way communication to and from a server or television distribution facility." Ex. 1005, ¶¶56, 59; Ex. 1003, ¶125. Moreover, "chat equipment 22 (e.g., a chat server) is capable of handling real-time communications and chat requests involving text, graphics, video, or audio data."

Pet. 59 (citing Ex. 1005 ¶ 58; Ex. 1003 ¶ 125).

Petitioner also explains that

> DeWeese discloses that "[c]ommunication paths 24 … allow television distribution facility 16 to distribute … real-time communications [and] chat requests and other video and audio information to user television equipment 20…." Ex. 1005, ¶55; Ex. 1003, ¶126. "The real-time communications supported by communication paths 24 may be text-based or, if more bandwidth is available, may be audio or video communications."

Pet. 60 (citing Ex. 1005 ¶ 55; Ex. 1003 ¶ 126).

Petitioner further explains that

> DeWeese discloses that set-top box 26: may present a "chat request on the recipient's television screen if the recipient user is watching the television program related to the chat request"; may "notify the user of chat request[s] sent by certain individuals"; and may "display incoming chat requests on the television based upon the user's indicated preferences."

Pet. 61 (citing Ex. 1005 ¶ 131; Ex. 1003 ¶ 127).

Petitioner provides an annotated version of DeWeese's Figure 4, below.




*FIG. 4*

DeWeese's Figure 4, above, annotated by Petitioner, shows a display screen for entering household user profile information. According to Petitioner,

> each user of television chat system 10 has a "unique user identification code (displayed in box 138 [annotated by a red box]), to help the system distinguish the user from other user's [sic] at the same user television equipment device when receiving a real-time communication or chat request from the outside. In this way real-time communications and chat requests can be directed to specific users." Ex. 1005, ¶76 (emphasis added); Ex. 1003, ¶128. DeWeese also discloses that "screen 120 may provide the user with an opportunity to enter a[n] icon that identifies the user in the chat room[.]"

Pet. 61 (citing Ex. 1005 ¶ 76; Ex. 1003 ¶ 128).

Petitioner also provides DeWeese's Figure 9, below.




*FIG. 9*

DeWeese's Figure 9, above, depicts an illustrative display screen containing video for a television program and a chat group display region related to the program. According to Petitioner, as shown in Figure 9,

> "[t]elevision program 202 may be displayed … while a chat room region 206 [is] displayed…." Ex. 1005, ¶93; Ex. 1003, ¶130. "Participants in the chat room send chat messages [208 and 210]" to a chat server, such as chat equipment 22, which then transmits the chat messages 208 and 210 to other users' devices to "appear in region 206."

Pet. 62 (citing Ex. 1005 ¶¶ 93, 94; Ex. 1003 ¶ 130).

*iii. Patent Owner argues that DeWeese fails to disclose a second receiver module where the second media content is received discretely from the first media content*

As discussed above, Petitioner asserts that DeWeese's "set-top box 26" corresponds to the claimed "*first receiver module*," and that set-top box 26 is configured to receive "television programming," which corresponds to the claimed "*first media content*". Pet. 58–59 (citing Ex. 1003 ¶ 124).

Petitioner also asserts that DeWeese's "DOCSIS modem" corresponds to the claimed "*second receiver module*" and that "[t]he DOCSIS modem is configured to receive 'real-time communications and chat requests,'" which correspond to the claimed "*second media content*". Pet. 63 (citing Ex. 1005 ¶¶ 58–59; Ex. 1003 ¶ 131).

Patent Owner, however, disputes whether DeWeese discloses a second receiver module where the second media content is received discretely from the first media content. PO Resp. 39–41, 44–46. Patent Owner argues that "DeWeese provides no detail on the DOCSIS modem to suggest that the modem receives the alleged *second media content*," and that "DeWeese makes clear that real-time communications are sent through communication path 24 of the set-top box (*i.e.*, Petitioner's asserted *first receiver module*)." PO Resp. 39–40 (citing Ex. 2019 ¶¶ 101–102).

Patent Owner argues that "the 'DOCSIS modem' is mentioned only once in DeWeese," where "DeWeese explains 'set-top box may include a

DOCSIS modem for use in two-way communication to and from a server or television distribution facility.'" PO Resp. 40 (citing Ex. 1005 ¶ 59; Ex. 2019 ¶ 101). Patent Owner points out that "DeWeese does not state that the DOCSIS modem receives 'real-time communications or chat requests,' nor does it offer any detail on what the DOCSIS modem receives or how the DOCSIS modem interacts with the device to output the media content." *Id.* (citing Ex. 2019 ¶ 101).

Patent Owner points out that "DeWeese describes the real-time communications are received by the 'communication paths 24,'" not the DOCSIS modem as Petitioner asserts. PO Resp. 40–41 (citing Ex. 2019 ¶ 102).

Patent Owner also argues that

> Petitioner's expert, Dr. Williams, admitted at his deposition that he relied on the same components of DeWeese as both the *first receiver module* and the *second receiver module*. Dr. Williams testified that the DOCSIS modem is a "part of the receiver" and that the receiver the DOCSIS modem is a part of is the "set-top box 26." EX2020, 102:24-105:7. Similarly, Dr. Williams testified that the DOCSIS modem also received the real-time communications (Petitioner's alleged *second media content*) as part of the larger receiver, "set-top box 26."

PO Resp. 40 (citing Ex. 2020, 105:15–106:17).

Patent Owner argues that "DeWeese does not describe how the television programming (Petitioner's alleged *first media content*) and the real-time communications or chat requests (Petitioner's alleged *second media content*) are received by the user television device." PO Resp. 44–45 (citing Ex. 2019 ¶ 113). Patent Owner also argues that "Petitioner's expert at deposition identified the DOCSIS modem as corresponding to both the first receiver module and the second receiver module." PO Resp. 45 (citing Ex. 2020, 103:14–19, 105:15–25).

Patent Owner argues, "[t]here is nothing in Petitioner's explanation that shows that DeWeese's "television programming" and "real-time communications" or "chat requests" are received in separate signals." PO Resp. 46 (citing Ex. 2019 ¶ 117). "If anything," Patent Owner argues, "Petitioner's arguments suggest the *first* and *second media content* are received together and not discretely." PO Resp. 46 (citing Ex. 2019 ¶ 117).

We agree with Petitioner. Here, Petitioner explains that DeWeese's "set-top box 26" includes a "DOCSIS modem for use in two-way communication to and from a server," such as chat server 22, over communication path 24. *See* Pet. 59–64; Ex. 1005 ¶ 59. Because DeWeese explains that its DOCSIS modem is "for use in two-way communication to and from a server," a person of ordinary skill in the art would reasonably infer that such a server would include DeWeese's "chat server," which is a part of DeWeese's "chat equipment 22" that is capable of handling real-time communications and chat requests involving text, graphics, video, and audio data. Ex. 1005 ¶ 58.

DeWeese also explains that

> [c]ommunication paths 24 preferably have sufficient bandwidth to allow television distribution facility 16 to distribute scheduled television programming, pay programming, *real-time communications, chat requests* and other video and audio information to user television equipment 20 in addition to non-video program guide information and communications. *The real-time communications supported by communication paths 24 may be text-based*.

*Id.* ¶ 55 (emphasis added).

With respect to Patent Owner's argument that DeWeese's DOCSIS modem (Petitioner's "second receiver module") may be housed within DeWeese's set-top box 26, we have already rejected Patent Owner's

argument that the two receiver modules recited in claim 9 must be "separate and distinct" from each other, i.e. two physically separate modules or devices. *See* Section II.B.3. There is nothing in claim 9, or in the '081 Patent specification, that would require such a physical separation between the two recited receiver modules. On the contrary, we have already pointed out that the '081 Patent specification explains that "the word 'module' . . . refers to logic embodied in hardware and/or firmware, and/or a collection of software instructions, possible having entry and/or exit points, written in a programming language" and that "software modules may be callable from other modules and/or from themselves" and logical modules "may be combined with other modules or divided into sub-modules despite their physical organization or storage." Ex. 1001, 6:47–7:8. Thus, we see nothing in claim 9 or the '081 Patent that would preclude the second receiver module from being housed within the first receiver module, or vice-versa, as Patent Owner argues.

With respect to Patent Owner's arguments that Dr. Williams relied on the same components of DeWeese as both the first receiver module and the second receiver module and that there is nothing in Petitioner's explanation that shows that DeWeese's television programming ("*first media content*") and real-time communications or chat requests ("*second media content*") are received as separate signals, we disagree.

Claim 9 recites in pertinent part "*the second media content received discretely from the first media content*." Neither party sought construction of the claim term "*discretely*". With respect to DeWeese, Dr. Williams explains that

> "DOCSIS" refers to the "Data-Over-Cable Service Interface Specifications," and that a "DOCSIS modem" receives television

> and radio broadcasts over the same physical transmission medium with Internet Protocol ("IP") data traffic, such as real-time communications; however, *the broadcast packets and the IP packets remain separate and distinct from one another* because the DOCSIS standard requires that each packet include a "header [that] identifies the payload as belonging to Data-Over-Cable … [or] other payloads"—a technique known as "interleaving."

Ex. 1003 ¶ 133 (citing Ex. 1008, 47) (emphasis added).

Dr. Williams goes on to explain that a person of ordinary skill in the art

> would have understood that because of the distinct header associated with each piece of information, *each piece of information can be directed to either a separate physical electronic component within the set-top box or a separate software process in order to provide for discrete processing* and/or presentation of information to the user.

Ex. 1003 ¶ 134 (emphasis added).

> Dr. Williams concludes that a person of ordinary skill in the art would have understood that set-top box 26 receives the "real-time communications," which correspond to the claimed "second media content," discretely from the "television programming," which corresponds to the claimed "first media content."

Ex. 1003 ¶ 135; *see also* Ex. 1016 ¶ 75 (explaining how the '081 Patent characterizes time multiplexed signals as "discretely separated"). We credit the testimony of Dr. Williams regarding DeWeese and "*the second media content received discretely from the first media content*."

Based upon the record before us, Petitioner has shown that one of ordinary skill in the art would reasonably understand or infer that DeWeese discloses a "*second receiver module*" where the "*second media content*" is received discretely from the "*first media content*".

*iv. Patent Owner argues that DeWeese fails to disclose data enabling identification of a specific instance of the first media content*

Patent Owner argues that "DeWeese features a static identifier in the form of a 'program guide' provided for television viewers." PO Resp. 38 (citing Ex. 1005 ¶ 53; Ex. 2019 ¶ 98). Patent Owner points out that "[t]he program guide data provides static information such as TV listings, program times, channels, and titles generated beforehand at the main facility." PO Resp. 38–39 (citing Ex. 1005 ¶¶ 51, 53; Ex. 2019 ¶ 98).

In contrast, Patent Owner argues that "the '081 patent permits identification of each occurrence by dynamically determining the data enabling the identification of a specific instance of the content at the time of broadcast." PO Resp. 39 (citing Ex. 1001, 32:5–20; Ex. 2021, 10:4–42, 12:32–38, 14:31–34; Ex. 2019 ¶ 99). Patent Owner argues that "Petitioner does not identify anything in DeWeese showing that the program guide data is dynamically determined at the time of broadcast by the main facility." PO Resp. 39 (citing Ex. 2019 ¶ 99).

Petitioner argues that there is no requirement in claim 9 that DeWeese's program guide be "dynamically determined," and that Patent Owner is improperly incorporating that limitation into the claim. Pet. Reply 21–22. Petitioner points out that Patent Owner "broadly cites the functionality of a 'broadcast scanning system 160' as described in the '081 specification," and that "no 'broadcast scanning system' or dynamic determination appears in claim 9." Pet. Reply 22 (citing Ex. 1016 ¶ 61).

We agree with Petitioner. Claim 9 recites in pertinent part, "data enabling the identification of a specific instance of the first media content from a first broadcast medium." Ex. 1001, 35:24–26. There is no requirement in claim 9 that the data be "dynamically determined" as Patent

Owner argues. We credit Dr. Williams' testimony that a person of ordinary skill in the art "would have found that DeWeese's "program guide data" enables the identification of a specific instance of a television program." Ex. 1003 ¶ 123; *see also* Ex. 1016 ¶¶ 60–63.

Based upon the record before us, Petitioner has shown that one of ordinary skill in the art would reasonably understand or infer that DeWeese discloses *data enabling identification of a specific instance of the first media content*.

*v. Patent Owner argues that DeWeese fails to teach two receiver module outputs (an output of the first receiver module or the second receiver module)*

With respect to this limitation, Petitioner asserts that

> DeWeese's "user television equipment 20" corresponds to the claimed "output system," which is configured to present concurrently "television program 202," which corresponds to the claimed "first media content," and "chat room messages 208 and 210," which correspond to the claimed "second media content," on "display screen 200," which corresponds to the claimed "output of the first receiver module or the second receiver module."

Pet. 68 (citing Ex. 1003 ¶ 139).

Petitioner provides Figure 9 from DeWeese, below.




*FIG. 9*

DeWeese's Figure 9, shown above, depicts an illustrative display screen containing video for a television program and a chat group display region related to the program.

Petitioner explains that

> DeWeese discloses that "user television equipment 20" includes a "set-top box 26[] connected to a television 30," as illustrated in figure 1A. Ex. 1005, ¶¶55, 65, Fig. 1A; Ex. 1003, ¶136. In one example, as illustrated in figure 9, reproduced [above], "[t]elevision program 202 may be displayed in region 203 of display screen 200, while a chat room region 206 may be displayed simultaneously in the lower portion of display screen 200." Ex. 1005, ¶93; Ex. 1003, ¶137. "Participants in the chat room send chat messages [208 and 210] which appear in region 206. A chat participant may send an HTML chat message such as a URL for a web site."

Pet. 66 (citing Ex. 1005 ¶ 93; Ex. 1003 ¶ 137).

According to Petitioner, DeWeese further explains, in connection with the example of figure 9, that

> The divided nature of screen 200 allows users to simultaneously watch a television program and send real-time communications to other users who are viewing the same program at the same time. In this way, chat room 206 is directly linked to the on-going actions in program 202 in that a user can send and receive comments about the content of the program as it unfolds on his television screen.

Pet. 67 (citing Ex. 1005 ¶ 97; Ex. 1003 ¶ 138).

Patent Owner, however, argues that claim 9 "requires two outputs." PO Resp. 42. According to Patent Owner, claim 9 "recites a structure of the claimed system: it must have a first "output" of the "first receiver module" and a second "output" of the "second receiver module." *Id.* (citing Ex. 2019 ¶ 106). "Each output," Patent Owner argues, "must have the capability of presenting—audibly, visibly or otherwise—media content." PO Resp. 42 (citing Ex. 2019 ¶ 106).

"At most," Patent Owner argues, "Petitioner has identified a single 'output'—a television with a display." PO Resp. 43 (citing Pet. 66–68; Ex. 2019 ¶ 107). "This 'output,'" Patent Owner argues, "is capable of either individual or concurrent presentation of media, but it is still only a single 'output.'" PO Resp. 43 (citing Ex. 2019 ¶ 107). Patent Owner argues that "Petitioner does not identify a second 'output' that is distinct from this first output." *Id.* "For example," Patent Owner argues, "there is no second device with its own separate display." *Id.* "Petitioner cannot identify a second output," Patent Owner argues, "because DeWeese does not disclose one." *Id.*

We have construed the recited limitation of claim 9, "an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module to mean either: 1) the output system must be able to present,

at the same time, both the first and the second media content on an output of the first receiver module; or 2) the output system must be able to present, at the same time, the first and the second media content on an output of the second receiver module.

With respect to DeWeese, the depiction in Figure 9, below, is instructive.




*FIG. 9*

With respect to DeWeese's Figure 9, shown above, Petitioner explains that "[t]elevision program 202 is displayed in region 203 of display screen 200, while chat room region 206 is displayed simultaneously in a lower portion of display screen 200." Pet. Reply. 26 (citing Ex. 1005 ¶ 93). DeWeese explains that "[t]he divided nature of screen 200 allows users to simultaneously watch a television program and send real-time communications to other users who are viewing the same program at the same time." Ex. 1005 ¶ 97. Thus, Petitioner argues, and we agree, "DeWeese's 'user television equipment 20' discloses the claimed '*output*

*system*,' and it is configured to concurrently present television program 202 ('*first media content*') and chat room messages 208 and 210, ('*second media content*') on its display screen 200 ('*output of the first receiver module or the second receiver module'*). Pet. Reply 26 (citing Pet. 66–68; Ex. 1016 ¶¶ 70–71).

Petitioner persuades us that DeWeese satisfies at least one of the following alternatives: 1) the output system must be able to present, at the same time, both the first and the second media content on an output of the first receiver module; or 2) the output system must be able to present, at the same time, the first and the second media content on an output of the second receiver module.

As discussed above in Section II.B.4., because the receiving modules may be logical submodules of one another, and therefore not necessarily separate physical structures or components, it follows that their outputs may not necessarily be separate physical structures either, but may maintain their identity and distinction through the use of logic or software or other technical means.

In one alternative, DeWeese discloses that its user television equipment 20 is configured to present concurrently television program 202 (a "*first media content*") and chat room messages 208 and 210 (a "*second media content*") on an output of the asserted "*first receiver module*" (set-top box 26), in particular, display screen 200. *See, e.g.*, Ex. 1005 ¶¶ 93, 97, Fig. 9. Thus, DeWeese discloses the recited "*output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module*."

*vi. Conclusion on Independent Claim 9*

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that DeWeese anticipates independent claim 9 under 35 U.S.C. § 102(b).

*2. Dependent Claims 10, 11, and 23*

Petitioner contends that DeWeese anticipates dependent claims 10, 11, and 23 under 35 U.S.C. § 102(b). *See* Pet. 76–80. Claims 10, 11, and 23 each depend directly from independent claim 9.

*i. Dependent Claim 10*

Dependent claim 10 recites, "[t]he system of claim 9 further comprising an output selection module configured to limit the output of the first and second media content based on a criterion." Ex. 1001, 35:42–44.

Petitioner argues that

> DeWeese discloses that "the set-top box application may assist in … filtering … to ensure that the chat requests are only delivered to the appropriate users." Ex. 1005, ¶134; Ex. 1003, ¶151. "For example, if a chat request is to be distributed to all users tuned to channel 4, the chat server at a television distribution facility may distribute a chat request to all users with information that specifies that the request is to be restricted to viewers whose set-top boxes are currently tuned to channel 4…. If the set-top box is not tuned to channel 4, the chat request is not displayed." Ex. 1005, ¶134. In addition, each program can have "one or more ***associated*** chat sessions." Ex. 1005, ¶¶64, 93, 97 (emphasis added); Ex. 1003, ¶151. Accordingly, a POSITA would have understood that the set-top box includes a channel tuner, and that the setting of the channel tuner limits the output of the television program (*i.e.*, which program is shown) and the ***associated*** chat session (including the chat messages therein).

> Ex. 1003, ¶151. Specifically, the tuner turns off (or changes) the outputs of both media contents.

Pet. 76–77 (citing Ex. 1003 ¶ 151).

Petitioner also argues that

> DeWeese's "set-top box" includes a channel tuner, which corresponds to the claimed "output selection module," and is configured to limit the output of the television program and chat requests, which corresponds to the claimed "limit[ing of] the output of the first and second media content based on a criterion."

Pet. 77 (citing Ex. 1003 ¶ 152).

Patent Owner asserts that "claim 10 relates to limiting how the first and second media content is output, it is not directed to changing what media is output." PO Resp. 46–47 (citing Ex. 2019 ¶¶ 119, 124). Patent Owner argues that

> Petitioner does not rely on how DeWeese outputs the media content on the display screen. EX2019, ¶ 125. Instead, Petitioner contends that "a POSITA would have understood that the set-top box includes a channel tuner, and that the setting of the channel tuner limits the output of the television program (i.e., ***which*** program is shown) and the associated chat session (including the chat message therein)." Pet. 76 (emphasis omitted and added); EX2019, ¶ 125. Petitioner readily admits that it relies on "***which*** program" is output rather than on how the program is output. EX2019, ¶ 125. This reliance was similarly confirmed by Petitioner's expert during his deposition. EX2020, 109:4-110:8. Petitioner has not shown that the selection module limits the output of the media based on a criterion. Accordingly, Petitioner has failed to show that DeWeese teaches *limit[ing] the output of the first and second media content based on a criterion.*

PO Resp. 48 (citing Ex. 2019 ¶ 125).

We agree with Petitioner. Claim 10 does not require a showing of how the output is limited. Rather, claim 10 is satisfied when an output is limited "based on a criterion."

DeWeese describes tuning the output to different channels, which would therefore limit the output of any previously viewed channels. *See* Ex. 1005 ¶¶ 134, 64, 93, 97. DeWeese explains that "[f]or example, if a chat request is to be distributed to all users tuned to channel 4 [and] the set-top box is not tuned to channel 4, the chat request is not displayed." Ex. 1005 ¶ 134. When the set-top box is tuned to a different channel, the previous television programming and corresponding chat requests would no longer be output. The criterion would be whether the channel tuner switched to another channel. *See* Ex. 1016 ¶¶ 77–79. If so, the output of the first and second media content would be limited. Petitioner's arguments are supported by the testimony of Dr. Williams. *See* Ex. 1003 ¶¶ 151–153.

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that DeWeese anticipates dependent claim 10 under 35 U.S.C. § 102(b).

*ii. Dependent Claim 11*

Dependent claim 11 recites, "[t]he system of claim 9 further comprising a computer storage device configured to store at least one of one the first and second media content."

Petitioner argues that DeWeese discloses that "[r]eal-time communications can be stored on a chat server (e.g. located at a television distribution facility)." Pet. 77 (quoting Ex. 1005 ¶ 98). Petitioner argues that the "chat server" (or a sub-system thereof) corresponds to the claimed "computer storage device," and is configured to store "real-time communications," which corresponds to the claimed "second media content." Pet. 77 (citing Ex. 1003 ¶ 154).

Petitioner argues DeWeese also discloses that each "set-top box 26 is typically connected to an optional videocassette recorder (VCR) 28 or other ***storage device*** in the home or at a remote location so that selected ***television programs and/or chat sessions may be recorded***." Pet. 78 (quoting Ex. 1005 ¶ 64 (emphasis added by Petitioner). Petitioner argues that "[t]he 'storage device' (or a subsystem thereof) corresponds to the claimed 'computer storage device,' and is configured to store 'television programs and/or chat sessions,' which correspond to the claimed 'first media content' and 'second media content,' respectively." Pet. 78 (citing Ex. 1003 ¶ 155).

Patent Owner does not contest Petitioner's evidence with respect to claim 11, but merely argues that "because Petitioner has failed to demonstrate claim 9 is anticipated by DeWeese, Petitioner has not carried its burden that dependent claims 11 and 23 are anticipated by DeWeese." PO Resp. 48 (citing Ex. 2019 ¶ 130).

We agree with Petitioner. Petitioner's arguments are supported by the testimony of Dr. Williams. *See* Ex. 1003 ¶¶ 154–156.

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence and determine that Petitioner has demonstrated by a preponderance of the evidence that DeWeese anticipates dependent claim 11 under 35 U.S.C. § 102(b).

*iii. Dependent Claim 23*

Dependent claim 23 recites, "[t]he system of claim 9, wherein the response message includes data that enables identification of a responder."

Petitioner argues that "DeWeese discloses the system of claim 9, wherein the response message includes data that enables identification of a responder." Pet. 78 (citing Ex. 1003 ¶¶ 157–158). Petitioner argues that as shown in DeWeese's Figure 4, "each user of television chat system 10 has a

unique user identification code (displayed in box 138), to help the system distinguish the user from other users at the same user television equipment device when receiving a real-time communication or chat request from the outside." Pet. 78 (citing Ex. 1005 ¶ 76; Ex. 1003 ¶ 157). "In this way," Petitioner argues, "real-time communications and chat requests can be directed to specific users." Pet. 78 (citing Ex. 1005 ¶ 76).

Petitioner also argues with respect to DeWeese's Figure 9, that "when a chat message is received at set-top box 26, the identity of the sender is also received." Pet. 79 (citing Ex. 1005, Fig. 9; Ex. 1003 ¶ 158). Petitioner argues, a person of ordinary skill in the art "would therefore have understood that each response message includes data that enables the identification of a responder, for example, the user's unique identification code 138, as further explained above in connection with limitation 9[b] and 9[f]." Pet. 79–80 (citing Ex. 1003 ¶ 158).

Patent Owner dos not contest Petitioner's evidence with respect to claim 23, but merely argues that "because Petitioner has failed to demonstrate claim 9 is anticipated by DeWeese, Petitioner has not carried its burden that dependent claims 11 and 23 are anticipated by DeWeese." PO Resp. 48 (citing Ex. 2019 ¶ 130).

We agree with Petitioner. Petitioner's arguments are supported by the testimony of Dr. Williams. *See* Ex. 1003 ¶¶ 157–159.

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence and determine that Petitioner has demonstrated by a preponderance of the evidence that DeWeese anticipates dependent claim 23 under 35 U.S.C. § 102(b).

*G. Obviousness over DeWeese*

Petitioner contends that claims 9–11 and 23 are unpatentable as obvious under 35 U.S.C. § 103(a) over DeWeese. Pet. 80–81. Petitioner argues that "it would have been obvious to a [person of ordinary skill in the art] to combine the features from the various embodiments, and a [person of ordinary skill in the art] would have had a reasonable expectation of success in doing so, as it would have been nothing more than routine design and implementation to apply various configurations." Pet. 80–81 (citing Pet. § V.B.1.9[f]; Ex. 1003 ¶ 160).

Petitioner also argues that the "features of DeWeese's invention are additive and compatible with each other." Pet. 81 (citing Ex. 1003 ¶ 161). Petitioner argues that a person of ordinary skill in the art "would have understood that the architecture of the generic television chat system 10 discussed with reference to figures 1A and 1B of DeWeese could implement the various embodiments of DeWeese." *Id.* Petitioner concludes that a person of ordinary skill in the art "would have found the motivation to combine various embodiments of DeWeese's invention (to the extent they are found to be distinct embodiments at all, and not exemplary applications of the invention as a whole) within DeWeese itself." Pet. 81 (citing Ex. 1003 ¶ 162).

Patent Owner makes similar arguments against Petitioner's showing of obviousness over DeWeese as it did for Mackintosh, which we discuss above in Section II.E. *See* PO Resp. 49–58.

In its Reply, Petitioner does not respond to Patent Owner's arguments concerning Petitioner's lack of analysis and evidence of obviousness. *See* Pet. Reply *passim*.

We agree with Patent Owner. Petitioner's obviousness analysis is deficient in that it does not provide an adequate articulation of the necessary factual analysis set forth in *Graham*. The Petition's obviousness analysis does not articulate what differences exist between the claimed subject matter and DeWeese's teachings, which of DeWeese's embodiments would need to be modified or combined in order to meet the claim limitations, how DeWeese's embodiments would have been modified or combined, and why such a modification or combination would have been desirable to one of ordinary skill in the art at the time of the claimed invention. Petitioner's conclusory statements with respect to obviousness, without more, are irreparably lacking in detail.

Based upon consideration of the entire record, we are not persuaded by Petitioner's arguments and evidence and determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 9–11 and 23 are unpatentable as obvious under 35 U.S.C. § 103(a) over DeWeese.

## III. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 9–11 and 23 of U.S. Patent No. 8,166,081 B2 are unpatentable on the bases set forth in the following table.[7]

---

[7] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 9–11, 23 | 102(b) | Mackintosh | | 9–11, 23 |
| 9–11, 23 | 103(a) | Mackintosh | | 9–11, 23 |
| 9–11, 23 | 102(b) | DeWeese | 9–11, 23 | |
| 9–11, 23 | 103(a) | DeWeese | | 9–11, 23 |
| **Overall Outcome** | | | 9–11, 23 | |

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 9–11 and 23 of U.S. Patent No. 8,166,081 B2 are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

VOLKSWAGEN GROUP OF AMERICA, INC.,
Petitioner,

v.

STRATOSAUDIO, INC.,
Patent Owner.

---

IPR2021-00721
Patent 8,166,081 B2

---

ARBES, *Administrative Patent Judge*, dissenting.

I join all aspects of the majority's decision other than Section II.B.4, pertaining to interpretation of the "output" limitation of claim 9, and Section II.F, pertaining to Petitioner's anticipation ground based on DeWeese. Because I would conclude that Petitioner has not met its burden to prove by a preponderance of the evidence that DeWeese anticipates claim 9, or claims 10, 11, and 23 depending therefrom, I respectfully dissent from the majority's determination that the challenged claims are unpatentable on that basis.

Claim 9 recites "an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module." Patent Owner argues that the claim thereby "recites a *structural* limitation of the system: that the first

receiver module and the second receiver module each have a corresponding output," where the system is configured to present concurrently the first and second media content "on one of these outputs." PO Resp. 13–14, 31, 42 (emphasis added); PO Sur-reply 7, 20–21; Paper 49, 1–2. "In other words, both outputs must exist, and at least one must support concurrent presentation." PO Sur-reply 7. Petitioner responds that because claim 9 uses the word "or," the claim is "satisfied when a single system includes a first and second receiver module and outputs the first and second media content concurrently." Pet. Reply 11–12, 25; Paper 50, 2. Thus, claim 9 in Petitioner's view encompasses a single system that presents concurrently the two items of media content, whereas Patent Owner argues that the claim requires the system to have two outputs (with at least one capable of presenting concurrently the two items of media content). I agree with Patent Owner.

First, the plain language of claim 9 supports Patent Owner's interpretation. Claim 9 recites "first" and "second" receiver modules configured to receive, respectively, "first" and "second" media content. The output system is configured to present concurrently those two items of media content on an output "of" the first receiver module or an output "of" the second receiver module. Thus, the system has (at least) two receiver modules, and each has its own output. The "or" in claim 9 applies to the concurrent presentation—the output system is configured to present concurrently the two items of media content on one output or on the other output, i.e., the output "of" the first receiver module or the output "of" the second receiver module. "Or" does not mean that there need not even be a second output. *See* Tr. 14:20–15:14 (Petitioner agreeing at the oral hearing

that claim 9 requires that "two outputs exist," with "one output that is of the first module, and another output that is of the second module"); *but see id.* at 13:16–22 (Petitioner arguing that "a single device having a single output system . . . is sufficient").

Petitioner's reading of the claim focuses solely on the recited "output system" and, in effect, ignores the last clause of "on an output of the first receiver module or the second receiver module." *See* Pet. Reply 11–12. Indeed, Petitioner's reading, and its position regarding the prior art, would appear to be the same even if the claim omitted the last clause, or recited "on an output" rather than "on an output of the first receiver module or the second receiver module." *See* PO Sur-reply 7. But that is not what Patent Owner claimed.[1] According to the plain language of claim 9, (1) the recited system must have two outputs, one for each of the two receiver modules, and (2) the two items of media content must be presented concurrently on at least one of those two outputs. I would give the last clause meaning and determine that the claim requires the system to have two outputs, one "of" the first receiver module and another "of" the second receiver module. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."); *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

---

[1] Unlike claim 9, which recites an output "of" one receiver module and another output "of" a different module, claim 5 of the '081 Patent recites "outputting" first and second media content "on the receiving system."

Second, the Specification of the ’081 Patent supports Patent Owner’s interpretation. As shown in Figures 1–3, primary device 4 and ancillary device 5 can both receive first media signal 111 and advertisement media signal 113. Ex. 1001, 10:56–62, 12:30–35, 21:49–51. Primary device 4 and ancillary device 5 each have an output, and each can be capable of presenting the two signals “at the same time or substantially the same time.” *Id.* at 14:5–13, 14:27–31, Fig. 3 (depicting primary device 4 with a display screen output showing information from multiple signals). The Specification further indicates why it might be beneficial to choose one output over the other for doing so. For example, one device may have insufficient bandwidth or may be incapable of presenting certain media content. *See, e.g.*, *id.* at 15:43–47 (“ancillary device 5 can comprise superior bandwidth, storage capacity, and/or processing power relative to the primary device 4”), 21:31–36 (“Other . . . output modules can be provided through a connection to an ancillary device 5. For example, if a media signal 114 and/or an advertisement media signal 113 cannot [be] viewed on the primary device 4, then a user can view the media signal 114 and/or the advertisement media signal 113 on an ancillary device 5.”), 25:20–29 (processing steps at media association system 2 “can reduce bandwidth requirements, restrict access to the related media signal 114, and allow it to be viewed on the primary and/or an ancillary devices 4, 5 capable of viewing media in a certain set of formats”). These disclosures in the Specification pertaining to two outputs with different capabilities are consistent with the claim’s use of “or” as reflecting a choice between two different outputs in the system (one “of” the first receiver module and another “of” the second receiver module) for displaying the items of media content together.

Based on the language of claim 9 and Specification of the ’081 Patent, I would interpret the “output” limitation to mean that the recited system has two outputs, one for each of the two receiver modules, and the first and second media content must be presented concurrently on at least one of those two outputs. I do not find expert testimony necessary to interpret the claim language, but to the extent relevant, would conclude for the reasons explained above that Dr. Moon’s testimony is consistent with the plain language and Specification, whereas Dr. Williams’s testimony is not. *See* Ex. 1016 ¶¶ 30–35; Ex. 2019 ¶¶ 38–39, 52–53.

Turning to Petitioner’s contentions regarding DeWeese, Petitioner explains in the Petition what components in DeWeese it is mapping to various limitations in claim 9. Pet. 53–75; *see also* Ex. 1020, 12 (table showing Petitioner’s mappings); Ex. 2023, 55 (visually depicting Petitioner’s mappings). Petitioner argues that “DeWeese’s ‘set-top box 26’ corresponds to the claimed ‘first receiver module’”; the “‘television programming’ . . . [received by set-top box 26] corresponds to the claimed ‘first media content’”; “DeWeese’s ‘DOCSIS modem’ corresponds to the claimed ‘second receiver module’”; and the “‘real-time communications and chat requests’ [received by the DOCSIS modem according to Petitioner] correspond to the claimed ‘second media content.’” Pet. 58–59, 63–64. In addressing the “output” limitation of claim 9, Petitioner first quotes various disclosures in DeWeese pertaining to set-top box 26, which displays television program 202 and chat room region 206 on display screen 200. *Id.* at 66–67 (citing Ex. 1005 ¶¶ 55, 65, 93, 97, Fig. 9). Petitioner then argues that

> DeWeese’s “user television equipment 20” corresponds to the claimed “output system,” which is configured to present

> concurrently "television program 202," which corresponds to the claimed "first media content," and "chat room messages 208 and 210," which correspond to the claimed "second media content," on "display screen 200," which corresponds to the claimed "output of the first receiver module or the second receiver module."

*Id.* at 68. Petitioner thus maps user television equipment 20 to the "output system" and display screen 200 to the "output of the first receiver module or the second receiver module." *Id.*; Pet. Reply 25–27.

As explained above, I would interpret the "output" limitation to require that the system have two outputs. To prove anticipation of claim 9, Petitioner must establish that DeWeese discloses two outputs—one "of" the "first receiver module" (i.e., set-top box 26) and one "of" the "second receiver module" (i.e., the DOCSIS modem). And at least one of those outputs must present concurrently both the "first media content" (i.e., the television programming) and the "second media content" (i.e., the chat room messages). Petitioner, however, identifies a single output in DeWeese—display screen 200—which allegedly displays both items of media content. Petitioner never identifies any second output. Nor does Petitioner ever argue, for example, that a portion of display screen 200 constitutes the first recited output and another portion of display screen 200 constitutes the second recited output.[2] Petitioner identifies *only* display screen 200.

---

[2] Even assuming that the language of claim 9 could be read to permit some overlap between the first and second outputs, I do not see how it would permit *complete* overlap. In other words, it would not be sufficient in my view for Petitioner to point to a single structure—as Petitioner did here with display screen 200—and assert that it is both a first output of the first receiver module and a second output of the second receiver module. The claim recites two outputs of two different receiver modules, not "an output."

*See* Pet. 68. I agree with Patent Owner and Dr. Moon that that failure is fatal to Petitioner's anticipation ground.[3] *See* PO Resp. 41–43; PO Sur-reply 20–21; Ex. 2019 ¶¶ 104–108.

Further, even if display screen 200 could be considered an output "of" the asserted "first receiver module" (i.e., set-top box 26), Petitioner identifies no output that could be considered "of" the asserted "second receiver module" (i.e., the DOCSIS modem). Indeed, it is unclear how a DOCSIS modem (mentioned in just a single paragraph of DeWeese) could have an output at all. *See* PO Resp. 43 (arguing that an output is simply "something capable of displaying media content to a user"); Ex. 1001, 18:28–30 ("The output device(s) may comprise a speaker, a display screen, a printer, and/or a voice synthesizer."); Ex. 1005 ¶ 59.

It is Petitioner's burden to prove unpatentability by a preponderance of the evidence, which includes proving that DeWeese discloses, expressly or inherently, the "output" limitation of claim 9. *See* 35 U.S.C. § 316(e); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378–79 (Fed. Cir. 2015) ("In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' . . . and that burden never shifts to the patentee. 'Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point . . . .'"). Based on the full record developed

---

[3] Petitioner argued for the first time at the oral hearing that DeWeese's speakers are another "output," but acknowledged that the speakers are not "something that was identified in the Petition." Tr. 76:14–77:17. That is a new theory not entitled to consideration. *See Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018) (holding that the Board is obligated under its own regulations to dismiss untimely argument "raised for the first time during oral argument").

during trial, I would find that Petitioner has not shown sufficiently that DeWeese discloses the "output" limitation of claim 9,[4] and, therefore, has not met its burden to prove by a preponderance of the evidence that DeWeese anticipates claims 9–11 and 23.

---

[4] Accordingly, I would conclude that there is no need to address Patent Owner's remaining arguments disputing Petitioner's anticipation ground. *See* PO Resp. 38–41, 44–49; PO Sur-reply 18–20, 22–23; *supra* Section II.F.

FOR PETITIONER VOLKSWAGEN GROUP OF AMERICA, INC.:

Michael D. Specht
Ryan C. Richardson
Daniel S. Block
Daniel E. Yonan
Timothy L. Tang
Wenhao Xiong
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
mspecht-ptab@sternekessler.com
rrichardson-ptab@sternekessler.com
dblock-ptab@sternekessler.com
dyonan-ptab@sternekessler.com

FOR PETITIONERS HYUNDAI MOTOR AMERICA, and SUBARU OF AMERICA, INC.:

Matthew D. Satchwell
Paul R. Steadman
DLA PIPER LLP (US)
matthew.satchwell@dlapiper.com
paul.steadman@dlapiper.com

Lewis E. Hudnell, III
Nicolas S. Gikkas
HUDNELL LAW GROUP P.C.
lewis@hudnelllaw.com
nsg@gikkaslaw.com

FOR PATENT OWNER:

John Scheibeler
Jonathan Lamberson
Ashley T. Brzezinski
WHITE & CASE LLP
jscheibeler@whitecase.com
jonathan.lamberson@whitecase.com
ashley.brzezinski@whitecase.com

US008166081B2

(12) **United States Patent**
**Christensen et al.**

(10) **Patent No.: US 8,166,081 B2**
(45) **Date of Patent: Apr. 24, 2012**

(54) **SYSTEM AND METHOD FOR ADVERTISEMENT TRANSMISSION AND DISPLAY**

(75) Inventors: **Kelly M. Christensen**, Marina Del Rey, CA (US); **John Phillip Hansen**, Austin, TX (US); **Thomas Daniel Mock**, Sheffield, PA (US)

(73) Assignee: **StratosAudio, Inc.**, Century City, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 323 days.

(21) Appl. No.: **12/366,535**

(22) Filed: **Feb. 5, 2009**

(65) **Prior Publication Data**

US 2009/0204640 A1 Aug. 13, 2009

**Related U.S. Application Data**

(60) Provisional application No. 61/026,449, filed on Feb. 5, 2008.

(51) **Int. Cl.**
*G06F 17/00* (2006.01)

(52) **U.S. Cl.** ........................ **707/812**; 707/737; 455/3.06

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,926,255 A | 5/1990 | Von Kohorn |
| 5,134,719 A | 7/1992 | Mankovitz |
| 5,303,393 A | 4/1994 | Noreen et al. |
| 5,438,355 A | 8/1995 | Palmer |
| 5,444,769 A | 8/1995 | Koen et al. |
| 5,539,635 A | 7/1996 | Larson, Jr. |
| 5,548,828 A | 8/1996 | Kozaki et al. |
| 5,557,541 A | 9/1996 | Schulhof et al. |
| 5,579,537 A | 11/1996 | Takahisa |
| 5,661,787 A | 8/1997 | Pocock |
| 5,708,478 A | 1/1998 | Tognazzini |
| 5,752,159 A | 5/1998 | Faust et al. |
| 5,857,156 A | 1/1999 | Anderson |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2 316 925 | 7/1999 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 10/806,084, filed Mar. 22, 2004, Christensen et al.

(Continued)

*Primary Examiner* — Belix M Ortiz
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The disclosure herein provides systems and methods for a media enhancement system configured to associate a secondary media signal (for example, the secondary media signal can comprise an advertisement) to a primary media signal (for example, a radio broadcast). The disclosure herein additionally provides systems and methods for a media enhancement system that enables the generating, transmitting, displaying, and/or responding to a plurality of associated and/or unassociated secondary media signals, based on a primary media content from a primary media signal, user characteristics (for example, demographic and/or geographic information), and/or third-party preferences (for example, the goals of advertisers). The secondary media signals can be used to enhance the primary media content already being provided to the user on a user device. The secondary media signals can also be used to create psychological associations or relationships with the primary media content already being provided to the user.

**24 Claims, 14 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,872,589 | A | 2/1999 | Morales | |
| 5,905,865 | A | 5/1999 | Palmer et al. | |
| 5,907,793 | A | 5/1999 | Reams | |
| 5,991,601 | A | 11/1999 | Anderson | |
| 5,991,737 | A | 11/1999 | Chen | |
| 6,036,086 | A | 3/2000 | Sizer, II et al. | |
| 6,098,106 | A | 8/2000 | Philyaw et al. | |
| 6,202,210 | B1 | 3/2001 | Ludtke | |
| 6,286,140 | B1 | 9/2001 | Ivanyi | |
| 6,446,262 | B1 | 9/2002 | Malaure et al. | |
| 6,463,469 | B1 | 10/2002 | Yavitz | |
| 6,473,792 | B1 | 10/2002 | Yavitz et al. | |
| 6,507,727 | B1 | 1/2003 | Henrick | |
| 6,578,047 | B1 | 6/2003 | Deguchi | |
| 6,611,201 | B1 | 8/2003 | Bishop et al. | |
| 6,658,232 | B1 | 12/2003 | Johnson | |
| 6,725,022 | B1 | 4/2004 | Clayton et al. | |
| 6,829,486 | B2 | 12/2004 | McKenna et al. | |
| 6,888,457 | B2 | 5/2005 | Wilkinson et al. | |
| 6,928,423 | B1 | 8/2005 | Yamanaka | |
| 6,941,154 | B1 | 9/2005 | Ritter | |
| 6,957,041 | B2 | 10/2005 | Christensen et al. | |
| 6,987,734 | B2 | 1/2006 | Hundemer | |
| 6,990,312 | B1 | 1/2006 | Gioscia et al. | |
| 7,054,653 | B2 | 5/2006 | Järvi et al. | |
| 7,088,950 | B2 | 8/2006 | Tassberg et al. | |
| 7,110,714 | B1 | 9/2006 | Kay et al. | |
| 7,149,541 | B2 | 12/2006 | Rautila | |
| 7,158,753 | B2 | 1/2007 | Kagan et al. | |
| 7,190,971 | B1 | 3/2007 | Kawamoto | |
| 7,194,235 | B2 | 3/2007 | Nykanen et al. | |
| 7,260,842 | B2 | 8/2007 | Hirayama | |
| 7,266,343 | B1 | 9/2007 | Yli-juuti et al. | |
| 7,299,194 | B1 * | 11/2007 | Manganaris et al. | 705/7.29 |
| 7,313,359 | B2 | 12/2007 | Steelberg et al. | |
| 7,313,360 | B2 | 12/2007 | Steelberg et al. | |
| 7,415,430 | B2 | 8/2008 | Christensen et al. | |
| 7,500,256 | B1 | 3/2009 | Ohmae et al. | |
| 7,647,609 | B2 | 1/2010 | Wachtfogel et al. | |
| 7,773,939 | B2 | 8/2010 | Christensen et al. | |
| 2001/0031013 | A1 | 10/2001 | Stetzler et al. | |
| 2002/0026474 | A1 | 2/2002 | Wang et al. | |
| 2002/0046407 | A1 | 4/2002 | Franco | |
| 2002/0133824 | A1 | 9/2002 | Mensch | |
| 2002/0178441 | A1 | 11/2002 | Hashimoto | |
| 2003/0086694 | A1 | 5/2003 | Davidsson | |
| 2003/0097338 | A1 | 5/2003 | Mankovich et al. | |
| 2003/0200543 | A1 | 10/2003 | Burns | |
| 2004/0205810 | A1 | 10/2004 | Matheny et al. | |
| 2005/0021744 | A1 | 1/2005 | Haitsuka et al. | |
| 2006/0174261 | A1 | 8/2006 | Cline et al. | |
| 2006/0184960 | A1 | 8/2006 | Horton et al. | |
| 2007/0155311 | A1 | 7/2007 | Christensen et al. | |
| 2007/0198353 | A1 | 8/2007 | Behringer et al. | |
| 2007/0226146 | A1 | 9/2007 | Ruul | |
| 2008/0049704 | A1 | 2/2008 | Witteman et al. | |
| 2009/0104870 | A1 | 4/2009 | Christensen et al. | |
| 2009/0104872 | A1 | 4/2009 | Christensen et al. | |
| 2009/0177736 | A1 | 7/2009 | Christensen et al. | |
| 2009/0183208 | A1 | 7/2009 | Christensen et al. | |
| 2009/0205000 | A1 | 8/2009 | Christensen et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 44 27 046 | 2/1996 |
| DE | 196 27 308 | 1/1998 |
| EP | 0713335 | 5/1996 |
| JP | 08-139624 | 5/1996 |
| JP | 10-135855 | 5/1998 |
| JP | 2000292182 | 10/2000 |
| KR | 10-1996-0033096 | 9/1996 |
| KR | 10-1998-0078248 | 11/1998 |
| WO | WO 90/00847 | 1/1990 |
| WO | WO 92/14222 | 8/1992 |
| WO | WO 94/02909 | 2/1994 |
| WO | WO 97/21291 | 6/1997 |
| WO | WO 97/42724 | 11/1997 |
| WO | WO 97/45814 | 12/1997 |
| WO | WO 99/18518 | 4/1999 |
| WO | WO 99/35771 | 7/1999 |
| WO | WO 99/35809 | 7/1999 |
| WO | WO 99/43109 | 8/1999 |
| WO | WO 00/19662 | 4/2000 |
| WO | WO 00/78050 | 12/2000 |
| WO | WO 01/01331 | 1/2001 |
| WO | WO 01/57759 | 8/2001 |
| WO | WO 01/77779 | 10/2001 |
| WO | WO 02/23773 | 3/2002 |
| WO | WO 2006/122028 | 11/2006 |
| WO | WO 2008/002000 | 1/2008 |

OTHER PUBLICATIONS

U.S. Appl. No. 12/897,509, filed Oct. 4, 2010, Christensen et al.
"Bookmark Your World", 1999-2000 Xenote, www.xenote.com.
"Sirus to Add 'Instant Buy' Button," Mar. 13, 2000, Twice, V 15, n 7, p. 28.
Jan. 25, 2000, Showcase 2000—Xenote Press Release re Xenote iTag, www.xenote.com/html/press/releases.html.
International Search Report and Written Opinion for International Application No. PCT/US2009/03349, Notification mailed Jun. 23, 2009.


* cited by examiner


1
ADVERTISEMENT ENTITY
6
CONTROL MANAGEMENT SYSTEM
100
101
105
ANCILLARY DEVICE(S)
5
104
103
MEDIA ASSOCIATION SYSTEM
2
PRIMARY DEVICE
4
102
FIRST TRANSMITTER
3

FIG. 1


First Transmitter
3
ID
115
First Media
111
Associated Media
112
Primary Device
4
Media Association System
2
Advertisement Entity
6
Control Management System
100

FIG. 1A


Media Association System
2
Advertisement
113
Related Media
114
ID
115
Ancillary Device(s)
5
Primary Device
4

FIG. 1B


2
Media Association System
114
Related Media
115
ID
113
Advertisement
115
ID
5
Ancillary Device(s)
4
Primary Device

FIG. 1C


115
ID
ID
ID
ID
ID
ID
Unique Identifier
Content Identifier
Media Signal Identifier
User Identifier
Device Identifier
Advertisement Identifier

FIG. 1D

FIG. 2



400
Central Processing Unit (CPU)
404
Memory
405
Display Selection Modules
406
Mass Storage Device
401
Multimedia Device
402
I/O Devices and Interfaces
403
415
COMMUNICATIONS MEDIUM
410
OTHER ENTITIES
10
ANCILLARY DEVICE(S)
5
FIRST TRANSMITTER
3
ADVERTISEMENT ENTITY
6
MEDIA ASSOCIATION SYSTEM
2
INTERNET
7
CONTROL MANAGEMENT SYSTEM
100

FIG. 3


4
455
453
451
"Song" - "Artist"
12:34
450
Advertisement
452
3
2
5
462
470
461


111
113
Advertisement Signal
First Media Signal
114
Related Media Signal

FIG. 3A

*FIG. 4*


Receive Media and Configuration
Choose Output Media
Store Output Media
Present Output Media
User Response
Perform Device Action


Receive 1st Media Signal
Receive Related Media Signal
Receive Advertisement Signal
Receive User Input
Receive Configuration Signal
Receive Stored Media
Choose Output Media
Store Output Media
Present Output Media
User Response
Send to Media Association System
Send to Advertisement Entity
Send to First Transmitter
Send to Ancillary Device
Change Output Criteria
Store Output Media
Perform Device Action

*FIG. 4A*


100
Control Management System
6
Advertisement entity
2
Media Association System
251
Advertisement Processing Module
4
Primary Device
280
Media Signal Identifier Module
250
Related Media Processing Module
3
First Transmitter

FIG. 5


6
Advertisement entity
2
Media Association System
222
Communications Element
261
Report Module
251
Advertisement Processing Module
223
Communications Element
5
Ancillary Device(s)
4
Primary Device
280
Media Signal Identifier
250
Related Media Processing Module
220
receiver
221
Communications Element
260
Report Module
3
First Transmitter
7
COMMUNICATIONS MEDIUM

FIG. 5A


System Start
Receive Advertisement Criteria and Signal
Choose Advertisement Signal
Prepare Advertisement Signal
Devices Respond
Send to Devices
Receive Information Re: 1st Media Signal
Identify Media
Collect Related Media
Prepare Related Media Signal

FIG. 6


1100
120
BROADCAST SOURCES
160
BROADCAST SCANNING SYSTEM
140
BROADCAST RECEIVING SYSTEM
1102
MEDIA ASSOCIATION (INTERSTITIAL AD) SYSTEM
1101
BROADCAST RESPONSE AND BUSINESS SYSTEM
1103
Content Database
1105
Response Database
1107
Consumer Database
1109
Purchase Database
1111
Unique Event Identifier Database
1113
FULFILLMENT SYSTEM
1115
DATA MINING AND REPORTING SYSTEM
1117
SUPPLIERS

FIG. 7

FIG. 8


Add a Campaign | Campaigns | Clients | Ad Graphics | My Profile | Log Out
Welcome Back, Customer
Campaigns
<< Back to Campaigns
Step 1 Choose a Client
Step 2 Campaign Information
Step 3 Demographics
Step 4 Select Stations
Step 5 Review and Launch
Step 2: Campaign Information
Campaign Details
Client Name: Digital Muse
*Campaign Name: Advertisement Entity
*Campaign Types:
Click Throughs ($0.12 per 100 clicks)
Interstitial ($10.00 per 1000 views)
More Info ($0.50 per click)
On Air Ad ($0.12 per 100 clicks)
Primary Banner ($10.00 per 1000 views)
Qualified Lead ($50.00 per lead)
Splash Screen ($25.00 per 1000 views)
Notes:
Schedule
*Begins: 02/04/2009 (Wed)
Ends: -- ONGOING --
Between the hours of: --24/7--
and: --24/7--
Advertise Now!
Handset Calendar Scheduling
Generic Ad Details
Showing Generic Version
32.9 MHz 3
MENU GET BACK
* Provide Ad Short Text (Preview)
* Provide Ad Text (Preview)
Ad Response Details
Bar Code ASCII (Code 39) Project
Handset Response URL http://
Web Response URL http://
PREV
Step 2: Campaign Information
NEXT

# SYSTEM AND METHOD FOR ADVERTISEMENT TRANSMISSION AND DISPLAY

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application claims the benefit under 35 U.S.C. 119(c) to U.S. Provisional Application No. 61/026,449, filed Feb. 5, 2008, which is hereby incorporated by reference in its entirety, including specifically but not limited to the systems and methods relating to advertisement transmission and display.

## BACKGROUND

1. Field

The invention relates generally to media advertising and in particular to systems and methods for associating an advertising media signal with another media signal.

2. Description of the Related Art

In advertising, it is generally desirable to associate products with specific characteristics, such as associating a brand of car with quality engineering. Another example is associating a brand of beverage with the characteristic of happiness or lifestyle as exhibited by smiling people. Creating such associations in the minds of potential customers may generally increase the chance that a potential customer will choose to purchase a product that is associated with a favorable characteristic. Celebrities and other images often exhibit favorable characteristics. Therefore, an advertisement may be more effective if the product advertisement is associated with an image of a celebrity or other media element exhibiting favorable characteristics.

## SUMMARY

In certain embodiments, a method for associating multiple media signals, comprising in no particular order: obtaining information about a first media signal; analyzing the information about the first media signal; selecting at least one second media signal to be correlated with the first media signal based on at least one criteria; assigning a unique identifier that is specific to the transmission of the selected second media signal, wherein at least the unique identifier is stored in a database; transmitting at least the second media signal and the unique identifier to a user device, wherein the user device outputs the first media signal and the second media signal to a user; receiving a user response from the user in relation to the second media signal wherein the user response includes at least the unique identifier; and correlating at least the unique identifier in the database.

In some embodiments, a method for combining multiple media signals in a device, comprising in no particular order: obtaining a first media signal by the device; outputting a first media content comprised in the first media signal to a user of the device; obtaining a second media signal by the device; obtaining a criteria correlated to the second media signal; evaluating the criteria in reference to the user of the device; and outputting at least a second media content comprised in the second media signal to the user of the device, wherein the second media content outputted is determined at least in part based on the evaluation of the criteria.

In certain embodiments, a user device system capable of combining multiple media signals comprising: a first receiver module configured to receive at least a first media signal from a first transmitter; a second receiver module configured to



receive at least a second media signal and a unique identifier correlated to the second media signal; an output module configured to output a primary media content from the first media signal and output a secondary media content from the second media signal; an input module capable of receiving at least a user input; and a transmitting module capable of transmitting at least the user input and the unique identifier to a computer server, wherein the computer server has access to a database containing at least the unique identifier.

In some embodiments, a method for associating multiple media signals, comprising in no particular order: obtaining information about a first media signal; analyzing the information about the first media signal; selecting at least one second media signal to be correlated with the first media signal based on at least one criteria; assigning a unique identifier that is specific to the transmission of the selected second media signal, wherein at least the unique identifier is stored in a database; transmitting at least the second media signal and the unique identifier to a user device, wherein the user device outputs the first media signal and the second media signal to a user; and transmitting the unique identifier to a third party.

For purposes of this summary, certain aspects, advantages, and novel features of the invention are described herein. It is to be understood that not necessarily all such advantages may be achieved in accordance with any particular embodiment of the invention. Thus, for example, those skilled in the art will recognize that the invention may be embodied or carried out in a manner that achieves one advantage or group of advantages as taught herein without necessarily achieving other advantages as may be taught or suggested herein.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other features, aspects and advantages of the present invention are described in detail below with reference to the drawings of various embodiments, which are intended to illustrate and not to limit the invention. The drawings comprise the following figures in which:

FIG. **1** illustrates a high-level overview of one embodiment of a media enhancement system.

FIGS. **1**A-**1**C illustrate signals and identifiers correlated and transmitted in between elements of one embodiment of a media enhancement system.

FIG. **1**D illustrates identifiers correlated, transmitted and stored in a database in relation to elements of one embodiment of a media enhancement system.

FIG. **2** illustrates a block diagram of one embodiment of a user device connected to a media association system via a network.

FIG. **3** illustrates one embodiment of a user device with a user interface, connected to a media association system.

FIG. **3**A illustrates one embodiment of an alternative display portion of a user interface.

FIG. **4** illustrates a flow-chart diagram of one embodiment of a method for a device providing media to a user.

FIG. **4**A illustrates a detailed flow-chart diagram of one embodiment of a method for a device providing media to a user.

FIG. **5** illustrates a block diagram of one embodiment of a media association system.

FIG. **5**A illustrates a more detailed block diagram of one embodiment of a media association system.

FIG. **6** illustrates a flow-chart diagram of one embodiment of a method for choosing media to provide to user devices.

FIG. **7** illustrates one embodiment of a media enhancement system in the context of one embodiment of a broadcast response and business system.

FIG. **8** illustrates one embodiment of a conditional access portal for establishing operations criteria, filters and conditions for the control, transmission, presentation, response to and reporting of media content activity.

## DETAILED DESCRIPTION

The disclosure herein provides systems and methods for a media enhancement system configured to associate a secondary media signal (for example, the secondary media signal can comprise an advertisement) to a primary media signal (for example, a radio broadcast). The disclosure herein additionally provides systems and methods for a media enhancement system that enables the generating, transmitting, displaying, and/or responding to a plurality of associated and/or unassociated secondary media signals, based on a primary media content from a primary media signal, user characteristics (for example, demographic and/or geographic information), and/or third-party preferences (for example, the goals of advertisers). The secondary media signals can be used to enhance the primary media content already being provided to the user on a user device. The secondary media signals can also be used to create psychological associations or relationships with the primary media content already being provided to the user.

For example, in one embodiment, a radio station transmits a song that is received by a user enabled-device, such as a cellular phone with a radio. The transmitted song is transmitted in a first media signal. The song is analyzed by a media association system to determine what prospective media elements can be associated with the song. The user enabled-device obtains and/or receives from the media association system a secondary media signal that is separate and/or discrete from the first media signal. For example, the secondary media signal could be an advertisement for a particular truck. As the user enabled-device is playing a song obtained from the first media signal, the user enabled-device displays the media content in the second media signal, wherein the media content can be a still or moving picture of the advertised truck. In another embodiment, as the user enabled-device is playing a song obtained from the first media signal, the user enabled-device displays the media content obtained from the second media signal, wherein the media content can be a still or moving picture with user selectable audio of the advertised truck wherein the first audio track could be paused upon selection.

Additional information could be associated with the first media signal and/or the secondary media signal. For example, additional information could be obtained by the user enabled-device in the form of a text message that offers a test drive of the advertised truck at a local truck dealer. A third media signal could be obtained or received by the user enable-device providing the address information and/or direction to the nearest truck dealer based on the GPS location of the user enabled-device. As an alternative to GPS, triangulation or other similar method may also be used to locate the user-enabled device. Accordingly, one or more media signals can be associated with the first media signal.

In one embodiment, the system provides logic and/or a user interface to allow users to select the form of desired media. For example, the user can select to receive textual, graphical, and/or audio media content based on the user's location. For example, if the user is in an environment that is not conducive to generating audio, such as in some transit systems, libraries, and/or schools, then the system could generate graphical and/or textual media content, and no audio media content.

In another embodiment, the first media signal provides and/or sends programming and/or other media content, the second media signal provides and/or sends additional information about the programming from a source other than the originator of the first media signal, and/or the third media signal (from a third party source) could provide and/or send unique media content to be associated with the first media signal and/or the second media signal. For example, a radio broadcast is received as the first media signal by a user device comprising an analog or digital receiver. The user device also receives the second media signal through for example, GPRS, EVDO and/or HSDPA over a wireless network, wherein the second media signal comprises additional information about the broadcast, such as an artist name, a title, an advertisement, an advertiser, a purchase option, a voting option, and/or other interactive options available and/or related to the first media signal. The user device also receives the third media signal comprising comments sourced through a peer to peer relationship received from other user devices relaying comments, opinions, and/or other additional information about the first and/or second media signals.

In one embodiment, the system comprises a computational device that receives a streamed internet transmission sourced from a radio station, a radio receiver that receives the first media stream from the radio station, a user device such as a cell phone capable of presenting to the user a media stream, and/or a storage device that could be connected via a network to at least a computational device and/or the user device/cell phone. The storage device is configured to present the multiple media streams that are available. The computational device is configured to perform an analysis of the first media stream. Based on user selectable criteria, the computational device is configured to select from the storage device which available media stream is to be associated with the first media stream. The storage device is configured to use the network connection to send the selected additional media stream to the cell phone.

The cell phone is configured to display the additional media stream. When the user changes the radio status (for example, changes station and/or turns off the device), the additional media stream on the cell phone could be continued, the user or device could alert the computational device of the status change to be used in future analysis, and/or the radio could automatically communicate with the computational device regarding the changed status. The computational device is configured to continuously monitor and/or detect changes in the media streams from the radio station (for example, one song followed by another song) via the internet streaming of the radio station transmission.

In one embodiment, the first media signal and the advertisement message could be integrated into the same transmission. The media association system could associate the first media signal with the advertisement message before the broadcast of the first media signal is completed. In another embodiment, the first media signal and the advertisement message are separate and discrete. In another embodiment, the first media signal is intercepted before reaching the user device and the advertisement message is added to the first media signal and sent on to the user device. In all three of the above embodiments, where the first media signal and advertisement message are discrete, integrated or combined after interception, the device receives both the first media signal and the advertisement message and presents them to the user.

In one embodiment, the first media signal and the second media signal are integrated into the same transmission. In one embodiment, the first media signal and the second media signal are separate and discrete. In one embodiment, the first

media signal is intercepted before reaching the user device and the second media signal is added to the first media signal and sent on to the user device. In one embodiment, the user can respond to the second media signal. In one embodiment, the user response is to the first media signal sender. In one embodiment, the user response is to the second media signal sender. In one embodiment, the user response is to a third party. In one embodiment, the media content of the second media signal is selected based on demographic information of the user, status of the user device (such as make, model, geographic location and/or other pertinent information) and/or other like criteria. In one embodiment, the second media signal is transmitted to the user device prior to the transmission of the first media signal. In one embodiment, the media content of the second media signal is stored in the user device. In one embodiment, the stored media content of the second media signal is communicated to the user based on a media association system integrated into the user device. In one embodiment, a third signal is sent to the user device indicating which, if any, stored media content should be communicated to the user.

As used herein, the terms "media" or "media content" are broad terms that comprise any form of content, including without limitation, graphics, videos, sounds, text, text messages, interactive applications, vibrations, television and/or radio programming, podcasts, movies, songs, games, telephone conversations, speeches, news, information, advertisements, polls votes, personal messages, and/or other physical manifestations capable of communicating a concept or idea.

Similarly, the terms "hear," "view," "read," "feel," "sense," their synonyms, and their alternative conjugations should be used interchangeably when referring to any form of media. When one sensory verb is used in connection with one form of media, it will be clear that other forms of media could be used in conjunction with other sensory verbs (such as "hear a sound" is interchangeable with "view a graphic"). Similarly, the terms "display," "present," their synonyms, and their alternative conjugations should be used interchangeably and be broadly interpreted as providing media to be sensed by the user.

The terms "media signal," "broadcast stream," or "media stream" are broad terms that comprise broadcasts or transmissions from AM/FM radio, Digital radio, IBOC, Satellite, Cable, Analog television, Digital Television, HSDPA (3G), UMTS, CDMA, internet, WiFi, other broadcast stations/entities, and/or other media conveyance methodologies such as direct wire connections. Media signals can be unique media streams. Further, the foregoing terms also comprise data signals or data streams from servers or devices that stream data and/or media to other devices or servers. For example, a radio device can receive a first media signal comprising music media content being played by a radio station, and the radio device can also receive simultaneously, serially, or otherwise a second media signal comprising an advertisement sent by an advertisement server or media association system.

Further, the term "program" is a broad term that comprises a portion of a media signal in any media form, or combinations thereof. This can comprise for example a discrete song, a series of songs, a truncated song, a song followed by or preceded by commentary, a song accompanied with graphical images and/or video, a song accompanied by text, combinations thereof, and/or analogous portions of other forms of media. Other examples can include, but are not limited to: discrete media elements comprising video and/or audio, a series of media elements, a portion of a media element, a media element followed by, or preceded by commentary, a media element accompanied with fixed graphical images, video, and/or audio, a media element accompanied by text, combinations thereof, and/or analogous portions of other forms of media.

Further, the term "sensor" is a broad term that comprises any mechanism for converting an external stimulus and/or characteristic into a simplified signal, comprising buttons, keyboards, joysticks, touch-screens, thermometers, electrocardiographs, cameras and other photo sensors, microphones, a mouse, trackpad and/or trackball, mice, styluses, GPS systems, and/or other sensors. These sensors can output to electromagnetic signals, optical displays, audio outputs, vibrators, signal carried by wire, and/or any other externally detectable response.

Further, the term "communication methods" as used herein broadly refers to protocols, standards, conventions, and/or the like for communicating. This comprises hypertext transfer protocol ("HTTP"), file transfer protocol ("FTP"), amplitude/frequency modulation ("AM/FM"), general packet radio service ("GPRS"), evolution-date optimized ("EVDO"), short message service ("SMS"), radio broadcast data system ("RBDS"), Bluetooth®, digital radio mondiale ("DRM"), in band on channel ("IBOC"), high speed download packet access ("3G" and/or "HSDPA"), other forms of broadcast, telephony, peer-to-peer networking/protocol, and/or the like. Additionally, "communication methods" could comprise various physical means for conveying information comprising nonexclusively electromagnetic waves (for example, radio or light), sound waves, cables, and/or the like. "Communication methods" also comprises indirect methods, such as a first communication to an intermediary via HTTP, followed by a communication from the intermediary to a receiver by a television signal. It should be understood that specific communication methods could be interchangeable in the context of this disclosure.

Further, the term "communications element" as used herein broadly refers to devices, elements, machines, and/or structures capable of using communication methods. Examples comprise radio transmitters, receivers, transceivers, cellular phones, internet-capable computers, Ethernet cards, wireless adapters, and/or the like.

Further, the term "broadcast" as used herein broadly refers to media distributed publicly over a communication method, comprising without limitation terrestrial radio, over-the-air (or terrestrial) television, cable, satellite, internet downloading, WIFI, internet streaming, other communications by electromagnetic waves, and/or the like.

Further, in general the word "module," as used herein, refers to logic embodied in hardware and/or firmware, and/or to a collection of software instructions, possibly having entry and/or exit points, written in a programming language, such as, for example, Java, and/or the Java Platform-Micro Edition (Java ME, and/or J2ME), comprising the Java Specification Request 234 (JSR 234) Advanced Multimedia Supplements. Other programming languages comprise without limitation COBOL, CICS, Lua, C and/or C++ and an application program including pseudo code interpretable instructions. A software module may be compiled and linked into an executable program, installed in a dynamic link library, and/or may be written in an interpreted programming language such as, for example, BASIC, Perl, PHP and/or Python. It will be appreciated that software modules may be callable from other modules and/or from themselves, and/or may be invoked in response to detected events and/or interrupts. Software instructions may be embedded in firmware, such as an erasable programmable read-only memory (EPROM). It will be further appreciated that hardware modules may be comprised of connected logic units, such as gates and/or flip-flops, and/

or may be comprised of programmable units, such as programmable gate arrays and/or processors. The modules described herein are preferably implemented as software modules, but may be represented in hardware and/or firmware. Generally, the modules described herein refer to logical modules that may be combined with other modules or divided into sub-modules despite their physical organization or storage.

The terms "computer," "computer server," "computing system," "computer clients," "servers," or "computing system devices" as used herein are interchangeable terms, and the terms broadly refer, without limitation, to a machine that manipulates data according to a list of instructions or the like.

Further, the terms "response transmission," "responses," "click-through's," or "status report" are broad terms that include any of the communication means described above to transfer information from the device to other components of the system such as the media association system, first transmitter, message entity, control monitoring system, ancillary device or other primary devices. The information can include, but is not limited to, aspects of the device such as being turned off, being turned on, accessing a different media signal; status of reception of a first media signal, an advertising signal, an associated media signal, a related media signal and/or an identifier (a unique identifier, content, device, user, advertising signal, first media signal, broadcaster, message entity and/or identifying other aspects of the system); device capabilities, including but not limited to parameters associated with first media signal, advertisement signal, associated media signal, and/or related media signal presentation (display, audio, vibration), user input capabilities, communication capabilities; device status such as location, motion, use patterns, capabilities being utilized, ambient environment; and/or user status.

The terms "rules," "criteria," "conditional filters," "programmable filters," "filters," "association criteria," "logic and rules of operation," or "advertisement criteria" are broad terms that comprise without limitation determinate control over the following: access, creation, organization, communication, presentation and display to users, dissemination, pricing, device and signal availability, user device media signal presentation and correlation to programming and/or programmable filters, and/or conditions to be applied to the media signals.

The terms "unique event identifier," or "unique identifier" as used herein are broad terms that refer to any means for identifying a specific instance of a broadcast stream, transmission and/or media signal. As used herein, when the terms "unique identifier" or "unique event identifier" are used in specificity it is to establish preeminence of operation amongst identifiers. It is not intended to limit or exclude the presence or use of other identifier elements, content and/or classes. The term "identifier" or "identifies" as used herein are a broad terms that refer to a representation of that which is being identified. The identifier may include, but is not limited to, at least the unique identifier and may further comprise identification of other elements, contents and/or classes. Such elements may comprise: an advertisement, related media, associated media, device, language user of a device, and/or first media signals. Such contents may comprise: a first media signal, related media, associated media, device, language, user of a device, and/or first media signal. And/or such classes may comprise: a class of a first media signal, advertisement, related media, associated media, device, language, user of a device, and/or first media signal. The unique event identifier and/or identifiers are preferably implemented as a part of a database that allows for the storage and/or retrieval of the identifier and/or data associated with the identifier. By means of the unique event identifier and/or identifiers, reports can be generated on the performance of various aspects of the system such as who, what, when, where, why, which, and/or how an event within the system occurred, including the number of times an event within the system occurred; locations for events; what prompted an event; devices, signals and/or users associated with events and/or means associated with the events.

Media Enhancement System

FIG. **1** depicts one embodiment of a media enhancement system for transmitting and/or displaying advertisements and/or other media content, wherein the system comprises but is not limited to a first transmitter **3**, control management system **100**, a media association system **2**, a primary device **4**, an ancillary device(s) **5**, and an advertisement entity **6**.

Referring to FIG. **1**, the first transmitter **3** can be a radio station broadcasting through an antenna tower via modulated electromagnetic waves. In other embodiments, the first transmitter **3** comprises but is not limited to a broadcaster broadcasting content over the internet (for example, by UDP, TCP/IP, HTML, HTTP, and/or the like), a broadcaster broadcasting content through a cable line, satellite and/or through other communication methods. Additionally, the first transmitter **3** can comprise a computer connected to the internet so as to transmit information to a more limited set of receivers, such as to a set of internet protocol addresses email addresses, instant messenger accounts, and/or the like. Thus, as further examples the first transmitter **3** can comprise an instance of peer-to-peer software, an interactive web-based video game, a website with controlled access, and/or the like. The first transmitter **3** can also comprise a telephone and/or wireless connection, so as to transmit information by phone, cellular phone, and/or other wired or wireless communication. The first transmitter **3** can also comprise a connection to some other element, such as a serial connection, capable of any form of communication method. Additionally, the first transmitter **3** can comprise an encryption module to limit access to a first media signal **111**, as illustrated in FIG. **1A**. Generally, the first transmitter **3** comprises a communications element. By an indirect or direct communication method, the first transmitter **3** sends a first media signal **111** that is received by the primary device **4**.

The primary device **4** illustrated in FIG. **1** may be a portable device, such as a radio, television, digital media player, GPS unit, multi purpose displays, cellular phone, laptop computer, personal digital assistant, transceiver, transmitter, receiver, and/or the like. The primary device **4** may also be a non-portable device, such as a desktop computer, television, land-line telephone, and/or the like. The primary device **4** can display the media content in the first media signal **111** and/or transmit the first media signal to one or more ancillary devices **5**, which may take the form of any device such as those defined for primary device **4** or an adjunct to a primary device **4** such as a personal computer, server, digital media player docking station, video player, printer, clock, telephone, answering machine, recorder, remote control and/or the like. The ancillary device can be portable, mobile such as a radio in a car or fixed in place. The ancillary devices **5** can then display the media content in the first media signal **111** and/or transmit the first media signal back to the primary device **4**. When the ancillary device **5** comprises a communications element capable of retransmitting the first media signal **111**, the first media signal may be viewed on the primary device **4** at a later time without requiring data storage on the primary device **4**. When the ancillary device **5** comprises a communications element capable of retransmitting the first media signal **111**,

the first media signal and/or information identifying the first media signal **111**, may be viewed on the ancillary device **5** at a later time without requiring data storage on the primary device **4**. The first media signal **111** that is transmitted from the first transmitter **3** to the primary device **4** can contain any form(s) of media in digital and/or analog formats.

Also illustrated in FIG. **1**, the primary and/or ancillary devices **4**, **5** can transmit information back to the first transmitter **3** by either the same communication method or by a different communication method. For example, the first media signal **111** sent by the first transmitter **3** can comprise a talk radio program soliciting responses to a poll. The primary and/or ancillary devices **4**, **5**, can respond by, for example, placing a phone call to the first transmitter **3**, when either the primary or ancillary device is capable of telephony. Alternatively, the first transmitter **3** can comprise a computer connected to the internet, sending a first media signal **111** instant message advertising an upcoming pay-per-view television program. The primary device **4** may comprise a computer configured to receive this instant message and upon receiving a user response transmit the message to an ancillary device **5**. The ancillary device **5** can comprise a television with interactive capabilities, such that upon receiving the message from the primary device **4** the ancillary device **5** can request the pay-per-view television program from the first transmitter **3**. The first transmitter **3** can then send the television program directly to the ancillary device **5**. It will be clear that other communication methods between the first transmitter **3** and the primary and/or ancillary devices **4**, **5** are possible.

Referring to FIG. **1**, similar transmissions and/or interactions can be made between the first transmitter **3** and the media association system **2** and/or the advertisement entity **6**. The media association system **2** and the advertisement entity **6** can each comprise the same forms as those identified for the primary and/or ancillary devices **4**, **5** and/or the first transmitter **3**. In one embodiment, the media association system **2** may comprise a radio signal receiver connected to a computer that is connected to the internet. The media association system **2** can then receive and/or identify the media content in the first media signal **111**. For example, the media association system **2** can identify the media content as a particular song or particular program. As illustrated in FIG. **1**B, media association system **2** can use this information to send or transmit a secondary or related media signal **114**, such as information regarding the media content of the first media signal **111**, to the primary device **4** and/or the ancillary devices **5** through an internet connection. The secondary or related media signal **114** can be provided by any communication method described herein, and the secondary or related media signal **114** can either be the same or different type of communication method used to transmit the first media signal **111**.

In one embodiment, as illustrated in FIG. **1**, the first transmitter **3** and the media association system **2** can be combined into a single system with one part performing the functions of the first transmitter **3** and another part performing the functions of the media association system **2**. The communications, processing, memory, and/or other components of such a combined system can be shared between the different parts or be separate.

As illustrated in FIG. **1**, the primary device **4** and/or ancillary device **5** can also send signals back to the media association system **2** and/or to the control management system **100**. For example, if the related media signal **114** sent by the media association system **2** to the devices **4**, **5** comprises purchasing information for a song present in the first media signal **111**, the primary and/or ancillary devices **4**, **5** can provide a purchase request to the media association system **2**. The media association system **2** can then transmit the purchase request to the first transmitter **3**, to a third party for fulfillment, and/or to the control management system **100**. The response transmission sent back to the media association system **2** and/or the control management system **100** can comprise: the response to a first media signal **111** and/or a unique identifier **115** obtained from first media signal **111**, a response to an advertisement media signal **113**, and/or a unique identifier **115** obtained from advertisement media signal **113**, (and/or a user identifier, a device identifier etc), a user selection from a list of options and/or the status of the device (including but not limited to the presentation of the first media signal, presentation of the advertisement signal, changing which first transmitter **3** is being received, the device turning on or off).



Referring to FIG. **1**, the advertisement entity **6** can make similar communications with the primary and/or ancillary devices **4**, **5**, the first transmitter **3**, as well as the media association system **2**, to a third party for more information, and/or to the control management system **100**. For example, the advertisement entity **6** can send an advertisement signal **113** to the media association system **2**, for the purpose of having it provided by the media association system **2** to the primary and/or ancillary devices **4**, **5**. The advertisement entity **6** can also send advertisement criteria to the media association system **2**, such that the advertisement signal **113** is provided to the primary and/or ancillary devices **4**, **5** upon them receiving a specific song from the first transmitter **3** in the first media signal **111**. The advertisement signal **113** can comprise, for example, graphical media along with an interactive purchasing option for the advertisement entity's product. A user of the primary and/or ancillary devices **4**, **5** can respond to the advertisement signal **113** with a purchase order in the form of an interactive response sent back to the media association system **2**, to a third party for fulfillment/more information or the control management system **100**, and/or directly to the advertisement entity **6**.

As illustrated in FIG. **1**, the advertisement entity **6** can also communicate with the first transmitter **3**, to a third party for fulfillment/more information, and/or the control management system **100**. As illustrated in FIG. **1**A, for example, the first transmitter **3** can send to the advertisement entity **6** a current and/or future schedule of the media content to be contained in the first media signal **111**. As illustrated in FIG. **1**B the advertisement entity **6** can then use this information to determine the advertisement media content **113** it transmits to the media association system **2**. In another embodiment, as illustrated in FIG. **1**A, the first transmitter **3** can send to the control management system **100** a current and/or future schedule of the media content to be contained in the first media signal **111**. As illustrated in FIG. **1**B, the control management system **100** can then use this information to determine the advertisement media content **113** it transmits to the media association system **2**.

The First Media Signal

Referring to FIG. **1**A, the first transmitter **3** can send a first media signal **111** to the primary device **4** and/or ancillary device **5**. FIG. **1**A also illustrates an embodiment of a first media signal **111** transmitted from the first transmitter **3** to the primary device **4**, the media association system **2**, and the advertisement entity **6**. The first media signal **111** can comprise any type of media as set forth herein.

In some embodiments the first media signal **111** can be integrated or transmitted together with a secondary or associated media signal **112** and/or identifier **115** (as illustrated in FIG. **1**A) or the first media signal **111** can be transmitted separately from the associated media signal **112** and/or iden-

tifier **115**. The associated media signal **112** can comprise information and/or data related to or about the media contents in the first media signal **111**, such as the title, author, artist, album, ad, advertiser, length, date of creation, language identifier, checksum, error checking/correction and/or other relevant information, or the associated media signal **112** can comprise associated media content, such as album cover art, accompanying music, lyrics and/or other media content. When the associated media signal **112** is integral with the first media signal **111** the two signals can be combined into a single signal transmitted with, for example, alternating information or data packets (as illustrated in FIG. **1**A) over a single frequency or physical data connection.

The associated media signal **112** can be transmitted integrally with the first media signal **111** via a communication method. Alternatively, when the two signals are separate they can be transmitted on distinct frequencies, through distinct physical connections, at distinct times, and/or through distinct communication methods (for example, one by physical connection and the other by electromagnetic waves). Integrally combining a first media signal **111** with an associated media signal **112** can ensure that all, substantially all, or some of devices that receive the first media signal **111** can also receive the associated media signal **112**. In some cases, when the first media signal **111** and the associated media signal **112** are not integral or are sent as separate media signals, then a unique identifier **115** can be assigned to the first media signal **111** and/or the associated media signal **112**. In other embodiments, the identifier is not a unique identifier. In some embodiments, the unique identifier **115** is specific to the transmission of the first media signal **111** and/or the associated media signal **112**. In another embodiment, the unique identifier **115** is tied to the specific instance of each media content segment conveyed via the first media signal **111**. In another embodiment, the unique identifier **115** is tied to the specific instance of each media content segment conveyed via the associated media signal **112**.

As illustrated in FIG. 1D, the unique identifier **115** is database-linked thereby allowing a user (for example, a user of the control management system **100**, media association system **2** and/or advertisement entity **6**) to conduct a search or lookup of the information identified by the unique identifier **115** to determine the location, the user device, the time of transmittal, the program and/or media content in the first media signal, the available options for response to the user of the device, and/or other identifying characteristic information. Identifiers illustrated in FIG. 1D are representative but not limited to identifiers, elements, content and/or classes of identifiers used in the media enhancement system. As depicted in FIG. **8**, the control management system **100** can comprise a conditional access user interface that allows programmable filters and/or conditions to be applied to the control, transmission, presentation and/or response to media content. The frequency of media content presentation, the duration of media content presentation, cost of click through responses to third parties by end users using primary device **4** and/or ancillary device **5**, cost or pricing for use of the media association system **2**, the conditions of response to media content presentation, the defined parameters controlling the relationship between first media signal **111** and associated media signal **112** and the language relating to the media content is controlled by conditions set in the control management system **100**.

Conditional filters established and/or controlled in the control management system server **100** may include but not be limited to: geographic location, time of day, language, source of broadcast transmission, account establishment for participation by third parties, cost of click throughs, cost of media content presentation, cost of reporting frequency of media content presentation, number of times media content presentation occurred, responses generated from media content presentation, demographic information associated with media content presentation and response, reporting results of media content presentation and response, noticeability of messages and/or advertisements by the user, demographic of the user, frequency of presentation, duration of presentation, size of the graphic and/or video presented, compression of the audio presented, combinations of the same, or the like. In addition, logic and rules of operation for presentation can be maintained by the control management system **100**. Conditional filters established and/or controlled in the control management system server **100** can also modulate and/or determine features of the primary device **4**, features of the ancillary device **5** and/or availability of communication means.

As illustrated in FIG. 1A, an identifier **115** can also be used when the first media signal **111** and associated media signal **112** are integral. The identifier **115** can serve to identify both signals, or only one of these signals and/or media content segments within a signal.

Again referring to FIGS. **1**, 1A the first media signal **111** from the first transmitter **3** can come in the form of an electromagnetic wave (for example, traditional radio, digital radio and/or television signals, WiFi, satellite, cellular phone signals, and/or the like), electronic and/or fiber-optic transmission over cable lines (such as, land-line telephones, cable television, DSL, other internet connections, and/or the like), and/or other communication methods.

Although the first media signal **111**, as depicted in FIG. 1A, is transmitted to the primary device **4**, the media association system **2**, and the advertisement entity **6**, it is clear that the first media signal **111** could further be transmitted to any number of devices or entities, as well as the ancillary devices **5** including the control management system **100**.

The Advertisement Signal

Referring back to FIG. **1**, both the media association system **2** and the advertisement entity **6** can provide an advertisement media signal **113** to the primary and/or ancillary devices **4**, **5**. The advertisement media signal **113** can be provided by any of the communication methods disclosed herein, and/or can comprise any form of media content.

FIG. 1B and FIG. 1C illustrate the media association system **2** transmitting the advertisement media signal **113** and the related media signal **114** to the primary and/or ancillary devices **4**, **5**. Similar to the first media signal **111**, the related media signal **114** and/or the advertisement media signal **113** can comprise graphics, video, audio, and/or text. Additionally, similar to the first media signal **111**, the related media signal **114** and/or the advertisement media signal **113** can be interactive in nature, allowing back-and-forth communication between the primary device **4** and the media association system **2**, the advertisement entity **6** and the control management system **100**. For example, the advertisement media signal **113** may comprise games, polls or votes, message boards, discounts, digital coupons, premiums, options to purchase related products, and/or other interactive activities. Further, the first media signal **111** can also be associated with a plurality of advertisement media signals **113** to be selectively played throughout the duration of the first media signal **111**.

Along with the advertisement media signal **113**, the advertisement entity **6** in FIG. **1** can provide advertisement criteria, associated with said advertisement signal **113**, for determining when said advertisement signal **113** should be provided to the primary and/or ancillary devices **4**, **5** and/or conditions of presentation to a user. To facilitate the assignment and/or sending of an advertisement media signal **113** with a first

media signal **111**, a unique identifier **115** can be provided to each media signal (the first media signal **111**, the advertisement media signal **113**, and/or the related media signal **114**), and/or each instance of each signal or content media segment. Similarly, media signals can additionally or alternatively be assigned one or more non-unique identifiers **115** to classify said media signals for similar purposes, such as an identifier for all, substantially all, or some instances of advertisement media signals **113** with a given graphical image, all, substantially all, or some signals provided in a given time period, all, substantially all, or some signals provided to a given device, all, substantially all, or some signals originating from a given source, or other purpose. These identifiers **115** can be stored in a database and/or other location such as the control management system **100**, along with other relevant information. The unique identifier **115** can be used by the media association system **2**, the advertisement entity **6**, the first transmitter **3**, and/or the primary and/or ancillary devices **4**, **5** and/or the control management system **100** as discussed further below, to track and/or record the results of any given signal as well as to determine whether the signal should be provided to the primary and/or ancillary devices **4**, **5** and/or the user. Presentation of advertisement signal **113** on primary devices **4** and/or ancillary devices **5** may be different for each user even when receiving the same first media signal **111** depending on the age, gender, language, location, time of day, type of device, user preferences, user affiliations, combinations of the same, or the like as defined by criteria established in the control management system **100**, the media association system **2** and/or the advertisement entity **6**.

Again referring to FIG. **1**B, the advertisement media signal **113** transmitted by the advertisement entity **6** can contain a unique and/or non-unique identifier **115**, along with further associated data integrated with the signal. For example, the advertisements media signal **113** may be immediately preceded by or immediately follow a data signal with the advertisement signal's unique identifier **115**, identifiers **115**, and/or advertisement criteria. The advertisement media signal **113** may also be associated with a separate data signal also sent by the advertisement entity **6**, for example, in a simultaneous transmission or in a later transmission. The signals can be associated by their time of transmission, use of identifiers **115**, or any other characteristics.

The identifier **115** associated with the first media signal **111**, associated media **112**, advertisement signal **113**, and/or related media **114**, could each be separate and/or discrete from each other. The identifier **115** associated with the first media signal **111**, associated media **112**, advertisement signal **113**, and/or related media **114**, could be the same identifier.

In one embodiment, the advertisement media signal **113** can be conveyed to the primary device **4** and/or ancillary device **5** prior to transmission of the first media signal **111**. Along with the advertisement signal **113**, the identifier **115** can contain association criteria for the advertisement signal **113**. The primary device **4** and/or the ancillary device **5** can store the advertisement signal **113** and the identifier **115**. Examples of such association criteria include, but is not limited to, the ability to recognize a particular first media signal by its identifier **115**, demographic information the advertisement signal **113** is appropriate for, information to match the demographics of the advertisement signal **113** with a first media signal **111**, and/or similar information. When a first media signal **111** and identifier **115** is received by the primary device **4** and/or the ancillary device **5**, then the association criteria could be applied. For example, an advertisement signal **113** identified as appropriate for people over 40 years of age could be indicated by the identifier **115**, could have been received earlier and stored in the primary device **4** and/or ancillary device **5**. A first media signal **111** could be received by the primary device **4** and/or ancillary device **5**, along with the identifier **115** indicating the first media signal **111** is directed primarily at people over 40. The association criteria could check the storage on primary device **4** and/or ancillary device **5**, determine that advertisement signal **113** is appropriate for presentation with first media signal **111** and then have either the primary device **4** and/or ancillary device **5** to present the advertisement signal **113** at the same time or substantially the same time as the first media signal **111** is presented to the user of the primary device **4** and/or ancillary device **5**. In some embodiments, the advertisement signal **113** may be presented at a different time than the first media signal **111**. Similarly, in another embodiment the advertisement signal **113** and a corollary identifier **115** are associated with a first media signal **111**. The first media signal **111** and the corollary identifier **115** are received and stored by the primary device **4** and/or ancillary device **5**. When the primary device **4** and/or ancillary device **5** receives the first media signal **111** with the first media identifier **115** corollary to the advertisement signal identifier **115**, the association criteria would check the stored information on primary device **4** and/or ancillary device **5** to determine that advertisement signal **113** is appropriate for presentation with first media signal **111**. Validation is confirmed because the advertisement signal identifier **115** and first media identifier **115** correlate. Next, the primary device **4** and/or ancillary device **5** present the advertisement signal media signal **113** at the same time or nearly the same time as the first media signal **111** is presented to the user of primary device **4** and/or ancillary device **5**.

The methods and systems of user sign up and/or opt in to web based portals for the purpose of managing content selection, advertising response follow up and/or account management are further described in detail in U.S. patent application Ser. No. 10/806,084, filed Mar. 22, 2004, titled "BROADCAST RESPONSE METHOD AND SYSTEM," which is incorporated by reference in its entirety.

Related Media Signal

As illustrated in FIGS. **1**, **1**A, **1**B, **1**C, the media association system **2** can also provide media as a service to the user and/or for its own benefit. The related media signal **114** sent from the media association system **2** to the primary device **4** and/or ancillary devices **5** can comprise any form of media content which may or may not be related to the first media signal **111** and/or the advertisement media signal **113**. For example, the related media signal **114** may comprise album art and/or a music video relating to a first media signal **111** that comprises a song. Additionally, the related media signal **114** can comprise text, such as a song's author, title, album, producer, lyrics, music notation, purchasing information, and/or other information. It will be clear that the related media signal **114** can also comprise interactive media, advertisements and/or any other form of media. It will also be clear that the related media signal **114** may be related to other criteria, such as criteria related to the user. For example, the related media signal **114** can comprise a reminder pre-programmed by the user, and/or other reminders such as a reminder to pay a service bill. Thus, the related media signal **114** can be related to the first media signal, the user, the media association system **2**, the advertisement signal **113**, and/or any other relevant element.

Again referring to FIGS. **1**, **1**B, **1**C, the related media signal **114** can be provided from the media association system **2** by any communication method discussed herein. This may be the same means or a different means from that which is used to transmit the advertisement media signal **113** and/or the first

media signal **111**. Additionally, like the foregoing media signals, the related media signal **114** may also be associated with a unique or non-unique identifier **115**.

As illustrated in FIGS. **1B**, **1C** the advertisement signal **113** and the related media signal **114** can be sent integrally or separately, as can the first media signal **111** and associated media signal **112**.

Response Signals

As illustrated in FIG. **1**, the primary and/or ancillary devices **4**, **5** can also send signals to the first transmitter **3**, the media association system **2**, control management system **100** and/or the advertisement entity **6**. As discussed above, these signals from the primary and/or ancillary devices **4**, **5** can comprise responses to interactive media signals. Additionally, the primary and/or ancillary devices **4**, **5** can also transmit user data in response to or independent of signals received by the primary and/or ancillary devices **4**, **5**. The primary device **4** can transmit user behavior, such as when the user changes a channel, turns the device on or off, changes the volume, and/or any other parameter. Primary and/or ancillary devices **4**, **5** equipped with GPS systems and/or other geographical positioning systems, such as those offered by Google®, can also report location, direction of motion, and/or speed. Primary and/or ancillary devices **4**, **5** further equipped with other sensors can detect other information or data about the user and/or the user's location and/or environment. Such information can advantageously be used by the media association system **2** to decide what media and/or advertisements to be sent to the primary and/or ancillary devices **4**, **5** in order to obtain a reaction from the user in general, and/or what media and/or advertisements are likely to elicit a positive reaction at a given time and/or when the user is in a given state or environment, as further discussed below.

Additionally, as depicted in FIG. **1**, the ancillary devices **5** can convey data from the primary device **4** to the media association system **2**. For example, if the primary device **4** is a radio-enabled cellular phone and an ancillary device **5** is a personal computer, the primary device **4** can collect data and later upload that data to the personal computer through a data transfer protocol, such as Bluetooth®, which in turn can send the user data through a network connection to the media association system **2**. The ancillary device **5** can comprise superior bandwidth, storage capacity, and/or processing power relative to the primary device **4**, allowing the ancillary device **5** to transmit more complex data to the media association system **2**.

As further illustrated in FIG. **1**, the primary and/or ancillary devices **4**, **5** can also provide similar communications with the advertisement entity **6** and/or the first transmitter **3**, and/or the control management system **100** as disclosed for the media association system **2**. Thus, the primary and/or ancillary devices **4**, **5** can be equipped to receive multiple media signals from either of these sources, and respond thereto in the same way as done with the media association system **2**. It is additionally possible for the primary and/or ancillary devices **4**, **5** to communicate with any of the other entities indirectly through the media association system **2**.

The methods and systems of processing responses or broadcast responses are further described in detail in U.S. patent application Ser. No. 10/806,084, filed Mar. 22, 2004, titled "BROADCAST RESPONSE METHOD AND SYSTEM," which is incorporated by reference in its entirety.

Referring to FIG. **1**, it is clear that system **1** could encompass multiple first transmitters **3**, primary devices **4**, ancillary devices **5**, media association systems **2** and/or message entities **6**. The introduction of multiple components in system **1** can increase the versatility of the communication connections. As an example, when primary device **4** is receiving a first media signal **111** from a first transmitter **3**, then the advertisement signal **113** can be handled using the media association system **2**. But when the primary device **4** changes device status to receive a different first media signal **111** from a different first transmitter **3**, then advertisement signal **113** may need to switch and be obtained from a different media association system **2**. This switch can occur in several different ways depending on how the communications are conducted. As an example, the change from first transmitter **3** to the different first transmitter **3** can be a change in tuning frequency, change in the method of communication with first transmitter **3**, sending a message to first transmitter **3** and/or the different first transmitter **3** and/or other action. With the change from first transmitter **3** to the different first transmitter **3**, the primary device **4** and/or ancillary device **5** can have already stored and/or obtained data indicating which media association system **2** corresponds to the different first transmitter **3** and how to establish communication with the appropriate media association system **2**. Alternatively, the associated media **112** can indicate which media association system **2** will have the advertisement signal **113** for the primary device **4** and/or ancillary device **5**. Alternatively, the media association system **2** can have a gateway system associated with it such that all communication from the primary device **4** and/or ancillary device **5** can be sent through the gateway. Then the media association system **2** can have sub-modules associated with the different first transmitters **3**. When the primary device **4** and/or ancillary device **5** indicates a device status change, the appropriate media association system **2** sub-modules can be informed so they can stop sending advertisement signal **113** associated with the current first transmitter **3** and begin sending advertisement signal **113** associated with the different first transmitter **3**. Alternatively, when the current media association system **2** receives the device status change from primary device **4** and/or ancillary device **5** indicating a change from receiving the current first transmitter **3** to receiving the different first transmitter **3**, then current media association system **2** can inform the different media association system **2** of the change, stop sending advertisement signal **113** to primary device **4** and/or ancillary device **5**, and the different media association system **2** can begin sending advertisement signal **113** to primary device **4** and/or ancillary device **5**. Alternatively, primary device **4** and/or ancillary device **5** can communicate with the control management system **100** all device status changes such as device turning on or off, device changing stations and/or the like. The control management system **100** could then coordinate among the media association systems **2** for which of them will communicate with the primary device **4** and/or ancillary device **5**. Alternatively, the primary device **4** and/or ancillary device **5** can send devise status change information to some or all media association systems **2** allowing them to determine which one of them should communicate with primary device **4** and/or ancillary device **5**.

Primary Device

Computing System Components

FIG. **2** illustrates an embodiment of a primary device **4**. The primary device **4** comprises a computing system **400**, which comprises a computer system suitable for controlling and/or communicating with the media association system **2**, the advertisement entity **6**, the first transmitter **3**, the control management system **100** and other third parties for which the primary device **4** is designed to communicate (for example, the internet **7**). The components and/or connections disclosed

below for computing system **400** can also be used to implement the other modules, systems, and/or devices described herein.

The computing system **400** comprises a central processing unit (CPU) **404**, which may comprise a microprocessor and/or baseband chip. The computing system **400** further comprises a memory **405**, such as random access memory (RAM) for temporary storage of information and/or a read only memory (ROM) for permanent storage of information, and a mass storage device **401**, such as a hard drive, diskette, flash memory, and/or optical media storage device. Typically, the modules of the computing system **400** are connected to the computer system **400** using a standards based bus system. In other embodiments, the standards based bus system could be Peripheral Component Interconnect (PCI), Microchannel, SCSI, Industrial Standard Architecture (ISA), Baseband Bus and Extended ISA (EISA) architectures, and/or other proprietary bus system for example.

In one embodiment, the computing system **400** comprises one or more commonly available input/output (I/O) devices and/or interfaces **403**, such as a keyboard, mouse, touchpad, four-way navigation button, other sensors, wireless technologies such as Bluetooth, WiFi, Infrared, and/or a printer. In one embodiment, the I/O devices and/or interfaces **403** comprise one or more display devices, such as a monitor or display that allows the visual presentation of media and/or options to a user. More particularly, a display device provides for the presentation of GUIs, application software data, multimedia presentations, menus and/or any other form of media or decision lists. In the embodiment of FIG. **2**, the I/O devices and/or interfaces **403** also provide a communications interface to various external devices. The computing system **400** may also comprise one or more multimedia devices **402**, such as speakers, video cards, graphics accelerators, microphones, vibrators, and/or other devices capable of presenting media.

Computing System Device/Operating System

The computing system **400** may operate on a variety of computing devices, such as, for example, a server, a Windows server, a Mac server, a Structure Query Language server, a Unix server, Linux server, a personal computer, a mainframe computer, a laptop computer, a cell phone, a personal digital assistant, a kiosk, an audio player, combinations of the same, or the like. The computing system **400** is generally controlled and coordinated by operating system software, such as z/OS, Windows 95, Windows 98, Windows NT, Windows 2000, Windows XP, Windows Vista, Linux, Unix, SunOS, Solaris, Palm, Windows Mobile, Symbian, Blackberry, Android, Mac OS X and/or the like. Other operating systems may also be compatible. In other embodiments, the computing system **400** may be controlled by a proprietary operating system. Operating systems control and schedule computer processes for execution, perform memory management, provide file system, networking, and I/O services, and/or provide a user interface, such as a graphical user interface (GUI), among other things.

Network

In the embodiment of FIG. **2**, the computing system **400** communicates with a network **410**, such as one or more of a LAN, WAN, cellular network, public switched telephone network, and/or the Internet, for example, via a wired, wireless, or combination of wired and wireless, communication link **415**. The network **410** communicates with various computing devices and/or other electronic devices via wired and/or wireless communication links. In the embodiment of FIG. **2**, the network **410** is communicating with the media association system **2**, the advertisement entity **6**, the first transmitter **3**, the internet **7**, the ancillary devices **5**, and/or other entities **10** with which any of the preceding elements are configured to communicate.



Access to the display selection module **406** of the computer system **400** by the media association system **2** may be through a web-enabled user access point such as a computer, cellular phone, laptop, and/or other device capable of connecting to the network **410**. Such a device may have a browser module implemented as a module that uses text, graphics, audio, video, and/or other media to present data and to allow interaction with data via the network **410**. The browser module may be implemented as a combination of an all, substantially all, or some points addressable display such as a cathode-ray tube (CRT), a liquid crystal display (LCD), organic light emitting diode (OLED), a rear-projection display, a plasma display, or other types and/or combinations of output devices to present media to the user. In addition, the browser module may be implemented to communicate with input devices **403** and may also comprise software with the appropriate interfaces which allow a user to access data through the use of stylized screen elements such as, for example, menus, windows, dialog boxes, toolbars, and/or controls (for example, radio buttons, check boxes, sliding scales, combinations of the same, or the like). Furthermore, the browser module may communicate with a set of input and/or output devices to receive signals from the user. The input device(s) may be connected and designed to interpret outputs from sensors comprised on the primary device **4**. The output device(s) may comprise a speaker, a display screen, a printer, and/or a voice synthesizer. In addition a touch screen may act as a hybrid input/output device. In another embodiment, a user may interact with the system more directly such as through a system terminal connected to the primary device **4** without communications over the Internet, a WAN, LAN, and/or similar network capable of a communication method.

Other Systems

In addition to the systems that are illustrated in FIG. **2**, the network **410** may communicate with other data sources and/or other computing devices. The computing system **400** may also comprise one or more internal and/or external media sources. For example, any of the media provided by the sources described herein may be stored in whole or in part in the computing system **400** or may be stored in whole or in part on ancillary devices **5** or the media association system **2**. In some embodiments, one or more of the data repositories and/or the data sources may be implemented using a relational database, such as DB2, Sybase, Oracle, CodeBase, mySQL, PHP and/or Microsoft® SQL Server as well as other types of databases such as, for example, a flat file database, an entity-relationship database, object-oriented database, and/or a record-based database.

It will be clear that any ancillary devices **5** can comprise the same organizational structure as the primary device **4**, as described in this section.

User Interface

FIG. **3** illustrates a user interface of an embodiment of a primary device **4**. When primary device **4** receives the first media signal **111** through a receiver **455** and/or wire data connection **470**, the contents of first media signal **111** can be presented along with related information to the user on primary device **4**. For example, if the first media signal **111** comprises a radio program the primary device **4** can play the audio signal to the user through speaker **453**. In some embodiments, the primary device **4** can modify the program by changing the volume and/or pitch, overlaying other audio effects, pausing and resuming the program, and/or if the program has been recorded the primary device **4** can fast-

forward or skip through the program. Analogous effects could be made on a television signal, comprising overlaying related content in a discrete section of the screen or mixing distinct audio signals with distinct video signals. It will be clear that further modifications could be made by the primary device **4** prior to viewing by the user for other forms of media. It will also be clear that the modifications need not be limited by the form of media viewed. Thus, for example, some embodiments can add graphics to a purely audio media signal, or add audio to a purely graphical media signal.

More specifically, the embodiment of a primary device presented in FIG. **3** is a radio-enabled cellular phone with a display panel **450**. When tuned to a radio station the first transmitter **3**, the display panel **450** can show information relating to the radio program being played, and the information can be acquired from an associated media signal **112** and/or from the media association system **2**. In FIG. **3**, the upper portion of the display panel **451** can comprise textual information corresponding to the music being played on the radio, comprising the name of the artist, title of the song or media content, and/or time remaining in the song or media content. However, the display could also comprise other information comprising the record label or logo, the price of the album or media content, related news, lyrics, radio station logo, advertiser logo or message, and/or sponsored information or other information that users may desire to see while listening to the radio station. Additionally, the display can comprise album art, a music video, and/or any other form of media (graphical, textual and/or otherwise). In this embodiment, the information is provided in an upper panel **451** but it could also be provided in other portions of the display panel **450**. It will additionally be clear that this information need not be static, but can instead scroll across the screen, periodically rotate through a set of distinct images and/or messages, and/or comprise other visual effects. It will further be clear that the images on the upper panel **451** could be associated with other media provided along with the radio signal, such as a brief ping and/or vibration when a new image is presented. Control and/or presentation logic of the graphic and/or audio information presented via display panel **450**, upper panel **451**, lower panel **452**, and/or speaker **453** is established and maintained through the use criteria established in the control management system **100** and/or rules of operation established in the media association system **2**.

The lower panel **452** of the display panel in FIG. **3** displays an advertisement signal **113**. In the illustrated embodiment, the lower panel **452** displays a textual advertisement signal **113**. However, like the related media signal **114** displayed on the upper panel **451**, the advertisement signal **113** can comprise any sort of media which can be provided as a static image, scrolling images, text, overlaid audio, interactive media, video, and/or other forms of media. Notably, the advertisement signal **113** need not be presented through the display panel, but could alternatively be presented through the speaker, a vibration system, and/or any other primary device output **402**, **403**.

In other embodiments, it will be advantageous to provide the related media signal **114** and the advertisement signal **113** to the display panel **450** separately as in FIG. **3**, or to provide the related media signal **114** in a distinct display panels **450**, or to alternate what is displayed, such that only one signal or media content segment is displayed in the display panel **450** at any one time. For example, the display panel **450** can comprise two separate panels, one for presenting the related media signal **114** and the other for presenting the advertisement signal **113**. This may be advantageous for allowing viewers to quickly and more easily identify the information they wish to find. In other embodiments, one signal is brighter than another or one display should be turned off while the other remains on. Considering these alternative embodiments, it will also be clear that the primary device **4** need not display both an advertisement signal **113** and a related media signal **114** at the same time. As an example, the primary device **4** may provide a related media signal **114** or provide an advertisement signal **113**. As another example, the primary device **4** may provide a toggle button **462** allowing a user to toggle between displays of the advertisement signal **113** and the related media signal **114**. It may be advantageous to set the display panel **450** to show the advertisement signal **113** by default, and then to display the data signal upon activation of the toggle button **462**. The display panel **450** can then return to displaying the advertisement signal **113** upon the occurrence of some criteria such as a re-activation of the toggle button **462** or the passage of a certain amount of idle time. In another embodiment, advertisement signal **113** may be presented using display panel **450**, upper panel **451** or lower panel **452** depending on various pricing scenarios determining value of the presentation area based on criteria such as: noticeability of the message or presentation by the user, age or gender of the user, frequency of presentation, duration of presentation, size of the graphic or video presented, compression of the audio presented, combinations of the same, or the like. Logic and rules of operation for presentation can be established through use of a conditional access portal in the control management system **100** or media association system **2** or a logical operative of both. Presentation of advertisement signal **113** on primary devices **4** and/or ancillary devices **5** may be unique for each user even when receiving the same first media signal **111** depending on criteria such as: age, gender, language, location, time of day, type of device, user preferences, user affiliations, combinations of the same, or the like.

Referring further to FIG. **3**, in some embodiments, the related media signal **114** and/or the advertisement signal **113** may be provided using the same display means as the first media signal **111**. In FIG. **3**, the first media signal **111** may comprise audio along with video and/or graphical media content. In this instance the display panel **450** can be further subdivided, such that the primary device **4** can present each graphical signal (first media signal **111**, advertisement signal **113**, and/or related media signals **114**) all, substantially all, or some on the same display panel **450**. In other embodiments, the primary device **4** can be configured by the user or through the media association system **2** to adopt a set of display criteria, which instructs the computing system **400** what should be displayed and how.

An alternative display is illustrated in FIG. **3**A. The primary device **3** can present the advertisement signal **113** and the related media signal **114** overlaid on the first media signal **111**. The display selection module **406** can comprise criteria for the placement of the advertisement signal **113** and/or the related media signal **114** so as to optimize the viewing experience. This may involve placing the signals in set positions on the periphery of the first media signal **111**, dynamically changing their placement according to characteristics of the first media signal **111**, and/or the like.

More generally, as illustrated in FIGS. **3** and **3**A, the advertisement and/or related media signals **113**, **114** can be provided in the interstices of a first media signal **111**. These interstices can be based on time, location, content and/or form of media. Alternatively, the advertisement and/or related media signals **113**, **114** can be provided overlapping with the first media signal **111**.

Referring back to FIG. 3, the primary device 4 comprises a plurality of buttons 462. In addition to buttons 462, some embodiments can comprise other input sensors to allow user input. These sensors 403 allow the primary device 4 to provide interactive media contained in the related media signal 114, advertisement media signal 113, and/or the first media signal 111. The sensors 403 can communicate with the computing system 400 (as illustrated in FIG. 2) which can then create a device response signal sent to the media association system 2 through the network 410. The media association 2 can respond to that with another related media signal 114 or advertisement signal 113, which can be displayed to the user so as to create a truly interactive experience for the user. Alternatively, this interactive signal set could be provided to the primary device 4 in the initial related media signal 114 or advertisement signal 113, such that the primary device 4 can respond to input from sensors (such as the buttons 462) without needing to communicate with the media association system 2. The interactive signal set can also configure the primary device 2 to communicate with ancillary devices 5, through the ancillary devices 5 to the media association system 2, through the media association system 2 to the ancillary devices 5, through either of these to other entities, or directly with other entities so as to create an interactive experience for the user. It will further be clear that an interactive signal set can comprise some combination of these communication methods.

As illustrated in FIG. 3, above the display panel 450 the primary device 4 comprises a speaker 453 and below the display panel 450 the primary device 4 comprises a microphone 461. Other input sensors and/or output modules can be provided through a connection to an ancillary device 5. For example, if a media signal 114 and/or an advertisement media signal 113 cannot viewed on the primary device 4, then a user can view the media signal 114 and/or the advertisement media signal 113 on an ancillary device 5. In other embodiment, the primary device 4 will modify the media signal 114 and/or an advertisement media signal 113 in order to display the media content on the primary device 4. Additionally, the primary device can also ignore the media signal 114 and/or an advertisement media signal 113 if the media content cannot be displayed on the primary device 4.

As further depicted in FIG. 3, the primary device 4 can be connected to an ancillary device 5, depicted here as a personal computer connected by a wire data connection 470. The first media signal 111 can be stored using a mass storage device 401 on the primary device 4 (depicted in FIG. 2) and/or on an ancillary device 5 comprising similar mass storage device. The ancillary device 5 can receive the first media signal 111 and the advertisement signal 113 directly from the first transmitter 3 and/or the media association system 2. Alternatively, the ancillary device 5 can receive the first media signal 111 and the advertisement signal 113 indirectly through the primary device 4 or some other agent. The ancillary device 5 need not acquire both signals from the same source. For example, if a user wishes to listen to a radio broadcast at a later time the user could configure an ancillary device 5 to record said first media signal 111. This configuration could be implemented indirectly through the interface on the primary device 4 or directly on an interface on the ancillary device 5. Then, the first media signal 111 could later be viewed on the primary device 4 after transmitting the recorded first media signal 111 from the ancillary device 5 to the primary device 4. Alternatively the first media signal 111 could be viewed directly on the ancillary device 5, such as when the ancillary device 5 comprises a home entertainment system. In the foregoing, the advertisement signal 113 and the related media signal 114 can be recorded, transferred, and viewed just as done with the first media signal 111. Accordingly, the advertisement signal 113 and the related media signal 114 can remain associated with the first media signal 111.

The primary and/or the ancillary devices 4, 5 in FIG. 3 can be in regular communication with the media association system 2, and accordingly a first media signal 111 stored for later viewing can be associated with an advertisement signal 113 distinct from the advertisement signal 113 associated with the first media signal 111 when viewed in real time. Whether the advertisement signal 113 is preserved or changed upon storage of the first media signal 111 can be determined by advertisement placement criteria, discussed further below. The primary device 4 can replace the advertisement signal 113 when the advertised product, service, cause, and/or event is geographically and/or temporally specific, such as presenting an advertisement for a restaurant intended to be shown slightly before lunch time to those likely to be near the given restaurant at that time of day. The advertisement signal 113 can also be replaced upon the occurrence of other criteria, such as a given user response, age, gender, language, location, time of day, type of device, user preferences, user affiliations, popularity, political affinity, cultural affinity, and/or the like. Similar actions can be made on the related media signal 114.

Although the embodiment described in this section is a radio-enabled cellular phone, it will be clear that other devices can be provided in accordance with the invention. For example, the primary device 4 could comprise a WiFi enabled receiver, laptop computer, personal digital assistant, desktop computer, television, and/or any other device capable of receiving media, displaying media, transmitting data, and sensing user inputs.

FIG. 4 illustrates a flow chart showing the actions performed by the primary device 4. The primary device 4 can receive media and/or a configuration from one of its inputs and/or through a communication method. The primary device 4 can then use the media and the configuration to choose output media. The output media can be stored and/or presented to the user. Storage of the output media could be dependent on the attributes of the primary device 4, the first media signal 111, user preferences and/or similar criteria. The user can then respond to the output media. The user's response can then cause the primary device 4 to perform an action.

FIG. 4A illustrates a more detailed flow chart showing the actions performed by the primary device 4. It will be clear that the same actions could be provided by the ancillary devices 5. When being turned on, the primary device 4 can receive a variety of inputs, comprising a first media signal 111, a related media signal 114, an advertisement signal 113, a user input, a configuration signal, and/or stored media. Each of these signals can comprise or be translatable into media that can be provided to the user. Examples of this comprise media provided through the media signals, stored media, pre-programmed media responses to user inputs, media responses to new configurations, and/or the like. Additionally, the inputs can cause a change of the primary device's configuration, such as by a signal from the media association system 2, advertisement entity 6, the first transmitter 3, an ancillary device 5, the control management system 100 and/or other sources. Such a signal may comprise machine readable code, or instructions for machine readable code already on the primary device. Alternatively, user inputs could alter the configuration of the primary device in a similar manner.

Referring further to FIG. 4A and FIG. 2, the display selection module 406 can use the incoming media, user inputs, and/or its own configuration to choose output media. For

example, a computer may be configured by the user to a "mute" setting, and when the computer receives an incoming media signal with both audio and video, the computer may output the video and not the audio. In another example, an interactive television system may receive multiple video signals from both a first transmitter **3** and a media association system **2**. The interactive television system can also receive a configuration signal from the media association system **2** with criteria stating what a user may and may not watch. The interactive television system could then, upon user input for selecting a channel, either display the video signal on that channel from the first transmitter, or instead an advertisement media signal **113** from the media association system **2** if the user is not permitted to view that channel. Further configurations could overlay advertisement and/or the related media signals **113**, **114** on a first media signal **111**. Additionally, the display selection module **406** can be configured to store one or more media signals for later viewing.

When presented with the output media, the user can provide a response, as illustrated in FIG. **4A**. The user response can be based on intentional action or inaction, and/or the response can be caused by the user or the user's environment. The response can comprise user reactions or user commands, detected by the primary device's sensors. These responses can then be used by the primary device **4** to change its output criteria, choose media to be stored, or choose to perform some other action of which the device is capable. Additionally, the primary device **4** can relay these responses, or some function thereof, to the media association system **2**, the advertisement entity **6**, the first transmitter **3**, the ancillary device **5**, the control management system **100** and/or the like. For example, the primary device **4** can report to the media association system **2** when the user chooses to view the first media signals **111** from a different first transmitter **3** (for example, the user changes stations).

Media Association System

Referring back to FIG. **1**, the media association system **2** can comprise the device components illustrated for the primary device **4** as depicted in FIG. **2**. The media association system **2** can also be a plurality of media association systems **2**, wherein each device performs similar and/or distinct functions to be described below.

FIG. **5** illustrates a block diagram of an embodiment of the media association system **2**. The media association system **2** can receive from the first transmitter **3**, the first media signal **111** or information related to the first media signal **111**. This can be used by the media signal identifier module **280** to identify the contents of the first media signal **111**, or certain characteristics thereof. That information can then be forwarded to a related media processing module **250**, which can then choose what media content to forward to a primary device **4**, and put said media in proper form for transmission.

As further depicted in FIG. **5**, a media association system **2** can also receive advertisement signals **113** and/or advertisement criteria from an advertisement entity **6**. This information, along with information from the media signal identifier module **280**, can be provided to an advertisement processing module **251**, which uses the information to perform functions that can be similar to or different from those performed by the related media processing module **250**. The media association system **2** can use the information related to a first media signal **111**, an advertisement signal **113**, and/or the advertisement criteria, and using or processing the information to select media to be sent to the primary device **4**. In one embodiment, advertisement criteria is created and/or managed in the control management system **100**. In another embodiment, advertisement criteria is created and/or managed in the advertisement entity **6**. In another embodiment, advertisement criteria is created and/or managed through combined use of the control management system **100** and the advertisement entity **6**.



FIG. **5A** illustrates a block diagram of a more detailed embodiment of a media association system **2**. As depicted in FIG. **5A**, the media association system **2** can send information to the primary device **4** and/or to any ancillary devices **5**. These communications can be established through communications element **223** comprising any of the communication methods discussed, or the like. The communication methods used can be the same, or can be different between each communications element **223** for each direction of communication. Advantageously, the media association system **2** can transmit directly to a given primary and/or ancillary device **4**, **5**, thus customizing content to that device and/or that user.

Further, as depicted in FIG. **5A**, the communications need not be specifically directed toward one primary or ancillary device **4**, **5** or specifically directed toward the media association system **2**. For example, the media association system **2** can send a related media signal **114** or advertisement signal **113** through communications elements **223** to a plurality of primary devices **4** and/or ancillary devices **5**, such as by broadcast radio whether analog or digital, satellite, cable, HSDPA, GPRS, a publicly available internet website, and/or some other openly accessible medium and/or communication method. Similarly, the signal can be sent directly to a given primary and/or ancillary device **4**, **5**, but not necessarily customized to the device. If desirable, the signal can then be customized by the primary and/or ancillary device **4**, **5** via a display selection module **406** on the primary and/or ancillary device **4**, **5** (depicted in FIG. **2**), such that a portion of the related media and/or advertisement signals **113** are presented to the user. The signal ultimately presented to the user can frequently and/or periodically be customized for said user by the display selection module **406**, which can be downloaded from the media association system **2**, edited by the media association system **2** via a data signal (for example, from the media association system **2**), edited by the user, edited through use of a conditional access portal and/or database server such as the control management system **100**, and/or modified in some other way.

The media association system **2** as depicted in FIG. **5A** provides a related media signal **114** to the primary and/or ancillary devices **4**, **5** via a communications element **223**. The communications element **223** can use a communication method to provide media to the primary and/or ancillary devices **4**, **5**, and to receive information from said devices. The related media signal **114** sent via the communications element **223** can be determined by a related media processing module **250**. The related media processing module **250** can receive information from the media signal identifier module **280**, the communications element **223**, the internet **7**, and/or other sources. These connections allow the related media processing module **250** to acquire information not stored on the media association system's mass storage device (not shown) or in the information transmitted by the first transmitter **3** (discussed below). For example, in the context of an SMS message as a first media signal **111**, the related phone number and/or the text of the message might not fully identify the identity of the sender. In this example, the related media processing module **250** may connect to a remote phone listings database to associate the phone number with a sender name, address, and/or other relevant information. As another example, in the context of radio the first media signal **111** may come with an accompanying RBDS and/or RDS signal, but not with album art. If the memory storage unit does not store album art or does not store album art for the particular song

being played, then the media association system **2** can access the internet **7** to automatically download the album art and prepare it for transmission to the primary and/or ancillary devices **4**, **5**.

The related media processing module **250** in FIG. **5**A can also perform the task of deciding what media to provide to different primary and/or ancillary devices **4**, **5**. The related media processing module **250** can use a set of user display criteria, based on pre-determined user preferences, bandwidth restrictions, broadcaster preference, artist preference, copyright access, the media association system's operator's preference, age, gender, language, location, time of day, type of device, user preferences, user affiliations, political affinity, cultural affinity, popularity, and the like, and/or any other criteria discussed herein. Notably, embodiments equipped for communication from the primary and/or ancillary devices **4**, **5** to the media association system **2** can update these criteria based on a user response constantly or intermittently, via the communications element **223**.

The related media processing module **250** depicted in FIG. **5**A can also prepare the related media for transmission to the primary and/or ancillary devices **4**, **5**. Such preparation can comprise encryption, compression, reformatting, and/or any other data processing method that can change the size, form, accessibility, and/or content of the related media signal **114**. Such steps can reduce bandwidth requirements, restrict access to the related media signal **114**, and allow it to be viewed on the primary and/or an ancillary devices **4**, **5** capable of viewing media in a certain set of formats.

As illustrated in FIG. **5**A, the related media processing module **250** can obtain and/or receive information relating to the first media signal **111** from the media signal identifier module **280**. The media signal identifier module **280** can obtain and/or receive information relating to the first media signal **111** from the first transmitter **3** via either the receiver **220** and/or the communications element **221**. The communications element **221** can allow two-way communication between the media association system **2** and the first transmitter **3**, while the receiver **220** can allow one-way communication, such as by receiving a publicly available radio or television signal. Two-way communications allow the media association system **2** to request specific information and provide the first transmitter **3** with information regarding user responses, discussed further below. The media signal identifier module **280** is also connected to the internet **7**, allowing the media signal identifier module **280** to obtain outside information to identify the first media signal **111**. Although not illustrated in FIG. **5**, the media signal identifier module **280** can also receive similar information from the primary and/or ancillary devices **4**, **5**. When the media signal identifier module **280** cannot obtain sufficient information from the first transmitter **3** to identify the first media signal **111**, the media signal identifier module **280** can obtain further information related to the first media signal **111** from the primary and/or ancillary devices **4**, **5**.

In addition to or in place of the related media signal **114**, as illustrated in FIG. **5**A the media association system **2** can send an advertisement signal **113** to the primary and/or ancillary devices **4**, **5** in the same ways that the related media signal **114** can be sent. The advertisement signal **113** is determined by an advertisement processing module **251**. The advertisement processing module **251** receives information regarding the first media signal **111**, or a representation thereof such as a identifier **115**, from the media signal identifier module **280**. Additionally, the advertisement processing module **251** receives advertisement signals **113** and/or advertisement criteria from advertising entities **6** through an advertiser communications element **222**. The advertisement processing module **251** can also receive feedback from the primary and/or ancillary devices **4**, **5** via the communications element **223**. The advertisement processing module can then use the advertisement criteria from the advertisement entity **6**, information regarding the first media signal **111** from the media signal identifier module **280**, and/or signals transmitted from the primary and/or ancillary devices **4**, **5** to determine which advertisement media to send to the primary and/or ancillary devices **4**, **5**. The advertisement processing module **251** can be substantially similar to the related media processing module, or it can comprise other elements. As with the related media signal **114**, the advertisement signal **113** can be stored in a memory storage unit on the primary and/or ancillary devices **4**, **5**, or be modified by the primary and/or ancillary devices **4**, **5**, prior to presentation to the user. In one embodiment information identifying the first media signal **111**, the advertisement signal **113**, the related media signal **114**, the unique identifier **115**, time of receipt and/or interactive selection options such as organization of options in a menu system can be stored in a memory storage unit on the primary and/or ancillary devices **4**,**5** for retrieval at a later time and display by as desired by the user. Key word search capabilities and/or time based first-in-last-out methodologies can be employed for ease of access.

The media association system **2** depicted in FIG. **5**A can provide an advertisement entity **6** interface through communications **222**, further discussed below. This interface can comprise a conditional access website and/or web portal, WAP portal, form letter, automated phone system, and/or some other mechanism for allowing advertisement entities **6** to automatically send advertisement criteria and/or signals and receive feedback from the media association system **2**. In one embodiment, the media association system **2** may operate discretely from the control management system **100**. In another embodiment, the media association system **2** may operate in logical combination with the control management system **100**. In another embodiment, the media association system **2** can operate as a portion of the control management system **100**.

As illustrated in FIG. **5**A, the media association system **2** can additionally comprise one or more report modules **260**, **261** connected to the communications element **223**. The report modules **260**, **261** allow the media association system **2** to transmit user feedback from the primary and/or ancillary devices **4**, **5** to the first transmitter **3**, the control management system **100** and/or the advertisement entity **6**. The report modules **260**, **261** can condense, transform, encrypt, and/or otherwise change the form or content of this data (customizable for each) before passing it along to the first transmitter **3**, the control management system **100** and/or the advertisement entity **6**. The first transmitter **3**, the control management system **100** and/or the advertisement entity **6** can then use this information to determine what signals and/or criteria to provide to the primary and/or ancillary devices **4**, **5**, and/or to the media association system **2**.

FIG. **6** illustrates a flow diagram for an embodiment of the media association system **2**. The system can be started by turning on the power, providing a command to start a given software module, or the like. The media association system **2** can then receive information relating to the first media signal **111**, the advertisement signal **113**, and/or the advertisement criteria. Information obtained relating to the first media signal **111** can comprise data related to the media signal's current programming, further comprising but not limited to the title of the program, artists, advertiser, ad, song, movie, program length, start times, end times, other information relevant to

the program, and/or simply the program itself. The foregoing information pertaining to the programs can also be transmitted by the first transmitter **3**. If the first transmitter **3** transmits the foregoing related information in a signal publicly available, then the media association system **2** can advantageously retrieve the information without requiring a separate communications link with the first transmitter **3**. Additionally, the primary and/or ancillary devices **4**, **5** can obtain this information independent of the media association system **2**. The information related to the first media signal **111** need not be transmitted from the first transmitter **3** constantly, and could instead be transmitted at regular or irregular intervals, in which case the media association system **2** can store said information in a memory storage unit.

In the case where the only information available is the actual first media signal **111**, or when the associated media signals **112** are otherwise inaccessible, the step of identifying the first media signal illustrated in FIG. **6** can comprise using the first media signal **111** itself to identify the contents of the media signal. For example, a radio station may verbally announce the title of a song prior to playing said song, and therefore the media signal identifier module **280** can use a voice-recognition module or a person listening to the broadcast to input or identify the contents of the first media signal **111**. Alternatively, the media signal identifier module **280** could maintain a database containing recordings of content that might be presented by a first transmitter **3**, and use statistical and/or non-statistical methods to compare the transmitted first media signal **111** and/or recorded content to identify the contents of the first media signal **111**. Methods for identifying first media signal **111** contents can comprise human recognition, least-squares spectral analysis (LSSA), hash sums, or other operations comparing the first media signal to recorded content. Similar operations can also be performed without a full recording of the content, but instead appropriate information related to the content. When other information regarding the first media signal **111** is available, using these methods can also be used for redundancy and/or error-checking.

In some instances it may not be necessary to fully identify the first media signal **111** as illustrated in FIG. **6**. For example, to choose appropriate accompanying signals it may be sufficient to identify the genre or topic of the first media signal **111** such as sporting events, political events, weather and/or news topic. As such, the media association system **2** can identify some characteristic of the first media signal **111**. When the foregoing is not possible, the accompanying media can be chosen based on default criteria.

Referring to FIG. **6**, once the first media signal **111** has been sufficiently identified the media association system **2** can collect and/or store the information and/or data related to the media signal **111** to be eventually provided to the primary and/or ancillary devices **4**, **5**. This related media can comprise media also transmitted by the first transmitter **3**, media stored in a mass storage device on the media association system **2**, or media collected from other sources such as the internet, other data connections, and/or by physical means.

FIG. **6** illustrates that after the media association system **2** has collected related media, the media association system **2** can prepare a related media signal **114**. This can involve editing, truncating, reordering, combining, and/or performing similar operations on the related media signal **114**. Additionally, it can involve putting the related media signal **114** in a proper format, as done by the related media processing module **250** in FIG. **5**A. Criteria or the filter for choosing what related media to provide to the primary and/or ancillary devices **4**, **5**, and in what format to do so, can comprise settings chosen by the user and reported by a primary and/or ancillary device **4**, **5**, and other data about the user further discussed below.

The device responses depicted in FIG. **6** provide information used to amend criteria for preparing the related media signal **114**. Thus, the media association system **2** can amend and/or calibrate criteria continuously, with the possibility of converging on a set of criteria that is optimal for each user or any given subset of users according to criteria discussed further below. The responses can be modified, condensed, encrypted, and/or transformed in some other way prior to transmission between any element and/or module.

Also in FIG. **6**, the media association system **2** can receive at least one advertisement signal **113** and/or advertisement criteria from an advertisement entity **6**. The media association system **2** can use this information, and possibly also the identity of the first media signal, to choose an advertisement media signal **113** to be transmitted to the primary and/or ancillary devices **4**, **5** based on preselected criteria. This advertisement media signal **113** can then be prepared for transmission and, with or without the related media signal **114**, sent to the devices **4**, **5**. Alternatively, the related media signal **114** can be sent without an advertisement signal **113**. The criteria or filter for choosing an advertisement signal **113** can be constantly refined. In general, the method for providing an advertisement signal **113** can comprise any of the methods by which the related media signal **114** can be provided, although they do not need to be provided in the same way in any single embodiment.

To determine rules for choosing which advertisement media signals **113** to provide to the devices at any given time, advertisement entities **6** provide a set of advertisement criteria as illustrated in FIG. **6**. The advertisement criteria can associate a given advertisement signal **113** and/or advertisement identifier **115** to certain content, users, times, geographies, sources, and/or other categories. Criteria or filter relating to content can comprise the title of a program, artist, producer, length, genre, lyrics, and/or keywords therein, and/or other characteristics. Criteria or filter relating to users can comprise demographic data, such as age, sex, income, race, zodiac sign, type of device, time of day, location, language, affiliations and/or club memberships, marital status, religion, cultural affinity, political affinity, popularity, user preference, place of residence, hometown, and/or other data.

Other demographic data comprises media event history of the user, media event history of the device, media stream content history, media stream transmitter history, alternate media stream content history, device history, prior interactions of the user based on past associations, promotional campaigns, previous, on going, and/or anticipated future events, demographic information associated with the source of the first media signal **111**, demographic information associated with the collective users of the first media signal **111**, demographic information from research providers, and/or the like.

Other criteria includes, but is not limited to, media stream producers, media stream artists, media stream consumers, benefits of associating one media stream with another, professional studies or psychographic data, availability, costs, signal strength, opportunity costs, geographic information, contractual obligations, intellectual property rights, genre, and/or the like. Criteria relating to users can further comprise data collected by the devices, such as choosing to turn off the device, change the volume, change the station, and/or provide any other response, upon receiving a first media signal **111**, a related media signal **114**, and/or an advertisement media signal **113**.

Criteria relating to times can comprise the length, date and/or time of transmission at the source, date and/or time of reception at the user device, date and/or time of viewing of a given media signal, as well as date and/or time relative to of the media signal relative to other media signals, including but not limited to prior, current, or future transmissions of media signals, date and/or time of prior, current, or future events, date and/or time of one criteria relative to another criteria, and/or the like.

Criteria related to geography can comprise the location and/or past locations of the first transmitter **3**, the advertisement entity **6**, the primary and/or ancillary devices **4**, **5**, or the user's home, place of work, billing address, and/or other locations associated with the user. Storing the primary and/or ancillary device's **4**, **5** past location histories can indicate travel habits as well as current direction, language in a location, velocity, and/or regional associations. Criteria relating to source can comprise characteristics of the first transmitter **3**, comprising first transmitter identity, signal strength, signal quality, signal type; for example, digital vs. analog, media form, usual genre, Nielsen ratings, and/or other characteristics. Other criteria sources can comprise the advertisement entity's **6** willingness to pay, the related advertisement media signals **113** (such as package advertisements or advertising campaigns), the advertised products, services, causes, and/or events that conflict with the interests of another advertisement entity **6**, and/or the interests of the operator of the media association system **2**, and/or any other criteria.

The foregoing should not be considered an exhaustive list of possible criteria for choosing what advertisement media signal **113** is sent or provided to a given device **4**, **5**. The foregoing criteria or filter elements can be used singularly or in combination with each other. The criteria used to determine the media content to be associated with the first media signal **111** can involve the assignment of weighting factors to some criteria, and/or can be dynamic changed, for example, where the status of one criterion determines the weight to assign to another criterion. Access to criteria selection and/or weighting factors could be through the use of the internet, data entry, paper, telephone, text messaging, and/or any other means of conveying information into the system. The analysis can be static where the criteria are evaluated independently of each other. The analysis can change with time, events, and/or the like.

In some embodiments, the analysis comprises the ability to anticipate criteria conflicts and/or the ability to resolve criteria conflicts. An example of a criteria conflict would be demonstrated when a filter or criteria dictates that two discrete secondary media signals be paired with a single first media signal. Resolution can be made by prioritizing one of the secondary media signals over the other; using additional criteria to resolve the conflict; dividing the association of the secondary media streams to the first media stream by time, location, demographics, language, number of devices, randomness, or the like. The division does not have to be equal, and/or can favor one media signal over another.

To provide an advertisement selection process, some embodiments are configured to analyze user responses reported by the primary and/or ancillary devices **4**, **5** to amend the advertisement selection process criteria (as well as the related media signal selection criteria). In some embodiments, it is advantageous to first condense advertisement criteria parameters and/or data collected by the devices into a variety of statistics, such as the estimated probability of a given response to a given signal or the estimated revenue from a given signal. To further improve data mining capabilities, some primary and/or ancillary devices **4**, **5** can send to the media association system **2** over communications element **223** a complete report similar to a keystroke log combined with a log of viewed media, data, and/or advertisements. In other embodiments the foregoing data is condensed before transmission.

When receiving the response data from the primary and/or ancillary devices **4**, **5**, the advertisement processing module **251** can use various statistical methods to estimate the likely success of a given advertisement media signal **113** and/or related media signal **114**. Success can be measured by user responses, such as eliciting or obtaining an increase in volume, not eliciting or obtaining a decrease in volume, eliciting a sale of an advertised product, a charge for each user response or click through to an advertiser or other results. Statistical techniques used can comprise generalized least squares regression, profit models, logic models, and/or other linear statistical techniques, as well as non-linear statistical methods. It may also be advantageous to comprise interactions between distinct variables, such as the effect of one variable on the effect of another variable on the success criteria. In other embodiments, other techniques could be used comprising holistic and/or non-mathematical methods.

It will be clear that these methods for measuring the anticipated user response to advertisement media signals **113** can also be used to measure the anticipated user response to related media signals **114** and/or first media signals **111**. Such methods allow the media association system **2** to advantageously provide optimal signals desirable to users, thus enhancing the value of the product.

Taking all, substantially all, or some of these criteria together, the related media and/or advertisement processing modules **250**, **251** can choose advertisement and/or related media signals **114** optimized for achieving a certain goal. Such goals may comprise boosting responses to advertisement media signals **113**, increasing viewing by users, increasing revenue from advertisement entities **6**, increasing user responses or click throughs to advertisement media signals **113** to increase per response revenue and/or other goals.

Additionally, the media association system **2** in FIG. **5A** and/or the signal selection process in FIG. **6** can be modified such that the advertisement signal **113** is selected knowing its accompanying related media signal **114**, the related media signal is selected knowing its accompanying advertisement signal **113**, or the two are selected as a pair. Such a system will be advantageous in that the two signals (advertisement message **113** and related media signal **114**) can be coordinated to avoid clashing colors, excessive stimuli, and/or other coordination problems. However, choosing the signals independently can sometimes require fewer computational resources by providing a smaller number of choices to be considered. Thus, the media association system **2** can be configured to choose the signals in any of these ways, depending on its available resources.

The process depicted in FIG. **6** of selecting an advertisement signal **113** to coincide with a given portion of the first media signal **111** can cause the advertised product, cause, or idea to become psychologically associated with the content of the first media signal. It may be desirable to provide the advertisement media signal **113** to the primary device **4** prior to the termination of the desired portion of the first media signal **111**, so as to enhance the psychological connection between the two media signals. However, providing the advertisement media signal **113** shortly before or after the related first media signal **111** can still have an effect. Similarly, if a first media signal **111** is sufficiently memorable and the advertisement media signal **113** is sufficiently related, it may be desirable to provide an advertisement signal **113** a set

time period after the first media signal **111** so as to evoke positive memories. Providing an advertisement media signal **113** in anticipation of a first media signal **111** can also provide benefits in accordance with the invention, such as to promote a future media program on the same or a different station or a program transmitted by an entirely different communication method.

The method depicted in FIG. **6** can provide the advertisement signal **113** from a source distinct from the first transmitter **3**. This allows one to associate advertisement signals **113** not necessarily the same as advertisement signals **113** provided by the first transmitter **3**. Thus, for example, a radio transmission without graphical advertisements from the first transmitter **3** can be augmented with graphical advertisements provided by the media association system **2**. Alternatively, a television broadcast from the first transmitter **3** can have advertisements specifically determined by the media association system **2**, perhaps targeted to a specific region, market, language, age, gender, political party, cultural affinity, and/or set of viewers. The media association system **2** can thus tailor advertisement media signals **113** to each individual, independent of or in conjunction with the first transmitter **3**.

Advertisement Entity

Referring back to FIG. **1**, the advertisement entity **6** can comprise corporations, companies, partnerships, agencies, firms, organizations, public entities, non-profit organizations, individuals, and/or any other entity, including the operator of the media association system **2** and/or the first transmitter **3**. Similarly, the advertisement signals **113** can advocate a product, service, cause, and/or event, promote awareness of an idea or issue, and/or comprise any other form of communication method. In some embodiments, the advertisement media signal **113** can be assigned a unique advertisement identifier **115** to facilitate communication, data processing, and/or data mining.

The communications between the advertisement entity **6** and the media association system **2**, depicted in FIGS. **1** and **5**A can go through an interface provided by the communications element **222**. The interface can comprise a webpage or web portal, WAP portal, paper form, automated telephone system, a person, and/or any other form capable of transmission through a communication method. Through the interface, the advertisement entity **6** can set advertisement criteria discussed above, such as when a given advertisement signal **113** should be provided. Additionally, the interface can allow the advertisement entity **6** to upload or send new advertisement media signals **113** remotely. Thus, an advertisement entity **6** can constantly update its advertisement media signals **113**. The interface can also provide information back to the advertisement entity **6** from the media association system **2**, comprising billing information and usage and/or response feedback from the primary and/or ancillary devices **4**, **5**. This information can be provided in whole, or in condensed forms such as numerical statistics, pie charts, bar graphs, text, and/or any other media. As with the related media signal **114** and the primary device **4**, the interface with the advertisement entity **6** can be determined by criteria deriving from either the advertisement entity **6** and/or the media association system **2**. The interface can further comprise modules that allow a user to access data through the use of stylized screen elements such as, for example, menus, windows, dialog boxes, toolbars, controls (for example, radio buttons, check boxes, sliding scales, combinations of the same, or the like), and/or the like.

With reference to FIG. **7**, the various embodiments of the media enhancement system may be used in a variety of systems and/or contexts. FIG. **7** illustrates such an example context. In the illustrated example, a plurality of broadcast sources **120** broadcast various media content in a plurality of broadcast streams, which are received by the broadcast scanning system **160**. In one embodiment, the broadcast scanning system **160** is configured to: analyze the broadcast streams received from the plurality of broadcast sources **120** to obtain or identify the media content transmitted in the broadcast streams; obtain additional information about the media content if available; and/or assign a unique event identifier **115** specific to the broadcast of each specific broadcast stream. In one embodiment, the broadcast scanning system **160** transmits the unique event identifier **115** to the media association (advertisement) system **1102**. Methods and systems of how the broadcast scanning system **160** obtain or generate the unique event identifier **115** are disclosed in detail in co-pending U.S. patent application Ser. No. 12/366,483, filed Feb. 5, 2009, titled "SYSTEM, METHOD, AND DEVICES FOR SCANNING BROADCASTS," which is incorporated by reference in its entirety. In one embodiment, the broadcast scanning system **160** stores the unique event identifier **115** in the unique event identifier database **1111**. In one embodiment, the unique event identifier **115** that is stored in the unique event identifier database **1111** is database linked with the corresponding and/or associated content and/or content identifiers that are stored in the content database **1103**.

Referring to FIG. **7**, in one embodiment, the broadcast scanning system **160** farther broadcasts or transmits over a network to the broadcast receiving systems **140**. In one embodiment, the unique event identifier **115** is transmitted through the internet and/or over a wireless/cellular network to a mobile device operating a software application (for example, a Java J2ME software application) capable of accessing the internet through the wireless/cellular network. After a broadcast receiving system **140** receives a broadcast stream from a broadcast source **120**, and receives a corresponding unique event identifier **115** from the broadcast scanning system **160**, the broadcast receiving system **140** is configured to receive a user selection or user input. After the broadcast receiving system **140** receives the user selection or user input, the broadcast receiving system **140** is configured, in one embodiment, to transmit to the broadcast response and business system **1101** at least the unique event identifier **115** and/or a user identifier.

In further reference to FIG. **7**, in one embodiment, the broadcast response and business system **1101** is configured to connect to the unique event identifier database **1111** in order to perform a database lookup of the received unique event identifier **115**. From the database lookup, the broadcast response system **1101** can determine the broadcast source, the time and date of the broadcast, and/or the content associated with the broadcast. The broadcast response system **1101** is configured in one embodiment to locate in the content database **1103** the content and if available, the content identifier associated with the broadcast based on the database lookup. In one embodiment, the broadcast response system **1101** is configured to store the user selection or the user response in the response database **1105**.

With reference to FIG. **7**, if the user selected to purchase the content associated with the unique event identifier **115**, then the broadcast response system **1101** is configured in one embodiment to verify the user identifier in the consumer database **1107**, which stores, for example, user name, address, demographic data, and/or other similar user information. The broadcast response system **1101** in one embodiment is configured to store the purchase event in the purchase database **1109**. The purchase database **1109** is configured to

store, for example, past user purchases, user credit card information, user billing information, user preferences, user telephone information for billing the user cellular account, age, gender, location, mobile operator, receiving device model and/or the like. In one embodiment, the broadcast response system **1101** is configured to transmit the purchase selection to the fulfillment system **1113**. The fulfillment system **1113** can also be configured to ship from a supplier **1117** to the user a physical product, for example, a CD or book, and in other embodiments, the fulfillment system **1113** is configured to inform the user where to download the content, or electronically transmits the content to the user.

Referring to FIG. **7**, in one embodiment, the data mining and reporting system **1115** is configured to connect to the content database **1103**, the response database **1105**, the consumer database **1107**, the purchase database **1109**, and/or the unique event identifier database **1111** to conduct data mining and/or reporting. In one embodiment, the data mining and reporting system **1115** is configured to identify based on the unique event identifier **115** the broadcast source, the broadcast segment, and/or the time and date of the broadcast segment that produced the most user responses in a given period.

As illustrated in FIG. **7**, in one embodiment, the media association (advertisement ad) system **1102** is configured to receive the unique event identifier **115** from the broadcast scanning system **160**. The media association system **1102** in one embodiment is configured to identify the content associated with the unique event identifier **115** by performing a database lookup using the unique event identifier database **1111** and/or the content database **1103**. The media association system **1102** can also be configured to compare the content with a database to determine whether an associated media stream or content should be transmitted to broadcast receiving systems **140** that are displaying or outputting the content associated with the unique event identifier **115**. For example, the media association system **1102** is configured in one embodiment to display an advertisement next to a graphic representing a music artist and/or advertiser featured in the content received from a broadcast source **120** and outputted on the broadcast receiving system **140**.

Conditional language, such as, among others, "can," "could," "might," or "may," unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or steps. Thus, such conditional language is not generally intended to imply that features, elements and/or steps are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without user input or prompting, whether these features, elements and/or steps are included or are to be performed in any particular embodiment.

In certain embodiments, the acts, methods, and processes described herein are implemented within, or using, software modules (programs) that are executed by one or more general purpose computers. The software modules may be stored on or within any suitable computer-readable medium. It should be understood that the various steps may alternatively be implemented in-whole or in-part within specially designed hardware. The skilled artisan will recognize that not all calculations, analyses and/or optimization require the use of computers, though any of the above-described methods, calculations or analyses can be facilitated through the use of computers.

Although the foregoing systems and methods have been described in terms of certain preferred embodiments, other embodiments will be apparent to those of ordinary skill in the art from the disclosure herein. Additionally, other combinations, omissions, substitutions and modifications will be apparent to the skilled artisan in view of the disclosure herein. While certain embodiments of the inventions have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions. Indeed, the novel methods and systems described herein may be embodied in a variety of other forms without departing from the spirit thereof. Further, the disclosure herein of any particular feature, aspect, method, property, characteristic, quality, attribute, element, or the like in connection with an embodiment can be used in all other embodiments set forth herein. Accordingly, other combinations, omissions, substitutions and modifications will be apparent to the skilled artisan in view of the disclosure herein.

What is claimed is:

**1**. A method for associating a secondary media content with a primary broadcast segment:

obtaining information about a broadcast communications medium received by a plurality of user devices;

obtaining the information about the broadcast communications medium to determine at least data enabling the identification of a specific instance of a primary broadcast segment conveyed on the broadcast communications medium;

selecting at least a secondary media content based on at least one criterion;

determining uniquely identifying data specific to the secondary media content, wherein at least the uniquely identifying data is stored in a database;

transmitting at least the secondary media content and the uniquely identifying data to a user device of the plurality of user devices on a secondary communications medium discrete from the broadcast communications medium, wherein the secondary media content is configured to be presented substantially concurrently with the primary broadcast segment received by the user device on the broadcast communications medium;

monitoring response messages received from the user device in response to a presentation of the secondary media content, wherein at least one response message includes at least the uniquely identifying data specific to the secondary media content; and

obtaining a report on user activity, the report correlating user activity with the secondary media content using the uniquely identifying data specific to the secondary media content.

**2**. The method of claim **1**, wherein the broadcast communications medium and the secondary communications medium different types of communications medium.

**3**. The method of claim **1**, wherein the at least one criterion is modified based at least partly on the report on user activity.

**4**. The method of claim **3**, wherein the at least one criterion is modified continuously.

**5**. A method for combining multiple media content in a receiving system:

obtaining, by the receiving system, a first media broadcast;

outputting on the receiving system a first media content comprised in the first media broadcast of;

obtaining, by the receiving system, a second media content and uniquely identifying data specific to the secondary media content via a secondary media content transmission discrete from the first media content broadcast;

obtaining at least one criterion correlated to the second media content;

evaluating the at least one criterion in reference to usage data for the receiving system;

outputting, based at least partly on the evaluation, at least the second media content on the receiving system, wherein the second media content is configured to be concurrently presented in association with the first media content; and

sending a response containing at least uniquely identifying data associated with the second media content.

**6**. The method of claim **5**, further comprising communicating obtainment of the first media signal-broadcast to a media signal association system.

**7**. The method of claim **5**, further comprising communicating a status of the receiving system to a media signal association system.

**8**. The method of claim **5**, further comprising:

obtaining data specific to an instance of outputting of the second media content;

detecting a user response to the second media content; and

transmitting at least the data specific to an instance of outputting to a computer server.

**9**. A system for combining multiple media comprising:

a first receiver module configured to receive at least a first media content and data enabling the identification of a specific instance of the first media content from a first broadcast medium;

a second receiver module configured to receive at least a second media signal content and uniquely identifying data specific to at least the second media content, the second media content received discretely from the first media content;

an output system configured to present concurrently the first media content and the second media content on an output of the first receiver module or the second receiver module;

an input module configured to receive at least a response input responsive to the second media content; and

a transmitting module configured to transmit a response message having at least the uniquely identifying data specific to the second media content to a computer server.

**10**. The system of claim **9** further comprising an output selection module configured to limit the output of the first and second media content based on a criterion.

**11**. The system of claim **9** further comprising a computer storage device configured to store at least one of one the first and second media content.

**12**. A method for associating a secondary media content presentation to a primary broadcast segment:

obtaining information about a first media content broadcast received by a plurality of user devices;

organizing the information about the first media content broadcast to determine at least data enabling the identification of a specific instance of a primary broadcast segment conveyed by the first media content broadcast;

selecting at least a secondary media content based on at least one criterion;

determining uniquely identifying data specific to the secondary media content, wherein at least the uniquely identifying data is stored in a database;

enabling access of at least the secondary media content and the uniquely identifying data to a user device of the plurality of user devices via at least a secondary media content transmission discrete from the first media content broadcast, wherein the secondary media content is configured to be concurrently presented in association with the primary broadcast segment, wherein the primary broadcast segment is accessible to the user device via the first media content broadcast;

enabling access to one or more response messages received from the user device in relation to a contextual presentation of the secondary media content, the one or more response messages including at least the uniquely identifying data specific to the secondary media content; and

obtaining a report on user activity, the report correlating user activity with at least the secondary media content broadcast and the uniquely identifying data specific to the secondary media content broadcast.

**13**. The method of claim **2**, wherein the broadcast communications medium comprises a radio broadcast and the secondary communications medium comprises a mobile wireless transmission.

**14**. The method of claim **1**, wherein the report further correlates the user activity with the specific instance of the primary broadcast segment.

**15**. The system of claim **9**, wherein, in response to receiving the response message, the computer server is configured to correlate the response message to the second media content with the specific instance of the first media content.

**16**. The method of claim **12**, whereby the data enabling the identification of a specific instance of a primary broadcast segment conveyed by the first media content broadcast and the uniquely identifying data specific to the secondary media content are cross referenced in the database.

**17**. The method of claim **12**, whereby the report correlating user activity includes secondary media content presentation activity obtained from the user device.

**18**. The method of claim **12**, whereby the secondary media content transmission is conveyed substantially synchronously with the first media content broadcast, discretely separated by time multiplexing.

**19**. The method of claim **12**, whereby the secondary media content transmission is conveyed substantially synchronously with the first media content broadcast, discretely separated by frequency multiplexing.

**20**. The method of claim **12**, whereby the secondary media content transmission is conveyed by means of at least one of the following: discrete multi-tone modulation, in-band on-channel (IBOC) radio, Digital Radio Mondial, CDMA, HSDPA, WiFi, RDS, RBDS, GPRS, mobile wireless network, satellite communication, Ethernet.

**21**. The method of claim **1**, wherein the at least one response message includes data that enables identification of a responder.

**22**. The method of claim **5**, wherein the response further includes data that data that enables identification of a responder.

**23**. The system of claim **9**, wherein the response message includes data that enables identification of a responder.

**24**. The method of claim **12**, wherein at least one of the response messages includes data that enables identification of a responder.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 8,166,081 B2
APPLICATION NO. : 12/366535
DATED : April 24, 2012
INVENTOR(S) : Kelly M. Christensen et al.



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

| Issued Patent Column | Line | Description of Discrepancy |
|---|---|---|
| (Item 56) Title Page 2 Col. 2 | 41 | Under Other Publications, change "“Sirus" to --"Sirius--. |
| In the Specifications: | | |
| 6 | 45 | Change "WIFI," to --WiFi--. |
| 10 | 40 | Change "information." to --information--. |
| 28 | 50 | Change "on going." to --ongoing.--. |
| 32 | 28 | Change "farther" to --further--. |
| In the Claims: | | |
| 34 | 52 | In Claim 2, after "medium" insert --are--. |
| 34 | 61 | In Claim 5, change "broadcast of;" to --broadcast;--. |
| 35 | 11 | In Claim 6, after "media" delete "signal-". |
| 35 | 20 | In Claim 8, before "instance" change "an" to --the--. |
| 35 | 21 | In Claim 8, before "outputting" insert --the--. |
| 35 | 28 | In Claim 9, after "media" delete "signal". |
| 35 | 46 | In Claim 11, change "one of one the" to --one of the--. |
| 36 | 47 | In Claim 20, change "Mondial," to --Mondiale,--. |
| 36 | 54 | In Claim 22, change "data that data that" to --data that--. |

Signed and Sealed this
Fourth Day of June, 2013

Teresa Stanek Rea

*Acting Director of the United States Patent and Trademark Office*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1719 and 2023-1721

**Short Case Caption:** StratosAudio, Inc. v. Hyundai Motor America

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 9,487 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 08/01/2023

Signature: /s/ Robert Greenspoon

Name: Robert Greenspoon

Save for Filing